# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

In re,                          :    **Chapter 11**

RAMSEY HOLDINGS, INC., *et al.*, :    **Case No. 09–13998-M**

:    **(Jointly Administered with
Case Nos. 09-13999-M, 09-
14000-M, 09-14001-M and 09-
14002-M)**

Debtors. :

---

### FIRST AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF REORGANIZATION OF AFFILIATED DEBTORS: RAMSEY HOLDINGS, INC.; RAMSEY INDUSTRIES, INC.; RAMSEY WINCH COMPANY.; AUTO CRANE COMPANY; AND ESKRIDGE, INC.

/s/ John D. Dale
Sidney K. Swinson, OBA No. 8804
John D. Dale, OBA No. 19787
Mark D.G. Sanders, CT No. 402798
Brandon C. Bickle, OBA No. 22064
Sarah G. Powers, OBA No. 22688
**GableGotwals, P.C.**
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103
918.595.4800 (telephone)
918.595.4990 (facsimile)
*Attorneys for Debtors-in-Possession*

**THIS FIRST AMENDED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE COURT UNDER § 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF § 1125(a) OF THE BANKRUPTCY CODE.**

April 29, 2010.

Ramsey Holdings, Inc. ("Ramsey Holdings") Ramsey Industries, Inc. ("Ramsey Industries"), Auto Crane Company ("Auto Crane"), Ramsey Winch Company ("Ramsey Winch"), and Eskridge, Inc. ("Eskridge"), as debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors" or the "Reorganized Debtors") submit this *First Amended Disclosure Statement for Joint Plan of Reorganization of Affiliated Debtors: Ramsey Holdings, Inc.; Ramsey Industries, Inc.; Ramsey Winch Company; Auto Crane Company; and Eskridge, Inc.* (the "Disclosure Statement") under Chapter 11 of the Bankruptcy Code.

## ARTICLE I.

## INTRODUCTION

On December 18, 2009 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Court"). On December 29, 2009 the Court entered its *Order Directing Joint Administration of Related Chapter 11 Cases* for administrative purposes. Consequently, the Debtors' chapter 11 cases are being jointly administered by the Court.

Since the Petition Date the Debtors have continued to operate their businesses in the ordinary course and pay their employees and other ordinary course (postpetition) creditors in full and on time, as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

This Disclosure Statement is submitted pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against, and Interests in, the Debtors in connection with (i) the solicitation of acceptances of the Debtors' *First Amended Joint Plan of Reorganization of Affiliated Debtors* (the "Plan") filed with the Court on or about April 29, 2010, and (ii) the hearing to consider confirmation of the Plan, scheduled for _____ __, 2010 at ___.m.

The Plan describes the manner in which Claims against and Interests in the Debtors will be classified and satisfied. The Plan is attached to this Disclosure Statement as Exhibit "A-1". **Wherever defined terms of the Plan are used but are not otherwise defined in this Disclosure Statement, such terms shall have the meanings ascribed thereto in the Plan.**

On May __, 2010, after notice and a hearing, the Court entered its *Order (i) Approving Disclosure Statement: (ii) the Disclosure Statement Order; (ii) Approving Solicitation and Voting Procedures with Respect to Debtors' Chapter 11 Plan; and (iii) Scheduling Certain in Connection Therewith* (the "Disclosure Statement Order"), which, among other things, approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment as to whether to accept or reject the Plan. A copy of the Disclosure Statement Order is attached hereto as Exhibit "F". Approval of this Disclosure Statement does not constitute a determination by the Court as to the fairness or merits of the Plan.

Only certain classes of creditors and interest holders are entitled to vote to accept or reject the Plan. Non-Debtor entities whose claims against, or interests in, one or more of the Debtors are classified as "Impaired" by the Plan are generally permitted to vote to accept or reject the Plan. Administrative Claims and Tax Claims are not classified or Impaired under the Plan; thus the votes of Holders of such Claims are not being solicited. In addition, certain other classes of Claims or Interests are not being solicited because they are deemed either to have accepted or rejected the Plan, as described more fully in ARTICLE VI of this Disclosure Statement.

The Bankruptcy Code provides that only Holders who actually vote on the Plan will be counted for purposes of determining whether the requisite acceptances of the Classes of Claims have been received to permit confirmation of the Plan. Failure by a Holder of a Claim to deliver a duly completed and signed ballot by the Voting Record Date will constitute an abstention by such holder with respect to a vote on the Plan. Abstentions will not be counted as votes to accept or reject the Plan and, therefore, will not be considered in the tabulation of votes.

The requirements for approval of the Plan, including the vote of creditors and interest holders to accept the Plan and certain statutory findings that must be made by the Court, are fully described below in ARTICLE VIII entitled "Voting and Confirmation of the Plan." If the Debtors do not receive the requisite acceptances by the Voting Record Date or if the Court declines to confirm the Plan, the Debtors will evaluate other options available to them.

Confirmation of the Plan and the occurrence of the Effective Date thereof are subject to a number of material conditions precedent. There can be no assurance that these conditions will be satisfied or waived, although the Debtors are confident of their ability to consummate the Plan.

The Plan provides for the continued operation of the Debtors' businesses. The Debtors submit the Plan because the reorganization proposed by the Plan will provide more value to creditors than a liquidation of the Debtors' assets. To achieve such value, the Plan contemplates treatment of the Debtors' secured and unsecured creditors in accordance with the classifications set forth more fully in the Plan. You should review the proposed classifications and the treatment to be afforded each Class carefully before voting to accept or reject the Plan.

**THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST POSSIBLE RETURN TO HOLDERS OF ALL CLAIMS. THE DEBTORS STRONGLY URGE YOU TO READ THIS DISCLOSURE STATEMENT AND VOTE IN FAVOR OF THE PLAN. ADDITIONALLY, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS ESTABLISHED IN THESE CHAPTER 11 CASES FULLY SUPPORTS CONFIRMATION OF THE PLAN, AND URGES YOU TO VOTE IN FAVOR OF THE PLAN.**

Attached as Exhibits to this Disclosure Statement are copies of the following:

- Exhibit A – Plan and Related Documents
    - o  A-1 – Joint Plan of Reorganization of Affiliated Debtors;
    - o  A-2 – Plan Term Sheet
    - o  A-3 – LLC Agreement Term Sheet
    - o  A-4 – Exit Term Loan Term Sheet
    - o  A-5 – Exit Revolving Facility Commitment Letter with Exit Revolving Facility Term Sheet
    - o  A-6 – Management Incentive Plan Term Sheet
    - o  A-7 – Administrative Agent Fee Letter

- Exhibit B – Financial Statements;
    - o  B-1 – Audited Financial Statements for 2006;
    - o  B-2 – Audited Financial Statements for 2007;
    - o  B-3 – Unaudited Financial Statements for 2008;

- Exhibit C – Bank Account Balances as of February 26, 2010;

- Exhibit D – Liquidation Analysis;

- Exhibit E – Balance Sheet and Income Statement from the Debtors' Monthly Operating Reports for periods ending (i) December 31, 2009; (ii) January 31, 2010; and (iii) February 28, 2010; and

- Exhibit F – Disclosure Statement Order

In addition, for the Holders of Claims and Interests that the Debtors believe are entitled to vote to accept or reject the Plan a Court-approved ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement. **TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED NOT LATER THAN THE VOTING RECORD DATE OF 5:00 O'CLOCK P.M., PREVAILING CENTRAL TIME, _____ __, 2010.**

The Disclosure Statement Order, which is attached hereto as Exhibit "F", sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating votes. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made other than pursuant to Section 1125 of the Bankruptcy Code.

The following Articles of this Disclosure Statement contain, among other things, an overview of certain material provisions of the Plan. Those summaries do not purport to be complete, and are qualified in their entirety by reference to all the provisions of the Plan itself, including all exhibits and documents described therein and the definitions therein of certain terms used herein.

## ARTICLE II.

## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business and capital structure for the benefit of its estate, creditors and equity interest holders. In addition to rehabilitating the debtor, Chapter 11 also promotes equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

Commencing a Chapter 11 case creates an estate that contains all of a debtor's property as of the filing date. Usually, as here, the debtor remains in exclusive possession of its property and continues to operate in the ordinary course of business as a "debtor-in-possession" with the powers and responsibilities of a bankruptcy trustee.

The principal objective of a Chapter 11 case is the consummation of a plan of reorganization. A plan of reorganization sets forth the treatment of claims against, and equity interests in, a debtor. Once the bankruptcy court confirms a plan of reorganization, the terms of the plan become binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the Plan and any creditor or equity interest holder of the debtor. Generally, an order of the bankruptcy court confirming a plan of reorganization discharges the debtor from any debt that arose prior to the date of confirmation of the plan, and substitutes for that debt the obligations specified under the confirmed plan. The Debtors' Plan provides for such a discharge in these Chapter 11 Cases.

A holder of an impaired claim or interest that is receiving a distribution under a plan is entitled to vote to accept or reject a plan of reorganization. A claim or interest is "impaired" under a plan of reorganization if the plan provides that such claim will not be repaid in full or that the legal, equitable or contractual rights of the holder of such claim or interest are changed.

Chapter 11 does not require that every holder of a claim or interest vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. However, the plan must meet a number of statutory tests—including a minimum level of acceptance—before the plan may be confirmed.

In order to solicit acceptances of a proposed plan, plan proponents, like the Debtors here, must prepare and distribute a disclosure statement to its creditors and equity interest holders entitled to vote on the plan. Section 1125 of the Bankruptcy Code requires that the disclosure statement contain adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the Plan. The Debtors have prepared this Disclosure Statement in accordance with the requirements of Section 1125.

# ARTICLE III.

## DESCRIPTION OF THE DEBTORS AND THEIR PAST OPERATIONS

### Section 3.01   Corporate Organization.

Ramsey Industries is a wholly owned subsidiary of Ramsey Holdings, a holding company currently owned by, among others, Gridiron Capital Fund, L.P. (51.6501%), Gridiron Strategic Advisors (4.0116%), Gridiron Co-Investors (1.8043%), AEA Mezzanine Fund L.P. (4.4539%) and Phoenix Life Insurance (9.1918%).  The operating entities, Auto Crane, Ramsey Winch and Eskridge, are all wholly owned subsidiaries of Ramsey Industries.

### Section 3.02   Company History.

In 1944, Claude Ramsey and his brother, Rayburn, founded Ramsey Winch, which originally manufactured aircraft parts, tools and dies for Douglas Aircraft Company.  In 1945, Ramsey Winch began manufacturing a front-mounted winch for passenger cars and pickups.

Auto Crane was established by Claire Simmons and Carl White in 1958 to manufacture a small crane designed to handle rock bits for Hughes Tool Company. Auto Crane's name originated from the fact the cranes were placed inside the trunks of automobiles.

Eskridge was founded as a Missouri corporation in 1972 by Wade Eskridge. In January 2008, the majority of the assets of Eskridge were acquired by a new Eskridge entity (a Delaware corporation) created as a wholly-owned subsidiary of Ramsey Industries.

### Section 3.03   Current Operations.

Headquartered in Tulsa, Oklahoma, the Ramsey Industries companies are leading manufacturers and suppliers of high-quality winches, cranes, crane service bodies, gear drives, and brake products, sold through distributors, truck outfitters, and original equipment manufacturers to end users in the towing and recovery, mining, oil and gas, forestry, non-residential construction, municipal, energy, and utility industries.   The Ramsey Industries' operating entities are organized as follows.

(i)     Ramsey Winch:  With manufacturing operations in Tulsa, Ramsey Winch offers a broad range of industrial (utility, towing and recovery) and consumer (off-road and ATV) winches, and has a dominant market share in the towing and recovery industry.

(ii)    Eskridge:  Eskridge, located in Olathe, Kansas, is a leading designer, manufacturer, and marketer of planetary gear drives, auger drives, and multiple-disc brakes, which are used in demolition and construction vehicles and equipment.

(iii)   Auto Crane:  Auto Crane, with manufacturing operations in Tulsa, manufactures a comprehensive line of truck-mounted telescopic and articulating cranes, crane service bodies, and accessories. Auto Crane offers models with the capability of

lifting 14,000 pounds. In 2009, Auto Crane expanded its body line by introducing the Titan Service Body (the reconfigured "Titan" and the "Titan Elite" crane service body product line) and the "NexStar" totally proportional crane control system.

### Section 3.04   Labor Force.

The Debtors have sales and distribution personnel throughout the United States, as well as in Australia, Canada, and Europe. The Debtors directly employ approximately 174 individuals located in the United States, primarily in Oklahoma and Kansas, which include hourly and salaried employees. In addition, the Debtors retain the services of a number of independent contractors that are sourced through various agencies and other third-party providers.

The Debtors offer employees a wide range of benefits including medical, vision and prescription insurance. The Debtors also offer a 401-k program under which they will match 100% of the employee's contribution up to 3% of the employee's wage or salary and 50% for any amount contributed over 3% but not exceeding 5% of the employee's wage or salary.

### Section 3.05   Prepetition Debt Structure.

The Debtors' prepetition debt structure consists of the following:

(i)    a senior secured credit facility structured under that certain prepetition credit agreement (the "Prepetition Senior Credit Agreement"), which provided for two term loans (the "Term Loans") in the original principal amount of approximately $59 million and a revolving line of credit with a maximum credit availability of approximately $10 million (the "Revolver"); and

(ii)   four (4) unsecured 15.0% Senior Subordinated Promissory Notes, due 2014 (the "Subordinated Notes"), in the aggregate original principal amount of approximately $22.3 million, issued to AEA Mezzanine Funding LLC and AEA Mezzanine (Unleveraged) Fund LP (collectively, the "Junior Lenders").

On November 19, 2009, CIT Lending Services Corporation and CIT Group, Inc., as the respective counterparties to two (2) related interest-rate swap agreements, provided the Debtors with notice of termination of said interest-rate swap agreements. As a result, additional amounts of approximately $1.1 million and $1.5 million are owed under the Prepetition Senior Credit Agreement on account of the termination of the related interest-rate swap agreements. The Debtors' obligations under the Prepetition Senior Credit Agreement are secured by a first priority lien on substantially all of the Debtors' assets. As of the Petition Date, each of the Debtors was jointly and severally liable to the Prepetition Senior Lenders under the Prepetition Senior Credit Agreement, including the swap agreements, in the aggregate principal amount of not less than $71,190,825 (plus accrued and unpaid prepetition interest, fees, costs and other expenses).

As of the Petition Date, there remained approximately $22 million in original principal plus approximately $4 million of capitalized accrued interest outstanding to the Junior Lenders under the Subordinated Notes.

In addition, as of the Petition Date, the Debtors owed, in the aggregate, approximately $4.8 million in trade vendor and other miscellaneous unsecured debts. Of that amount approximately $1.4 million is attributable to goods received by the Debtors within twenty days before the commencement of the Debtors' bankruptcy cases. Such claims, to the extent they are Allowed, constitute administrative claims under Section 503(b)(9) of the Bankruptcy Code, entitled to priority under Section § 507(a)(2) of the Bankruptcy Code. The vast majority of the trade debt is owed by the operating entities: Auto Crane, Ramsey Winch and Eskridge.

**Section 3.06   Management of the Debtors.**

Management of the Debtors' operations and business affairs is vested in their Boards of Directors, which currently consist of seven (7) persons—the same persons are directors and officers of each of the Debtors. The following persons currently serve on the Boards of Directors and as Officers of each of the Debtors as indicated:

<u>Members of the Boards of Directors of the Debtors</u>

| Officer and/or Director Name | Principal Employer |
| --- | --- |
| Thomas A. Burger, Jr., Director, Vice President, Assistant Treasurer and Assistant Secretary | Gridiron Capital, L.L.C. |
| Timothy Clark, Director, Vice President, Assistant Treasurer and Assistant Secretary | Gridiron Capital, L.L.C. |
| Joseph A. Saldutti, Jr., Director, Vice President, Assistant Secretary | Gridiron Capital, L.L.C. |
| Geoffrey D. Spillane, Director | Gridiron Capital, L.L.C. |
| Richard Blaudow, Director | Advanced Technology Services |
| Michael Walsh, Director | Gridiron Capital, L.L.C. |
| John R. Celoni, Jr., Director, President and Chief Executive Officer | Ramsey Holdings, Ramsey Industries, Ramsey Winch, Auto Crane and Eskridge |
| Michael Barber, Chief Operations Officer | Ramsey Holdings, Ramsey Industries, Ramsey Winch, Auto Crane and Eskridge |
| Don Helms, Chief Financial Officer | Ramsey Holdings, Ramsey Industries, Ramsey Winch, Auto Crane and Eskridge |

## ARTICLE IV.

## KEY EVENTS LEADING TO THE FILING OF THE CHAPTER 11 PETITIONS

In April 2007, Gridiron Capital, LLC ("Sponsor") purchased the Debtors (excluding Eskridge) with the proceeds of a $69 million credit facility provided by the Prepetition Senior Lenders and $18.5 million in additional credit provided by the Junior Lenders. In January 2008, the Debtors (excluding Eskridge) acquired substantially all of the assets of Eskridge, Inc., a Missouri corporation, with the proceeds of a new $10 million loan from the Prepetition Senior Lenders.

The Debtors have experienced a significant decline in sales due primarily to the ongoing domestic and global recessions, and particularly the impact of these recessions on the automotive and construction industries, which are the primary industries that generate the Debtors' sales. As a result of the recession, the Debtors' revenues prior to the Petition Date declined by more than fifty percent (50%) since approximately January 2008. The Debtors have taken a number of actions over the past two years to streamline their businesses and reduce operational expenses, which include (i) consolidating the Ramsey Winch and Auto Crane facilities in Tulsa, Oklahoma; (ii) adjusting plant schedules to meet demand; (iii) lowering payroll expenses through multiple reductions in force and significant pay cuts for the salaried work force; (iv) reducing inventory; (v) active collections management; and (vi) significantly increasing cash on hand. Despite these actions, the Debtors were still unable to service their substantial long-term obligations to the Prepetition Senior Lenders and Junior Lenders, which date from a period in which the Debtors' revenues were more than twice what they are today.

Since the Sponsor's acquisition of the Debtors, the Debtors' EBITDA has declined dramatically, leaving them with insufficient cash flow to pay their long-term debt obligations as they became due. As a result, in or about December 2008, the Debtors defaulted under the Prepetition Senior Credit Agreement due to a failure to satisfy certain financial covenants. The Debtors made their last payments to the Prepetition Senior Lenders on or about June 30, 2009. After June 30, 2009, the Debtors entered into a series of forbearance agreements with the Prepetition Senior Lenders under the Prepetition Senior Credit Agreement regarding the financial covenant and other defaults. During this period, the Debtors engaged in continual negotiations with the Prepetition Senior Lenders and the Junior Lenders and the holders of the Debtors' equity ("Existing Equity"), led by the Sponsor, regarding a consensual balance-sheet restructuring, whether in or out of court.

Further, in anticipation of reorganization, the Debtors necessarily increased their cash reserves prior to the Petition Date by slowing capital expenditures and other operation and product improvements, stretching accounts payable and ceasing their interest payments to the Prepetition Senior Lenders and Junior Lenders. These steps, along with the Debtors' over-levered balance sheet, have put the Debtors' businesses at significant risk and strategic competitive disadvantage if they cannot restructure and de-lever quickly and effectively. The Debtors must resume making critical capital expenditures and product developments in the near future to continue providing high-quality products and preserve their businesses.

From approximately October 25, 2009, through the Petition Date, the Prepetition Senior Lenders and the Debtors were parties to a Sweep-but-Standstill Agreement (the "Standstill") under which the Prepetition Senior Lenders and the Debtors agreed, among other things, to the terms of a forbearance. Prior to the Petition Date, the Standstill had been extended on five (5) occasions and was scheduled to expire on the Petition Date at 5:00 p.m., EST, after which time, the Debtors' cash would have been available to the Prepetition Senior Lenders. Notwithstanding the Standstill and good faith efforts by the Debtors, the Prepetition Senior Lenders, the Junior Lenders and Sponsor, those parties were unable to reach an agreement prior to the expiration of the Standstill on December 18, 2009. Consequently, the Debtors' boards of directors determined that the best course for each of the Debtors was to file voluntary petitions for relief under chapter 11 to obtain the benefits of the Bankruptcy Code, including the automatic stay.

## ARTICLE V.

## THE DEBTORS' CHAPTER 11 CASES

### Section 5.01   "First Day" Motions in the Chapter 11 Cases.

Simultaneous with the filing of the Debtors' chapter 11 petitions, the Debtors filed numerous "first day" motions, described more fully below, seeking orders from the Court authorizing the Debtors to: (i) retain professionals; (ii) use cash collateral secured to the Prepetition Senior Lenders; (iii) have their cases jointly administered, (iv) pay certain prepetition wages and salaries and payroll taxes; and (v) pay prepetition sales, use and franchise taxes.

On the Petition Date, the Debtors filed a motion seeking authority to employ the law firm of GABLEGOTWALS, P.C. as bankruptcy counsel. On January 11, 2010, the Court granted the motion, thereby authorizing GABLEGOTWALS to be the Debtors' general bankruptcy counsel. On January 14, 2010, the Debtors filed a motion to employ Koehler & Associates, Inc. as Accountants to assist with, among other things, the preparation of the monthly operating reports required by the United States Trustee's *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* to be filed with the Court during the pendency of the Chapter 11 Cases ("MOR(s)"). On January 15, 2010, the Court granted the motion to employ Koehler & Associates, Inc. Finally, on January 20, 2010, the Debtors filed their motion to employ David R. Payne and Associates ("Payne") as valuation expert, including to determine the value of the Debtors' businesses as a going concern. On January 21, 2010, the Court granted the motion to employ Payne.

The Prepetition Senior Lenders' collateral consists of, among other things, all of the Debtors' cash, accounts receivable and accounts. To use this collateral, known as "cash collateral," the Debtors were required to provide special protection to the Prepetition Senior Lenders under Section 363 of the Bankruptcy Code to guard against the dissipation of their cash collateral. Thus, on the Petition Date, the Debtors filed a motion seeking the Court's authority to use cash collateral, and on December 28, 2009, the Court entered an Interim Order authorizing the Debtors to use cash collateral in their ordinary course of business, subject to certain terms and conditions constituting "adequate protection." On January 6, 2010, the Court entered its Second Interim Order authorizing the Debtors to use cash collateral in their ordinary course of business on terms and conditions essentially identical to those provided in the original Interim

Order.  By Order dated January 28, 2010, the Court extended the Second Interim Order to February 4, 2010.  By Order dated February 4, 2010, the Court entered a Third Interim Order authorizing use of cash collateral through March 9, 2010, on the same terms and conditions as the Second Interim Order.  On March 9, 2010, as amended by an Order dated March 12, 2010, the Court entered a Fourth Interim Order authorizing use of cash collateral through March 23, 2010, on the same terms and conditions as the Third Interim Order. On March 24, 2010, the Bankruptcy Court entered a final Order authorizing the use of cash collateral, and the Prepetition Lenders' other collateral, over a period of approximately four (4) months.

Finally, on the Petition Date, the Debtors filed a motion seeking authority to pay prepetition wages and salaries and payroll taxes related thereto ("Wage Motion").  Due to the Debtors' employees being paid in arrears and the next payday occurring after the Petition Date, such wages and salaries constituted prepetition debt which required the Debtors to obtain court approval in order to pay the wages and salaries outside of a chapter 11 plan.  On December 29, 2009, the Court granted the Wage Motion to the extent that none of the wages or salaries to be paid would exceed the statutory priority limit of $10,950 per employee and also permitted the taxes associated with the same be paid.  All of the Debtors' employees' prepetition wages and salaries and related payroll taxes have been paid.  On January 15, 2010, the Debtors filed their motion for an order supplementing the Wage Motion, and on February 16, 2010,  the Court granted the supplemental motion, thereby authorizing the payment of certain restructuring bonuses, but only to the extent that such payment did not exceed the statutory priority limit of $10,950 per employee—taking into account the wages paid under the Order granting the Wage Motion.

### Section 5.02   Appointment of Creditors' Committee.

On January 27, 2010, the Assistant United States Trustee overseeing the Debtors' Chapter 11 Cases appointed a creditors' committee to represent the general unsecured creditors of the Debtors (the "Committee"). The Committee is comprised of the following entities.

- AEA Mezzanine Funding B LLC

- Optimas Manufacturing Solutions II, LLC

- Metalwest

- Elliott Precision Products, Inc.

- Cooper Gear & Manufacturing, Inc.

- Farrar Corporation

On February 23, 2010, the Committee filed its application to employ the law firm of Sneed Lang Herrold, P.C. as counsel for the Committee. The Court, by Order dated February 26, 2010, granted the Committee's application to employ counsel.

### Section 5.03    Post-Petition Operations.

Operations of the Debtors have continued without significant interruption or material change since the Petition Date. Since that date, the Debtors have generated sufficient cash to sustain their operations and all post-petition obligations. Results of the Debtors' operations from December 18, 2009 through February 28, 2010 are reflected in the balance sheets and income statements in the MORs that are attached hereto as Exhibit "E". The Debtors and Reorganized Debtors shall continue to file MORs when due through the confirmation of the Plan, and thereafter shall file timely *Post-Confirmation Operating Reports* through the closing of the Chapter 11 Cases.

### Section 5.04    Settlements Under the Plan of Reorganization.

The Plan incorporates a compromise and settlement under Bankruptcy Rule 9019 among requisite majorities of the Prepetition Senior Lenders, the Junior Lenders, the Sponsor and the Debtors.

The holders of the Prepetition Senior Facility Claims hold the largest claims against the Debtors. These claims are secured by first priority liens on substantially all of the Debtors' assets. Given the magnitude of the Prepetition Senior Facility Claims, in the absence of a consensual restructuring, the absolute priority rule in Section 1129(b) of the Bankruptcy Code would preclude the distribution of any value to junior classes, including Class 4 (General Unsecured Claims) and Class 10 (Parent Equity Interests). In addition, distributions otherwise payable to Class 6 (Junior Lender Claims), which are contractually subordinated to the Prepetition Senior Facility Claims, would be paid directly to the holders of the Prepetition Senior Facility Claims and the holders of Junior Lender Claims would receive no distribution.

Prior to and following the Petition Date, the Debtors, the Sponsor, the Administrative Agent and the Junior Lender Agent had extensive negotiations concerning a consensual restructuring and the advantages of facilitating a rapid conclusion to these Chapter 11 Cases. On February 3, 2010, these negotiations culminated in a Plan Term Sheet, a copy of which is attached hereto as Exhibit "A-2", which forms the basis for the Plan. The Plan Term Sheet was agreed to by the Debtors, the Administrative Agent, certain of the Prepetition Senior Lenders, the Junior Lenders and the Sponsor. Under the Plan, the holders of Prepetition Senior Facility Claims have agreed to share a portion of the value to which they would otherwise be entitled with holders of Claims in Classes 4 (General Unsecured Claims) and 6 (Junior Lender Claims), and with holders of Interests in Class 10 (Parent Equity Interests).

### Section 5.05    The Plan, Disclosure Statement and Hearings thereon.

On or about April 29, 2010, the Debtors filed this Disclosure Statement and the Plan with the Court. The Court considered the adequacy of the Disclosure Statement at a hearing on May 3, 2010. The Confirmation Hearing in respect of the Plan has been scheduled for _____, 2010 at _____ o'clock __.m., Prevailing Central Time, before the Honorable Terrance L. Michael, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder Avenue, Tulsa, Oklahoma 74103.

**Section 5.06    Summary of the Plan.**

Commencing the Chapter 11 Cases was a difficult decision for the Boards of Directors of the Debtors, yet a decision that was necessary because of the Debtors' inability to make the requisite payments under the Prepetition Senior Credit Agreement and the Subordinated Notes. Selling the Debtors' assets, including real and personal property, is not in the best interests of the Debtors' estates because the Debtors' value is based upon their continued operation. The Plan is the product of many hours of research and analysis by the Debtors' Boards of Directors to achieve what is sincerely believed to be a fair balance between paying as much as the Debtors reasonably can to the Prepetition Senior Lenders, the Junior Lenders and Holders of Allowed General Unsecured Claims without jeopardizing the financial stability of the Debtors. The Debtors urge you to vote in favor of the Plan.

As part of the Debtors' reorganization provided for in the Plan, the debt owed to the Prepetition Senior Lenders is being recapitalized. In implementation thereof, on or before the Effective Date, the Debtors will execute and deliver to the Administrative Agent, for the benefit of the Prepetition Senior Lenders, the Exit Term Loan, which is a term promissory note, in the original principal amount of $50,000,000, with a maturity date of October 31, 2013, the terms of which are more fully set forth on the Exit Term Loan Term Sheet attached hereto as Exhibit "A-4". Additionally, on the Effective Date, the Debtors will enter into the Exit Revolving Facility, pursuant to the terms set forth in the Exit Revolving Facility Commitment Letter with Exit Facility Term Sheet attached hereto as Exhibit "A-5", which is a senior secured first-lien $3,000,000 revolving credit facility. In order to secure the repayment of the Exit Term Loan and Exit Revolving Facility, the Debtors will grant a senior secured first-priority security interest (and other Liens) in substantially all of the Debtors' personal and real property. The remainder of the Prepetition Senior Lenders' claims will be satisfied through the issuance of new equity interests (72%) in a newly formed parent entity—Ramsey LLC—of the Debtors pursuant to the terms set forth on the LLC Agreement Term Sheet attached hereto as Exhibit "A-3".

The Junior Lenders' claims will be satisfied by the conversion of their debt to equity (13.5%) pursuant to the terms of the Plan and the LLC Agreement Term Sheet. The remaining equity interests in the newly formed parent entity will be held by (i) Existing Equity (4.5%) pursuant to the terms of the Plan and the LLC Agreement Term Sheet and (ii) the Debtors' management (10%) pursuant to the terms set forth on the Management Incentive Plan Term Sheet attached hereto as Exhibit "A-6". In addition, as part of the compromise that resulted in the Plan Term Sheet, certain of the fees and expenses of the Administrative Agent, Junior Lenders and Sponsor shall be reimbursed as described in Section 7.04 of this Disclosure Statement.

The Debtors' liabilities for trade obligations (*i.e.*, for goods and services provided to the Debtors on credit) and other unsecured debts, will receive a substantial distribution under the Plan. In fact, the Plan proposes to pay Allowed Claims in Class 4, General Unsecured Claims, 90% of such Allowed Claims paid in installments as follows: 50% of such distribution on the Distribution Date and the balance of such distribution in equal monthly installments on the 15th day of each of the following 12 calendar months.

The administrative expenses of these Chapter 11 Cases (including Section 503(b)(9) claims), and the relatively negligible priority tax debt of the Debtors, shall be paid in full as required by the Bankruptcy Code.

The following table provides a thumbnail guide to the Plan's classification and treatment scheme with respect to Claims against and Interests in the Debtors. The table is then followed by a more detailed verbal description of the Plan's classification and treatment provisions. *For a more detailed description of the classification and treatment of Claims and Interests under the Plan, see Article III of the Plan.*

### SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

| CLASS | DESCRIPTION | SUMMARY TREATMENT/STATUS |
|---|---|---|
| Unclassified | Administrative Claims (§ 507(a)(2)) | Holders of Allowed Administrative Claims shall (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable non-bankruptcy law or in the ordinary course of business; or (c) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors. |
| Unclassified | Tax Claims (§ 507(a)(8)) | Holders of Allowed Tax Claims shall (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (c) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors. |
| Class 1 | Prepetition Senior Facility Claims | Holders of Allowed Claims in Class 1 will receive their Pro Rata Share of the Exit Term Loan and payment of Administrative Agent's fees and expenses per the Plan Term Sheet.<br>**IMPAIRED** (entitled to vote) |

| CLASS | DESCRIPTION | SUMMARY TREATMENT/STATUS |
|---|---|---|
| Class 2 | Other Secured Claims | Holders of Allowed Claims in Class 2 (i) at the Debtors' option Holders of Allowed Claims will either have the property that serves as Collateral for its Claim returned or have its Claim cured and Reinstated, or (ii) will receive such other treatment as may be agreed to between the Holder and the Debtors. **UNIMPAIRED** (not entitled to vote, deemed to accept) |
| Class 3 | Other Priority Claims | Holders of Allowed Claims in Class 3 will (i) to the extent such claim is due and owing on the Effective Date, have such Allowed Claim paid in full, in Cash, on the Distribution Date; (ii) to the extent such Allowed Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable non-bankruptcy law or in the ordinary course of business; or (iii) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors. **UNIMPAIRED** (not entitled to vote, deemed to accept) |
| Class 4 | General Unsecured Claims | Holders of Allowed Claims in Class 4  will receive 90% of such Allowed Claim paid in installments as follows: 50% of such Distribution on the Distribution Date and the balance of such Distribution in equal monthly installments on the fifteenth (15th) day of each of the following twelve (12) calendar months. **IMPAIRED** (entitled to vote) |
| Class 5 | Unsecured Deficiency Claims | Holders of Allowed Claims in Class 5  will receive their Pro Rata Share of the Series A Equity Interests. **IMPAIRED** (entitled to vote) |
| Class 6 | Junior Lender Claims | Holders of Allowed Claims in Class 6 will receive their Pro Rata Share of the Series B Equity Interests and payment of the Junior Lenders' fees and expenses per the Plan Term Sheet. **IMPAIRED** (entitled to vote) |
| Class 7 | Administrative Convenience Claims | Holders of Allowed Claims in Class 7 shall (i)  have such Allowed Claim paid in full, in Cash, on the Distribution Date; or (ii) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors. **UNIMPAIRED** (not entitled to vote, deemed to accept) |

| CLASS | DESCRIPTION | SUMMARY TREATMENT/STATUS |
|-------|-------------|--------------------------|
| Class 8 | Intercompany Claims | No property will be distributed to or retained by Holders of Class 8 Intercompany Claims and such Intercompany Claims shall be deemed cancelled and extinguished on the Effective Date.<br>**IMPAIRED** (not entitled to vote, deemed to reject) |
| Class 9 | Intercompany Interests | Allowed Intercompany Interests will be Reinstated on the Effective Date.<br>**UNIMPAIRED** (not entitled to vote, deemed to accept) |
| Class 10 | Parent Equity Interests | Holders of Allowed Claims in Class 10 will receive their Pro Rata share of the Series C Equity Interests and payment of Sponsor's fees and expenses detailed in the Plan Term Sheet.<br>**IMPAIRED** (entitled to vote) |

## ARTICLE VI.

## DESCRIPTION OF DISTRIBUTIONS UNDER THE PLAN

**Section 6.01   Unclassified Claims.**

**(a)      Administrative Claims.**

Unless otherwise agreed to by the parties, each Holder of an Allowed Administrative Claim shall, in full satisfaction, release, settlement and discharge of such Allowed Administrative Claim:  (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable non-bankruptcy law or in the ordinary course of business; or (c) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors.

**(b)      Priority Tax Claims.**

Pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, settlement and discharge thereof:  (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Distribution Date; (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (c) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors.

**Section 6.02    Classified Claims.**

(a)    **Class 1 – Prepetition Senior Facility Claims (Impaired, Entitled to Vote).**

Class 1 consists of all Claims against the Debtors secured by and to the extent of the value (as of the Petition Date) of the Collateral securing such Claims directly or indirectly arising from or under, or relating in any way to, the Prepetition Senior Credit Documents. On the Effective Date, each Holder of an Allowed Class 1 Claim shall, in full satisfaction, release, settlement, discharge of and in exchange for such Allowed Class 1 Claim, receive the following: (i) its Pro Rata Share of the Exit Term Loan; and (ii) payment of the Administrative Agent's fees and expenses as described in Section 7.04 hereof.

(b)    **Class 2 – Other Secured Claims (Unimpaired, Note Entitled to Vote, Deemed to Accept)**

Class 2 consists of all Secured Claims against the Debtors other than Claims in Class 1. For purposes of the Plan, each Allowed Other Secured Claim will be deemed a separate subclass. Each Holder of an Allowed Class 2 Claim will, in full satisfaction, release, settlement, discharge of and in exchange for such Allowed Class 2 Other Secured Claim: (i) at the Debtors' option, either have the property that serves as Collateral for its Claim returned or have its Claim cured and Reinstated within the meaning of Section 1124(2) of the Bankruptcy Code; or (ii) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors.

(c)    **Class 3 – Other Priority Claims (Unimpaired, Not Entitled to Vote, Deemed to Accept).**

Class 3 consists of all Other Priority Claims.  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims shall be unaltered by the Plan.  Each Holder of an Allowed Class 3 Claim, will, in full satisfaction, release, settlement, and discharge of and in exchange for such Allowed Claim: (i) to the extent such claim is due and owing on the Effective Date, have such Allowed Claim paid in full, in Cash, on the Distribution Date; (ii) to the extent such Allowed Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the parties, or as may be due and owing under applicable non-bankruptcy law or in the ordinary course of business; or (iii) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors.

(d)    **Class 4 – General Unsecured Claims (Impaired, Entitled to Vote).**

Class 4 consists of all General Unsecured Claims, including all outstanding trade and vendor Claims, and all other Unsecured Claims against the Debtors. Each Holder of an Allowed Class 4 Claim, shall receive, in full satisfaction, release, settlement, and discharge of and in exchange for such Allowed Claim, 90% of such Allowed Claim ("Distribution") paid in installments as follows:  50% of such Distribution on the Distribution Date, and the balance of such Distribution in equal monthly installments on the fifteenth (15th) day of each of the following twelve (12) calendar months.

(e)     **Class 5 – Unsecured Deficiency Claims (Impaired, Entitled to Vote).**

Class 5 consists of the Unsecured Deficiency Claims.  On the Effective Date, each Holder of an Allowed Class 5 Claim shall, in full satisfaction, release, settlement, discharge of and in exchange for such Allowed Class 5 Claim, receive its Pro Rata Share of the Series A Equity Interest.

(f)     **Class 6 – Junior Lender Claims (Impaired, Entitled to Vote).**

Class 6 consists of the Junior Lender Claims.  The Holders of Allowed Class 6 Claims shall receive, in full satisfaction, release, settlement, discharge of and in exchange for such Allowed Class 6 Claims, (i) on the Effective Date, their Pro Rata share of the Series B Equity Interests and (ii) payment of the Junior Lenders' fees and expenses as described in Section 7.04 hereof.

(g)     **Class 7 – Administrative Convenience Class (Unimpaired, Note Entitled to Vote, Deemed to Accept).**

Class 7 consists of all Administrative Convenience Claims.  The legal, equitable and contractual rights of the Holders of Allowed Class 7 Claims shall be unaltered by the Plan.  Each Holder of an Allowed Class 7 Claim, will, in full satisfaction, release, settlement, and discharge of and in exchange for such Allowed Claim:  (i)  have such Allowed Claim paid in full, in Cash, on the Distribution Date; or (ii) receive such other treatment as may be agreed to between the Holder and the Debtors or Reorganized Debtors.

(h)     **Class 8 – Intercompany Claims (Impaired, Not Entitled to Vote, Deemed to Reject).**

Class 8 consists of all Intercompany Claims.  No property will be distributed to or retained by Holders of Class 8 Intercompany Claims and such Intercompany Claims shall be deemed cancelled and extinguished on the Effective Date.  Each Holder of a Class 8 Claim is deemed to reject the Plan.

(i)     **Class 9 – Intercompany Interests (Unimpaired, Not Entitled to Vote, Deemed to Accept).**

Class 9 consists of all Intercompany Interests. On the Effective Date, each Class 9 Interest shall be Reinstated.

(j)     **Class 10 – Parent Equity Interests (Impaired, Entitled to Vote).**

Class 10 consists of all Parent Equity Interests.  The Holders of Allowed Class 10 Interests shall receive, in full satisfaction, release, settlement, discharge of and in exchange for such Allowed Class 10 Interests, and on account of Sponsor's waiver of all Claims against the Debtors, including, but not limited, to all management and other fees (except fees and expenses described in subsection (ii) of Section 3.04(f) of the Plan), (i) on the Effective Date, their Pro Rata share of the Series C Equity Interests and (ii) payment of Sponsor's fees and expenses as described in Section 7.04 hereof.  All Class 10 Interest Holders shall surrender any shares or other

evidence of their Parent Equity Interests, and such Parent Equity Interests shall be cancelled, as of the Effective Date.

### Section 6.03    Special Provision Regarding Unimpaired Claims.

Except as otherwise provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to Setoff Claims or recoupments against Unimpaired Claims.

## ARTICLE VII.

## IMPLEMENTATION OF THE PLAN

### Section 7.01    Continued Corporate Existence.

Following the Effective Date, the Reorganized Debtors shall continue to exist as separate corporate entities, in accordance with applicable non-bankruptcy law and pursuant to their Corporate Documents in effect prior to the Effective Date, except to the extent that such Corporate Documents are amended by the terms of the Plan or the Restated Corporate Documents.

### Section 7.02    Corporate Action.

**(a)    Cancellation of Prepetition Credit Documents, Subordinated Notes and Parent Equity Interests.**

On the Effective Date, except as otherwise provided for in the Plan, (i) the Prepetition Credit Documents, Subordinated Notes, Parent Equity Interests and any other note, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors related to the Prepetition Credit Documents, Subordinated Notes, or Parent Equity Interests shall be cancelled, and (ii) the obligations of the Debtors under any agreements governing the Prepetition Senior Facility, Subordinated Notes, Parent Equity Interests and any other note, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors related to the Prepetition Senior Facility, Subordinated Notes or Parent Equity Interests shall be discharged; *provided, however,* that each agreement that governs the rights of the Holder of a Prepetition Senior Facility Claim, Junior Lender Claim or Other Secured Claim that is administered by an agent shall continue in effect solely for the purposes of (a) allowing such agent to make the distributions to be made on account of such Allowed Claims under the Plan as provided in Article III of the Plan and (b) permitting such agent to maintain any rights or liens it may have for fees, costs and expenses under such agreement; and *provided, further,* that the provisions of clause (ii) of this paragraph shall not affect the discharge of the Debtors' liabilities under the Bankruptcy Code and the Confirmation Order or result in any expense or liability to the Reorganized Debtors.

**(b)     Restated Corporate Documents.**

The Corporate Documents of Ramsey Holdings shall be amended and restated as necessary to satisfy the provisions of the Plan. Reorganized Ramsey Holdings shall own, directly or indirectly, the Equity Securities of each of the other Reorganized Debtors. The Restated Corporate Documents of Ramsey Holdings shall be filed as part of the Plan Supplement. On the Effective Date or as soon thereafter as is practicable, Reorganized Ramsey Holdings shall file with the Secretary of the State of Delaware an amended certificate of incorporation pursuant to Section 242 of Delaware General Corporation Law.

**(c)     Creation of Ramsey LLC.**

For purposes of effectuating the provisions of the Plan, a new entity, Ramsey LLC, shall be created. The New Entity Documents of Ramsey LLC shall include those provisions necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) if applicable, a provision as to the classes of securities issued pursuant to the Plan or thereafter possessing voting power, for an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends. Ramsey LLC shall own 100% of the Equity Securities of Reorganized Ramsey Holdings. Any holder of Series A Equity Interest or Series B Equity Interests may, at its sole option, elect to convert all or any portion of such Series A Equity Interests or Series B Equity Interests into non-voting securities, which non-voting securities, except for the absence of voting rights, shall have the same economic and other rights of Series A Equity Interests or Series B Equity Interests, as the case may be. The New Entity Documents of Ramsey LLC shall be filed as part of the Plan Supplement. On the Effective Date or as soon thereafter as is practicable, Ramsey LLC shall file with the Secretary of the State of Delaware its certificate of formation pursuant to Section 18-201 of the Delaware Limited Liability Company Act, and the members of Ramsey LLC will execute the LLC Agreement.

**(d)     Other General Corporate Matters.**

On or after the Effective Date, the Debtors and/or Reorganized Debtors shall take such action as is necessary under the laws of the State of Delaware, State of Oklahoma, federal law and other applicable law to effect the terms and provisions of the Plan. Without limiting the foregoing, the issuance of the New Equity Interests, the election and appointment of directors or officers, adoption and implementation of the Management Incentive Plan and any other matter involving the corporate structure of the Reorganized Debtors, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to Section 303 of the Delaware General Corporation Law or Section 1118 of the Oklahoma Corporation Act (or the laws of each state pursuant to which a Reorganized Debtor is organized) without requiring any further action by the shareholders or directors of the Debtors and/or Reorganized Debtors.

**Section 7.03    Restructuring Transactions.**

**(a)      Consolidation.**

Pursuant to Bankruptcy Code Section 1123(a)(5)(C), the Plan combines all of the Debtors' Estates into a single consolidated Estate for all purposes associated with Confirmation and consummation of the Plan, including but not limited to voting and distribution.  Accordingly, on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as merged into the Estate of Ramsey Holdings for all purposes associated with Confirmation and consummation of the Plan, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any obligation of another Debtor shall be treated as one collective obligation of the Debtors.

Consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or in connection with contracts or leases assumed or entered into during the Chapter 11 Cases.  Any alleged defaults under any applicable agreement with the Debtors or Reorganized Debtors arising from consolidation under the Plan shall be deemed cured as of the Effective Date.

**(b)      New Equity Interests; New Securities.**

      (i)      <u>Authorization</u>.

As of the Effective Date, Ramsey LLC is authorized to issue the New Equity Interests without further act or action under applicable law, regulation, order or rule.

      (ii)     <u>Issuance</u>.

The Confirmation Order shall provide that, pursuant to Section 1145 of the Bankruptcy Code, the issuance of the New Equity Interests shall be exempt from the registration requirements of the Securities Act, as amended, and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities; *provided*, that if the issuance of any of the New Equity Interests do not qualify for the exemption under Section 1145 of the Bankruptcy Code, the New Equity Interests will be issued in a manner which qualifies for another available exemption, whether as a private placement under Rule 506 under the Securities Act in which securities are issued only to "accredited investors," as such term is defined in Rule 501 under the Securities Act, or otherwise.  In the event the issuance of the New Equity Interests do not qualify for the exemption from securities laws under Section 1145 of the Bankruptcy Code and the Debtors elect to pursue an exemption under Rule 506 under the Securities Act for securities issued only to "accredited investors," then each Holder of an Allowed Class 1 Claim may be required, as a condition to receiving such shares of New Equity Interests, to provide the Debtors with a representation, in form and substance reasonably satisfactory to the Debtors, that it is an "accredited investor" and such other representations as the Debtors may reasonably request in order to determine that such

shares of New Equity Interests were offered and issued in a private placement to "accredited investors" only under Rule 506 under the Securities Act. All securities issued pursuant to the Plan will be deemed issued as of the Effective Date regardless of the date actually distributed.

      (iii)    <u>LLC Agreement</u>.

Without limiting the effect of Section 1145 of the Bankruptcy Code, upon the Effective Date, the LLC Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each Holder of New Equity Interests shall, upon the Effective Date, be bound by the LLC Agreement irrespective of whether such party is a signatory thereto. Attached hereto as <u>Exhibit "A-3"</u> is the LLC Agreement Term Sheet which sets forth the principal terms of the LLC Agreement.

      (iv)    <u>Listing</u>.

Ramsey LLC shall not be obligated to (a) list the New Equity Interests on a public securities exchange or (b) register the New Equity Interests under the Securities Act or Exchange Act. In addition, the New Equity Interests shall be subject to certain restrictions on transfer to limit the number of record holders of New Equity Interests, to ensure that Ramsey LLC is not required to register the New Equity Interests under the Securities Act or Exchange Act.

      (v)    <u>Distribution of New Equity Interests</u>.

          1)    *Class 5—Unsecured Deficiency Claims.*

Pursuant to the Plan and the LLC Agreement, and as described in the LLC Agreement Term Sheet attached hereto as <u>Exhibit "A-3"</u>, the New Series A Equity Interests shall be distributed to the Prepetition Senior Lenders in satisfaction of their Class 5 Claims (the "<u>Prepetition Senior Lender Share</u>") such that the holdings of the Prepetition Senior Lenders, in the aggregate, on the Distribution Date shall equal 72.00% of the issued and then-outstanding New Equity Interests.

Each Prepetition Senior Lender shall receive a Pro Rata Share of such Prepetition Senior Lender Share of the New Equity Interests based upon the aggregate amount of the Loans and other Obligations (as defined in the Prepetition Senior Credit Agreement) owing to such Senior Lender (including Obligations under or in connection with existing Swap Agreements) on the Effective Date.

          2)    *Class 6—Junior Lender Claims.*

Pursuant to the Plan and the LLC Agreement, and as described in the LLC Agreement Term Sheet attached hereto as <u>Exhibit "A-3"</u>, the New Series B Equity Interests shall be distributed to the Junior Lenders in satisfaction of their Class 6 Claims (the "<u>Junior Lender Share</u>") such that the holdings of the Junior

Lenders, in the aggregate, on the Distribution Date shall equal 13.50% of the issued and then-outstanding New Equity Interests.

Each Junior Lender shall receive a Pro Rata Share of such Junior Lender Share of the New Series B Equity Interests based upon the amount of the Junior Lender Claims owing to such Junior Lender on the Effective Date.

3)   *Class 10—Parent Equity Interests.*

Pursuant to the Plan and the LLC Agreement, and as described in the LLC Agreement Term Sheet attached hereto as <u>Exhibit "A-3"</u>, the New Series C Equity Interests shall be distributed to the Parent Equity Interests in satisfaction of their Class 10 Parent Equity Interests (the "<u>Existing Parent Equity Share</u>") such that the holdings of the Parent Equity Interests, in the aggregate, on the Distribution Date shall equal 4.50% of the issued and the-outstanding New Equity Interests.

Each Parent Equity Interest Holder shall receive a Pro Rata Share of such Existing Parent Equity Share of the New Series C Equity Interests held by such Holder on the Effective Date. The Record Agent shall be entitled to rely conclusively upon the stock register of Ramsey Holdings as to the Pro Rata Share distributable to individual Parent Equity Interest Holders unless and until there exist Final Order(s) as to any Contested Class 10 Parent Equity Interests, in which event, after Final Orders are entered as to all Contested Class 10 Parent Equity Interests, the distributions under the Plan to Class 10 shall be subject to disgorgement, adjustment, and redistribution to effect the Pro Rata Share contemplated by the Plan.

4)   *Management Distribution.*

Pursuant to the Plan and the Management Incentive Plan, and as described in the LLC Agreement Term Sheet attached hereto as <u>Exhibit "A-3"</u>, the beneficiaries of the Management Incentive Plan shall receive the New Series D Equity Interests such that the holdings of the beneficiaries of the Management Incentive Plan, in the aggregate, on the Distribution Date shall equal 10.0% of the authorized New Equity Interests.

Attached hereto as <u>Exhibit "A-6"</u> is the term sheet for the Management Incentive Plan. Said exhibit sets forth the principal terms under which the beneficiaries of the Management Inventive Plan will receive the New Series D Equity Interests and other incentives from the Reorganized Debtors.

(vi)   <u>Liquidity Event Payments and Dividends.</u>

Irrespective of the proportion of New Equity Interests held by any Entity, and as described in the LLC Agreement Term Sheet attached hereto as <u>Exhibit "A-3"</u>, in the instance of a Liquidity Event (as defined in the Exit Credit

Agreement) the proceeds of such event ("Proceeds") will be paid, and or distributed according to the terms of the following:

  1) *Repayment of Debt.* Proceeds will be applied first to the repayment of the Exit Revolving Facility, payment of which will be excluded from the computation of the total net proceeds to the Prepetition Senior Lenders contemplated in the descriptions of Series A, B, C, and D Equity Interests, below. The remaining Proceeds will then be applied toward the payment in full of the Exit Term Loan, net of any amortization payments made post-Liquidity Event;

  2) *Series A Equity Interests.* Following the repayment in full of Exit Revolving Facility and the Exit Term Loan, the next $13.9 million of Proceeds shall be split 72.0% to the Prepetition Senior Lenders, 10.0% to the beneficiaries of the Management Incentive Plan, 13.5% to the Junior Lenders, and 4.5% to Parent Equity Interests (until the Prepetition Senior Lenders have received total net proceeds of $60 million);

  3) *Series B Equity Interests.* Following distribution in full of Proceeds subject to Series A Equity Interests, the next $34.2 million of Proceeds shall be split 58.5% to the Prepetition Senior Lenders, 10.0% to the beneficiaries of the Management Incentive Plan, 17.0% to the Junior Lenders, and 14.5% to the Parent Equity Interest Holders (until the Prepetition Senior Lenders have received total net proceeds of $80 million);

  4) *Series C Equity Interests.* Following distribution in full of Proceeds subject to Series A and B Equity Interests, the next $25.0 million of proceeds shall be split 40.0% to the Prepetition Senior Lenders, 10.0% to the beneficiaries of the Management Incentive Plan, and 22.0% to the Junior Lenders, and 28.0% to the Parent Equity Interest Holders (until the Prepetition Senior Lenders have received total net proceeds of $90 million); and

  5) *Series D Equity Interests.* Following distribution in full of the Proceeds to Series A, B, and C Equity Interests, any additional Proceeds shall be split 20.0% to the Prepetition Senior Lenders, 10% to the beneficiaries of the Management Incentive Plan, 39.25% to the Junior Lenders, and 30.75% to the Parent Equity Interest Holders.

(c) **Exit Credit Facilities.**

On the Effective Date, the Reorganized Debtors (except Reorganized Ramsey Holdings), as borrowers, and Reorganized Ramsey Holdings, as guarantor, shall enter into the Exit Credit Facilities. The Reorganized Debtors and Ramsey LLC are authorized to use the Exit Credit Facilities for any purpose permitted thereunder, including to (a) refinance amounts outstanding on the Effective Date under the Prepetition Senior Credit Agreement, (b) make other payments required to be made on the Effective Date or Distribution Date, and (c) operate their businesses.

(i)    Exit Term Loan.

As part of the Debtors' reorganization under the Plan, and as described in the Exit Term Note Term Sheet attached hereto as Exhibit "A-4", the Debtors will make and deliver to the Prepetition Senior Lenders the Exit Term Loan, which is in the principal amount of $50,000,000, with a maturity date of October 31, 2013. Interest on the Exit Term Loan will accrue, and be payable in cash on a monthly basis, at a rate per annum equal to the Adjusted LIBO Rate (as defined in the Exit Credit Agreement) plus the Applicable Rate (as defined in the Exit Credit Agreement) of 400 basis points. The Adjusted LIBO Rate will have a floor of 2%. The default rate of interest shall be equal to 2% per annum above the contract rate set forth above.

Principal amortization payments under the Exit Term Loan will be made as follows: (i) no amortization during calendar year 2010, (ii) $250,000 on the final day of each quarter of calendar year 2011, (iii) $350,000 on the final day of each quarter of each calendar year 2012; and (v) $500,000 on the final day of each pre-maturity quarter of calendar year 2013, with the remaining unpaid principal balance due and payable on the Maturity Date. Additionally, commencing with the quarter ending September 30, 2010 and continuing on a quarterly basis thereafter: (i) for each quarter ending March 31, June 30 and September 30, the Debtors will prepay the Exit Term Loan in an amount equal to twenty five percent (25%) of Excess Cash Flow (as defined on Schedule C of the Plan Term Sheet) for each such quarter to be applied pro rata, in the inverse order of maturity and (ii) for each quarter ending December 31, the Debtors will prepay the Exit Term Loan in an amount equal to (x) the sum of 75% of Excess Cash Flow for such quarter plus seventy-five percent (75%) of Excess Cash Flow for each of the prior three (3) quarters (the "Prior Quarters"), in each case, including non-recurring items, minus (y) the aggregate amount of Excess Cash Flow payments previously made by the Debtors for the Prior Quarters, to be applied pro rata, in the inverse order of maturity.

Attached hereto as Exhibit "A-4" is the Exit Term Loan Term Sheet which sets forth in more detail the principal terms of the Exit Term Loan. Also attached hereto as Exhibit "A-7" is the Administrative Agent Fee Letter which sets forth in more detail the annual fee payable to the Administrative Agent for the Administrative Agent's services as agent for the Exit Lenders. The Prepetition Senior Credit Agreement included the same annual fee to the Administrative Agent.

(ii)   Exit Revolving Facility.

In addition to the Exit Term Note, the Revolving Lenders will extend, pursuant to the terms of the Exit Revolving Facility Commitment Letter attached hereto as Exhibit "A-5", a senior secured first-lien $3,000,000 revolving credit facility. The Exit Revolving Facility will be (i) a revolving, standby facility that may be used only to support the liquidity needs of the Reorganized Debtors, and (ii) subject to an asset-based formula. For purposes of clarity, credit extended under the Exit Revolving Facility is in addition to any obligations under the Exit Term Loan.