## ARTICLE XI

### RETENTION OF JURISDICTION

Subject to the jurisdictional provisions of Title 28, United States Code, under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    entry and implementation of such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

(b)    consideration of any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

(c)    determination of any objections to proofs of Claim and/or Interests filed, or to otherwise resolve any Contested Claim/Interests;

(d)    determination of requests for allowance and/or payment of Administrative Claims, including, without limitation, requests for compensation of and reimbursement of expenses of Professionals and other parties entitled thereto under Sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code;

(e)    resolution of any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, and to determine any Rejection Claims;

(f)    determination of any and all adversary proceedings and/or contested matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors prior to or after the Effective Date;

(g)    resolution of matters relating to the recovery of all property of the Debtors' Estates and assets of the Reorganized Debtors, wherever located;

(h)    determination of matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under Section 505(b) of the Bankruptcy Code);

(i)    determination of the scope of any discharge of any Debtor under the Plan and/or the Bankruptcy Code;

(j)    accomplishment of distributions to Holders of Allowed Claims and/or Interests as provided herein;

(k)    issuance of injunctions, entry of other orders, or other Court action as may be necessary or appropriate to restrain interference by any Entity with the consummation,

implementation, or enforcement of the terms of the Plan, the Confirmation Order, or any other Order of the Court;

      (l)    entry of such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

      (m)    entry of orders in aid of execution and consummation of the Plan as provided by Section 1142 of the Bankruptcy Code;

      (n)    determination of disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan or the extent of any Entity's obligations incurred in connection with or released under the Plan;

      (o)    to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

      (p)    entry of Final Decrees closing the Chapter 11 Cases.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.01**  **Bar Dates For Certain Claims.**

      (a)    Proofs of Claims or Interests.

      As previously ordered by the Court in its Claims Order, all Holders of Claims against and/or Interests in the Debtors, including without limitation, the Twenty-Day Claims and Priority Tax Claims, other than the Holders of certain Administrative Claims and Rejection Claims, must have filed proofs of claims or interests on or before the Bar Date of March 31, 2010.

      (b)    Requests for Allowance/Payment of Administrative Claims.

      (i)    Pre-Confirmation Date Claims.    All applications for allowance and payment of Non-Ordinary Course Administrative Claims allegedly incurred by the Debtors on or before the Confirmation Date shall be filed no later than 45 days after the Effective Date.  Twenty-Day Claims are subject to, *inter alia*, the general Bar Date for Claims as stated in Section 12.01(a), above.

      (ii)    Effect of Failure to Assert Timely Claim.  Any Holders of Administrative Claims who do not timely assert such Claims shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors, and/or any property of the same.

      (iii)    Ordinary Course Administrative Liabilities.  Holders of Ordinary Course Administrative Claims (other than Claims of governmental units for taxes (and for interest and/or penalties related to such taxes)) shall not be required to file any request for

payment of such Claims. Such Ordinary Course Administrative Claims, unless objected to by a Debtor, shall be assumed and paid by the Debtors, in Cash, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim.

(c)  Rejection Claims.

A claimant possessing a Rejection Claim must File proof of such Claim not later than 30 days following the date of any Final Order approving the rejection of the subject executory contract or unexpired lease.

(d)  Professional Fee Claims; Substantial Contribution Claims.

The Confirmation Order will establish a Fee Claims Bar Date for filing of all Professional Fee Claims (including claims for the expenses of the members of the Committee) and Substantial Contribution Claims, which date will be 45 days after the Effective Date. (the "Fee Claims Bar Date"). A notice prepared by the Reorganized Debtors will set forth such date and constitute notice of this Fee Claims Bar Date. The Debtors or Reorganized Debtors, the Committee, the United States Trustee, and any other parties in interest, shall have 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Fee Claims Bar Date to review and object to such Administrative Claims.

(e)  Administrative Tax Claims.

All requests for payment of Administrative Claims by a governmental unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be filed and served on the Reorganized Debtors and any other party specifically requesting a copy in writing on or before the later of (a) thirty (30) days following the Effective Date; and (b) one hundred and twenty (120) days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any such Claim that is required to file a request for payment of such taxes and does not file and properly serve such a claim by the applicable bar date shall be forever barred from asserting any such claim against the Debtors, the Reorganized Debtors or their property, regardless of whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date. Any interested party desiring to object to an Administrative Claim for taxes must file and serve its objection on counsel to the Debtors and the relevant taxing authority no later than ninety (90) days after the taxing authority files and serves its application.

**12.02  Successors and Assigns.**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir(s), executor(s), administrator(s), successor(s) or assign(s) of such Entity.

**12.03  Payment of Statutory Fees.**

The quarterly fees payable to the United States Trustee under 28 U.S.C. § 1930(a)(6) shall be paid when due (*i.e.* on or before the last day of the month following each calendar quarter) until the Chapter 11 Cases are closed. All other fees payable pursuant to 28 U.S.C. § 1930 through confirmation of the Plan shall be paid Debtors on the Effective Date, and thereafter by the Reorganized Debtors.

**12.04  Discharge of the Debtors.**

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties, and, except as otherwise provided herein or in the Confirmation Order, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, upon the Effective Date, (a) the Debtors, shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, or (iii) the Holder of a Claim based upon such debt accepted the Plan; and (b) all Interests and other rights of the equity security holders in the Debtors shall be terminated. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, subject to the Effective Date occurring.

**12.05  Exculpation and Limitation of Liability.**

None of the Reorganized Debtors, Administrative Agent, Prepetition Senior Lenders, Junior Lenders, Sponsor, Exit Agent, Exit Lenders, and the Committee, or any of their respective present or former members, managers, equity holders, partners, officers, directors, employees, advisors, attorneys, or agents, shall have or incur any liability to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or the successors or assigns of any of the foregoing, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases and the commencement thereof, negotiation of the Disclosure Statement or the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding any other provision of this Plan, no Holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of the foregoing, shall have any right of action against the Reorganized Debtors, Estates, Administrative Agent, Prepetition Senior Lenders, Junior Lenders, Sponsor, Exit Agent, Exit Lenders, and the Committee, or the

present or former members, managers, equity holders, partners, officers, directors, employees, advisors, attorneys, or agents of any of the foregoing, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases including the commencement thereof, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence or willful misconduct.

The foregoing exculpation and limitation on liability shall not limit, abridge, or otherwise affect the rights, if any, of the Reorganized Debtors to enforce or settle the Causes of Action.

## 12.06   Permanent Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order, all entities who have held, hold or may hold Claims against, or Interests in, the Debtors will be permanently enjoined, on and after the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest, (ii) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order against the Debtors on account of any such Claim or Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest, and (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or against the property or interests in property of the Debtors on account of any such Claim or Interest.  The foregoing injunction will extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.

## 12.07   Releases by the Debtors.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any successors shall be deemed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors or the Reorganized Debtors, the Chapter 11 Cases or the Plan (other than the rights of the Debtors and Reorganized Debtors and any successors to enforce the Plan and the contracts, instruments, releases, and other agreements or documents assumed, passed through or delivered in connection with the Plan) and whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date and in any way relating to the Debtors, Reorganized Debtors or any successors or their property, the Chapter 11 Cases (including the commencement thereof), the Plan, Administrative Agent, Prepetition Senior Lenders, Junior Lenders, Sponsor, Exit Agent and Exit Lenders, and that may be asserted by or on behalf of the Debtors, the Reorganized Debtors against the Administrative Agent, Prepetition Senior Lenders, Junior Lenders, Exit Agent and Exit Lenders, and any successors or their property and each of their members, managers,

directors, officers, employees, agents, financial advisors, representatives, affiliates, attorneys and other professionals as of the Effective Date; *provided, however*, that such releases shall not operate as a waiver or release of any causes of action arising out of (x) any express contractual obligation owing by any such manager, member, director, officer, or employee, agent, financial advisor, representative, affiliate, attorney or other professional, or (y) the willful misconduct, gross negligence, intentional fraud or criminal conduct of such manager, member, director, officer, or employee, agent, financial advisor, representative, affiliate or professional.

**12.08   <u>Releases by Holders of Claims and Interests</u>.**

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim (including a Prepetition Senior Facility Claim and a Junior Lender Claim) or Interest that votes in favor of the Plan (or is deemed to accept the Plan), and to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Holder of a Claim or Interest that does not vote to reject the Plan, shall be deemed to unconditionally, forever release, waive and discharge all Claims, Interests, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the recapitalization and restructuring efforts undertaken by the Debtors, the Chapter 11 Cases (including the commencement thereof), and the Plan (other than the rights to enforce the Plan and the contracts, instruments, releases, and other agreements or documents assumed, passed through or delivered in connection with such Plan) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors and any successors, the Chapter 11 Cases, the Plan, Administrative Agent, Prepetition Senior Lenders, Junior Lenders, Exit Agent, Exit Lenders and the Sponsor against (i) the Debtors, the Reorganized Debtors and any successors, (ii) the Debtors' present and former managers, members, directors, officers, employees, agents, financial advisors, attorneys and other professionals, (iii) the Committee, its members and its counsel, and their successors and assigns, directors, officers, partners, members, shareholders, employees, and agents, (iv) the Administrative Agent and their successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals, (v) the Prepetition Senior Lenders and each of their successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals, (vi) the Junior Lenders and their successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals, (vii) the Exit Agent and its successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals, (viii) the Exit Lenders and their successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals, and (ix) Sponsor and its successors and assigns, directors, officers, employees, agents, financial advisors, attorneys, and other advisors and/or professionals; *provided, however*, that the foregoing shall not waive or release any causes of action arising out of (y) any express contractual obligations owing by any such manager, member, director, officer, employee, agent, financial advisor, attorney or other Professional of the Debtors, the Reorganized Debtors and any successors, or (z) the willful misconduct, gross negligence, intentional fraud or criminal conduct of such

manager, member, director, officer, employee, agent, financial advisor, representative or Professional of the Debtors.

**12.09  Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to Section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest (except the Junior Lender Claims) in accordance with any contractual, legal, or equitable subordination relating thereto.

**12.10  Binding Effect.**

The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including, but not limited to, the Reorganized Debtors, and all other parties-in-interest in these Chapter 11 Cases.

**12.11  Plan Supplement.**

Any and all exhibits, lists, or schedules not filed with the Plan shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court not later than ten (10) days prior to the Plan Voting Deadline.  Upon filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours or on its website (http://www.oknb.uscourts.gov).  Holders of Claims or Interests may also obtain a copy of the Plan Supplement upon written request to the Debtors.

**12.12  Notices.**

Any notice, request or demand given or made under this Plan or under the Bankruptcy Code or the Bankruptcy Rules shall be in writing and shall be hand-delivered or sent by a reputable overnight courier, and shall be deemed given when received at the following addresses:

If to the Debtors or Reorganized Debtors:

John R. Celoni, Jr., President & Chief Executive Officer
Ramsey Industries, Inc.
1600 N. Garnett Road
Tulsa, Oklahoma  74116-1633
johnceloni@ramseyindustries.com

With a copy to:

  Sidney K. Swinson, Esq.
  Gable & Gotwals
  1100 ONEOK Plaza
  100 West Fifth Street
  Tulsa, Oklahoma  74103-4217
  sswinson@gablelaw.com
  (918) 595-4990 (Fax)

If to Administrative Agent or Exit Agent:

  Vincent Belcastro
  CIT Lending Services Corporation
  505 Fifth Avenue
  New York, NY  10017
  Vincent.belcastro@cit.com
  (212) 771-1758 (Fax)

  With a copy to:

  Marc Rosenberg
  Kaye Scholer LLP
  425 Park Avenue
  New York, NY 10022
  mrosenberg@kayescholer.com
  (212) 836-8689 (Fax)

  and

  Steven W. Bugg
  McAfee & Taft
  Tenth Floor , Leadership Square
  211 North Robinson
  Oklahoma City, OK  73102-7103
  steven.bugg@mcafeetaft.com
  (405) 235-0439 (fax)

  and

  Charles Greenough
  McAfee & Taft
  500 ONEOK Plaza
  100 West 5th Street
  Tulsa, OK  74103
  charles.greenough@mcafeetaft.com
  (918) 574-3105 (fax)

Notwithstanding anything to the contrary provided herein, all notices concerning this Plan shall be served upon the entities prescribed and in the manner prescribed under the Bankruptcy Code and Bankruptcy Rule 3017.

## 12.13   Severability of Plan Provisions.

If prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or the conditions to Confirmation or the Effective Date is held by the Court to be invalid, void or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a final judicial determination and shall provide that each term and provision of the Plan as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

## 12.14   Term of Injunctions or Stay.

Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.

## 12.15   Setoffs.

Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, each Reorganized Debtor may setoff against any Allowed Claim (other than an Allowed Claims in Class 1, 2, 5 or 6) or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before such distribution is made), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or

otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to Section 553 or otherwise.

**12.16  Recoupment.**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**12.17  Hart-Scott-Rodino Compliance.**

Any shares or interests of New Equity Interests to be distributed under the provisions of the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated.

**12.18  Dissolution of Committee.**

On the Effective Date, the Committee shall dissolve and the members of the Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases.

## ARTICLE XIII

### CONFIRMATION REQUEST

The Debtors request Confirmation of the Plan under Section 1129 of the Bankruptcy Code. If any Impaired Class does not accept the Plan pursuant to Section 1126 of the Bankruptcy Code, the Debtors request Confirmation pursuant to Section 1129(b) of the Bankruptcy Code. In that event, the Debtors reserve the right to modify the Plan to the extent (if any) that Confirmation of the Plan under Section 1129(b) of the Bankruptcy Code requires modification.

**DATED** this __ day of April, 2010.

**RAMSEY HOLDINGS, INC.**

By: _____
     John R. Celoni, Jr., President & CEO

**RAMSEY INDUSTRIES, INC.**

By: _____
     John R. Celoni, Jr., President & CEO

**RAMSEY WINCH, INC.**

By: _____
     John R. Celoni, Jr., President & CEO

**AUTO CRANE COMPANY**

By: _____
     John R. Celoni, Jr., President & CEO

**ESKRIDGE, INC.**

By: _____
     John R. Celoni, Jr., President & CEO

/s/ John D. Dale
Sidney K. Swinson, OBA No. 8804
John D. Dale, OBA No. 19787
Mark D.G. Sanders, CT. No. 402798
Brandon C. Bickle, OBA No. 22064
Sarah G. Powers, OBA No. 22688
**GableGotwals, P.C.**
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103
918.595.4800 (telephone)
918.595.4990 (facsimile)
*Attorneys for Debtors-in-Possession*

# EXHIBIT A-2

## (Plan Term Sheet)

FOR SETTLEMENT PURPOSES<br>
SUBJECT TO FRE 408

*The Preliminary Summary of Terms and Conditions outlined below is not intended to set forth all of the terms and conditions of the transactions contemplated hereby.*

**Preliminary Summary of Terms and Conditions ("Term Sheet")**
**of an Amendment Agreement or an Amendment and Restatement of the Credit Agreement and a Recapitalization of Ramsey Holdings, Inc.**

**Ramsey Industries, Inc. and its Subsidiaries**

**February 3, 2010**

| | |
|---|---|
| CREDIT AGREEMENT: | Credit Agreement dated as of April 5, 2007 (as amended, supplemented or otherwise modified from time to time) by and among the Borrowers (as defined below), the lenders from time to time party thereto (the "Lenders") and the Agent (as defined below). Capitalized terms used, but not defined herein shall have the meaning assigned to such terms in the Credit Agreement. |
| BORROWERS: | Ramsey Industries, Inc. ("Ramsey Industries"), Ramsey Winch Company ("Ramsey Winch"), Auto Crane Company ("Auto Crane") and Eskridge, Inc. ("Eskridge"). |
| HOLDINGS: | Ramsey Holdings, Inc. (collectively with the Borrowers, the "Ramsey Companies") |
| AGENT: | CIT Lending Services Corporation ("CIT") |
| LENDERS: | The existing Lenders |
| RESTRUCTURED CREDIT FACILITY: | Term Loan in the principal amount of $50,000,000. Each Lender and each affiliate of a Lender that is a counterparty to an existing Swap Agreement ("Affiliate Counterparty") shall have a pro rata portion of the Term Loan based on the aggregate amount of the Loans and other Obligations owing to such Lender or such Affiliate Counterparty (including Obligations owing to such Lender or Affiliate Counterparty under or in connection with existing Swap Agreements) on the Recapitalization Date (as defined below). Except for the liquidity backstop, no further Revolving Loans will be made under the Credit Agreement. |
| RECAPITALIZATION DATE: | The date of substantial consummation of the Plan (as defined below) on the terms provided herein. |
| MATURITY DATE: | October 31, 2013 |
| AMORTIZATION: | Term Loan amortization shall be as follows: (i) $250,000 per quarter during calendar year 2011, (ii) $350,000 per quarter during calendar year 2012 and (iii) $500,000 per quarter during calendar year 2013, with the remaining unpaid principal balance due and payable on the |

31882372.DOC

Maturity Date.  No Term Loan amortization shall be due during calendar year 2010.

EXCESS CASH FLOW
PAYMENTS:

Commencing with the quarter ending September 30, 2010 and continuing on a quarterly basis thereafter: (i) for each quarter ending March 31, June 30 and September 30, the Borrowers shall prepay the Term Loan in an amount equal to 25% of Excess Cash Flow (as defined on Schedule C attached hereto) for each such quarter to be applied pro rata, in the inverse order of maturity and (ii) for each quarter ending December 31, the Borrowers shall prepay the Term Loan in an amount equal to (a) the sum of (x) 75% of Excess Cash Flow for such quarter plus (y) 75% of Excess Cash Flow for each of the prior three (3) quarters (the "Prior Quarters"), in each case, including non-recurring items, minus (b) the aggregate amount of Excess Cash Flow payments previously made by the Borrowers for the Prior Quarters, to be applied pro rata, in the inverse order of maturity.

INTEREST RATES:

Interest on Eurodollar Loans (other than amounts outstanding under the Liquidity Backstop) shall be payable in cash on a monthly basis at a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Rate of 400 basis points.  The Adjusted LIBO Rate will have a floor of 2%.  The default rate of interest shall be equal to 2% per annum above the rates set forth above.

SENIOR DEBT
CONVERSION:

The entire amount of the Loans and other Obligations outstanding under the Credit Agreement (including Obligations owing to a Lender or an Affiliate Counterparty under or in connection with existing Swap Agreements) in excess of $50,000,000 shall be converted into common stock of Holdings, which after giving effect to such conversion and the other transactions contemplated by this Term Sheet, including the conversion of the entire amount of the Subordinated Indebtedness into common stock of Holdings (but excluding any dilution resulting from the management incentive plan set forth below), shall equal 80% of the common stock of Holdings.  Each Lender and Affiliate Counterparty shall receive a pro rata portion of such common stock of Holdings based on the aggregate amount of the Loans and other Obligations owing to such Lender or such Affiliate Counterparty (including Obligations under or in connection with existing Swap Agreements) on the Recapitalization Date.  The common stock of Holdings issued to the Lenders and Affiliate Counterparties may be comprised of voting and non-voting common stock.

CONVERSION OF
SUBORDINATED
INDEBTEDNESS:

The entire amount of the Subordinated Indebtedness shall be converted into a specified amount of the common stock of Holdings as set forth below (subject to any dilution resulting from the

management incentive plan set forth below), upon terms and conditions and pursuant to documentation, in each case, satisfactory to the Agent, the Lenders and Affiliate Counterparties constituting at least a majority in number of all Lenders and Affiliate Counterparties and holding at least two-thirds of the outstanding amount of the Loans and other Obligations outstanding under the Credit Agreement (including Obligations owing to a Lender or an Affiliate Counterparty under or in connection with existing Swap Agreements) who have consented to the terms hereof (the "Consenting Lenders"), the Borrowers, Gridiron Capital ("Gridiron") and the holders of the Subordinated Indebtedness (the "Subordinated Lenders" and, together with the Agent, the Consenting Lenders, the Borrowers and Gridiron, the "Transaction Parties").

CAPITALIZATION:

After giving effect to the transactions contemplated by this Term Sheet (but excluding any dilution resulting from the management incentive plan set forth below), the Lenders and any Affiliate Counterparties shall own 80% of the common stock of Holdings, the current equity holders of Holdings (including Gridiron) ("Existing Equity") shall own 5% and the Subordinated Lenders shall own 15%, in each case as set forth in the capitalization table attached hereto as Schedule A.

EQUITY
INCENTIVE:

Existing Equity and the Subordinated Lenders shall receive an increased share of any amounts to be paid to the owners of the common stock of Holdings upon the occurrence of a Liquidity Event (to be defined in the applicable Amendment Documents) in accordance with Schedule B attached hereto.

COMPOSITION OF THE
BOARDS OF DIRECTORS:

The board of directors of Holdings and each of the Borrowers shall at all times be comprised of seven directors of which (i) four directors shall be Independent Directors designated collectively by the Consenting Lenders, (ii) one director shall be designated by the Subordinated Lenders (the "ABA Director"), (iii) one director shall be designated by Gridiron (the "Gridiron Director") and (iv) one director shall be the CEO of Ramsey Industries. The Consenting Lenders shall propose two search firms to identify Independent Directors for the initial boards of directors and Gridiron and the Subordinated Lenders shall select one of such firms. The selected search firm shall be engaged to identify not less than eight qualified Independent Director candidates from which the Consenting Lenders shall choose four as the Independent Director candidates of the Lenders. Gridiron and the Subordinated Lenders shall have the right to eliminate one or two of such four Independent Director candidates, in which event the Consenting Lenders shall fill any such open directorship positions from the remaining candidates identified by the search firm.

Replacement of Independent Directors. The process for replacement of an Independent Director shall be as follows: The Consenting

Lenders shall reengage the search firm used for the selection of the initial Independent Directors (or if such firm is no longer able to provide such function, a replacement nationally recognized search firm selected by the Consenting Lenders and reasonably acceptable to Gridiron and the Subordinated Lenders). Such search firm shall identify not less than three qualified Independent Director candidates for each open Board position from which the Consenting Lenders shall choose one as the Independent Director candidate of the Lenders. If not previously used to eliminate a candidate in the event of the removal of an Independent Director, Gridiron and the Subordinated Lenders collectively shall have a one-time right (which if not used shall continue until it is used) to eliminate one of such replacement Independent Director candidates and in the event such right is exercised, the Consenting Lenders shall fill such position from the remaining candidates identified by the search firm. The AEA Director may be removed by (i) the Subordinated Lenders or (ii) a majority of the directors of the applicable board of directors for cause. The Gridiron Director may be removed by (i) Gridiron or (ii) a majority of the directors of the applicable board of directors for cause. The AEA Director that ceases to serve as a director, whether as a result of removal, resignation or otherwise, may be replaced only by AEA. The Gridiron Director that ceases to serve as a director, whether as a result of removal, resignation or otherwise, may be replaced only by Gridiron.

<u>Removal of Independent Directors</u>. The process for removal of an Independent Director shall be as follows: The three Independent Directors (other than the Independent Director to be removed), shall send a notice to the Consenting Lenders identifying the Independent Director to be removed. The Consenting Lenders shall reengage the search firm used for the selection of the initial Independent Directors (or if such firm is no longer able to provide such function, a replacement nationally recognized search firm selected by the Consenting Lenders and reasonably acceptable to Gridiron and the Subordinated Lenders). Such search firm shall identify not less than three qualified Independent Director candidates from which the Consenting Lenders shall choose one as the Independent Director candidate of the Lenders. If not previously used to eliminate a candidate as a replacement Independent Director, Gridiron and the Subordinated Lenders collectively shall have a one-time right (which if not used shall continue until it is used) to eliminate one of such Independent Director candidates in the event of which the Consenting Lenders shall fill such position from the remaining candidates identified by the search firm.

As used herein, the term "Independent Director" means an individual selected as set forth above on the basis of such individual's independence and disinterestedness with respect to the Lenders and on such individual's experience, qualifications and integrity. A director shall not be considered independent if (i) the director is, or has been within the last five years, a full-time employee of any

Lender or any Affiliate of any Lender, or a director's spouse is or has been within the last five years an officer of a Lender or any Affiliate of any Lender, (ii) the director has received, or a director's spouse has received, during any twelve-month period within the last five years, more than $120,000 in direct compensation from any Lender or any Affiliate of any Lender, other than pension or other forms of deferred compensation for prior service (provided such compensation is not contingent in any way on continued service), (iii) the director, or a director's spouse, is a current partner or employee of a firm that is the external auditor of any Lender or any Affiliate of any Lender, or (iv) (A) the director, or a director's spouse, is a current partner or employee of a management or consulting firm that has received over $500,000 from any Lender or any Affiliate of any Lender in any of the last five years or (B) the director, or a director's spouse, was within the last five years a partner or employee of such a firm and personally worked on engagements for any Lender or any Affiliate of any Lender which generated payment of over $500,000 from any Lender or any Affiliate of any Lender in any of the last five years. Each of the Independent Director candidates shall represent that he or she meets this Independent Director definition.  If an Independent Director candidate that is selected as an Independent Director ceases to meet the qualifications for independence, then such Director will be removed and replaced as provided above.  For purposes of the foregoing, an Affiliate of a Lender shall mean a financial institution that is controlled by, controlling or under common control with a Lender; provided that an Affiliate shall not include a former borrower of a Lender that is controlled by a Lender by virtue of foreclosure or similar action.

CORPORATE
GOVERNANCE ISSUES:     Any action to be taken by a board of directors must be authorized by a majority of the directors of such board.

LIQUIDITY
BACKSTOP:     A liquidity backstop of not less than $3,000,000 and up to $4,000,000 shall be provided by a sub-group of the Lenders upon terms and conditions satisfactory to such Lenders; provided, that not more than $3,000,000 of the total liquidity backstop shall be provided by CIT. The liquidity backstop shall be (i) a revolving, standby facility that may be used only to support the liquidity needs of the Borrowers (usage criteria to be defined in the applicable Amendment Documents), (ii) subject to an asset-based formula (to be defined in the applicable Amendment Documents consistent with asset-based lending facilities of this nature) and (iii) secured by the Collateral on a pari passu basis with the other Obligations.  However, during the continuance of an Event of Default, the proceeds from any sale, other disposition of or realization upon any of the Collateral shall be applied to the repayment of the loans and other amounts outstanding under the liquidity backstop prior to the repayment of any Term Loans.  In the event of a default under the liquidity backstop and the Lenders thereunder agree in their sole discretion to continue lending

to the Borrowers at the Borrowers' request (or permit the use of cash collateral, at the Borrowers' request) then the Lenders under the liquidity backstop will not impose as a condition to any such lending (or use of cash collateral) that the Borrowers forego payment of interest due and owing on the Term Loans. For purposes of clarity in this Term Sheet and Schedule B attached hereto, loans made with respect to the liquidity backstop are not part of the Term Loan.

Interest on amounts outstanding under the liquidity backstop shall be payable at the Adjusted LIBO Rate plus the Applicable Rate of 500 basis points. The Adjusted LIBO Rate will have a floor of 2%. The default rate of interest shall be equal to 2% per annum above the rate set forth above. An unused line fee of 25 basis points shall be payable monthly in arrears on the undrawn amount of the liquidity backstop. A liquidity backstop upfront fee of $100,000, which shall be fully earned on the Recapitalization Date, shall be paid as follows: (i) $50,000 shall be paid on the Recapitalization Date and (ii) $50,000 shall be paid on the six (6) month anniversary of the Recapitalization Date.

MANAGEMENT
INCENTIVE PLAN:

Following the payment in full of the Term Loan and all other Indebtedness and other Obligations outstanding under the Credit Agreement and the other Financing Documents and the termination of the Credit Agreement and other Financing Documents in connection with a Liquidity Event, senior management of the Borrowers shall be entitled to receive 10% of any amounts to be paid to the owners of the common stock of Holdings pursuant to a management incentive plan in form and substance satisfactory to the Agent and the Consenting Lenders which shall be included in the applicable Amendment Documents.

In addition to the foregoing, the Consenting Lenders will not object if the Borrowers (i) pay to the senior management of the Borrowers restructuring bonuses which were previously approved for the 2009 calendar year in an aggregate amount of up to $150,000 and (ii) establish a bonus plan for the 2010 calendar year pursuant to which an aggregate amount of up to $800,000 may be paid to the senior management of the Borrowers as bonuses for such year; provided, that the payment of $500,000 of such amount shall be subject to the satisfaction of certain performance criteria associated with EBITDA performance in excess of $3,000,000 (after giving effect to the payment of any such performance bonus payment); provided, further, that the payment of $300,000 of such amount shall be in the form of guaranteed retention bonus payments payable within six (6) months to the members of the current senior management team that are employed by the Borrowers at such time. Other than the payment of the $300,000 of guaranteed retention bonus which shall be further allocated and defined in the applicable Amendment Documents, the terms of any bonus plan for the 2010 calendar year and thereafter

shall be determined and approved by the applicable board of directors.

RELEASE AND WAIVER: On the Recapitalization Date, in accordance with the terms of the Amendment Documents (as defined below) the parties involved in the recapitalization and other transactions contemplated by this Term Sheet shall enter into a mutual release or mutual releases, in form and substance satisfactory to each such party.

FINANCIAL COVENANTS: Following the Recapitalization Date, the Credit Agreement will contain only the following financial covenants:

a) Maximum CAPEX: Amounts and the definition of Restructuring/Consolidation Capex are set forth on Schedule C attached hereto. The definition of normal course Capex shall be consistent with the definition of Capital Expenditures in the pre-petition Credit Agreement.

With respect to Maximum Normal Capex as shown on Schedule C, if the amount of Capital Expenditures made in any Fiscal Year is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in the first two fiscal quarters of the following Fiscal Year.

With respect to Restructuring/Consolidation Capex as shown on Schedule C, if the amount of Capital Expenditures made in Fiscal Year 2010 is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in Fiscal Year 2011.

b) Minimum EBITDA: Amounts and the definition of EBITDA are set forth on Schedule C attached hereto. Compliance will be tested on the last day of each calendar quarter commencing December 31, 2010 on a trailing twelve month basis.

c) Minimum FCC: Ratios and the definition of Fixed Charge Coverage Ratio are as set forth on Schedule C attached hereto.

ACCOUNTING: If the Borrowers adopt fresh start accounting, the Borrowers and the Lenders will negotiate in good faith to adjust the numbers set forth on Schedule C attached hereto, if any adjustment is needed, such that they conform to the projections and cushions utilized in determining the numbers set forth on Schedule C attached hereto.

ADDITIONAL REPORTING: The Borrowers shall deliver to the Agent for distribution to the Lenders on a weekly basis, a rolling 13-week cash flow forecast, in form and substance satisfactory to the Agent, including (i) information pertaining to accounts receivables, inventory and accounts payable and (ii) a comparison of the actual results for such calendar week with the corresponding forecast. The Borrowers shall provide additional quarterly and monthly reporting as set forth on

Schedule D attached hereto. The Agent and Lenders may exercise their rights to visit, inspect, examine, audit, etc. under Section 5.04 of the Credit Agreement once per quarter at the Borrowers' expense (or as often as the Agent or Lenders may request upon the occurrence and during the continuance of an Event of Default). All other existing reporting requirements to continue. The Borrowers shall provide Gridiron and the Subordinated Lenders with copies of the financial forecasts and reports delivered to the Agent.

AMENDMENT FEE:

An Amendment Fee of $250,000, which shall be fully earned and paid on the Recapitalization Date.

CONDITIONS AND MILESTONES:

(i)   Definitive documentation, including, without limitation, the Ramsey Companies' plan of reorganization (including all exhibits, schedules and annexes thereto) (the "Plan"), the treatment of claims contained therein, the related confirmation order, and all agreements and other documents entered into in connection with the Plan, shall be in form and substance reasonably satisfactory to the Transaction Parties;

(ii)   The final order authorizing the use of the Agent's cash collateral (the "Cash Collateral Order") and related budget shall be in form and substance reasonably satisfactory to the Ramsey Companies, the Agent and the Consenting Lenders;

(iii)   The Cash Collateral Order shall include termination events relating to the following, among others:

(a)   An extraordinary event occurs after December 18, 2009 that is not contemplated in the Ramsey Companies' business plan provided to the Transaction Parties prior to the date hereof, and such event has a material adverse effect on the business, assets, financial condition or prospects of the Ramsey Companies taken as a whole;

(b)   At 5:00 P.M. Eastern Time on March 8, 2010 if the Plan and disclosure statement (containing detailed term sheets with respect to the Amendment Documents) reasonably satisfactory to the Transaction Parties has not been filed by the Ramsey Companies with the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court") on or before such date (the date of the filing of the Plan with the Bankruptcy Court being referred to herein as the "Plan Filing Date");

(c)   At 5:00 P.M. Eastern Time on the 45th day after the Plan Filing Date if a disclosure statement consistent with the Plan and this Term Sheet shall not have been approved by the Bankruptcy Court on or before such date;

(d) At 5:00 P.M. Eastern Time on the 90th day after the Plan Filing Date if the Bankruptcy Court has not entered an order confirming the Plan (the "Confirmation Order") on or before such date (the "Plan Confirmation Date"); and

(e) At 5:00 P.M. Eastern Time on the 30th day after the Plan Confirmation Date, unless on or before such date substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan shall have occurred.

(iv) The terms of the Cash Collateral Order and related budget shall have been agreed to by the Agent and the Ramsey Companies on or before February 18, 2010;

(v) On or before March 8, 2010, the Lenders providing the liquidity backstop shall provide the Ramsey Companies with a written commitment, subject to market terms and conditions, to provide the liquidity backstop on the terms set forth in this Term Sheet; and

(vi) The Transaction Parties shall have agreed to the definitive terms of the Amendment Documents on or before April 15, 2010.

OTHER:

(i) The Credit Agreement shall be either amended or amended and restated to reflect the terms set forth herein and such other terms and conditions as may be reasonably requested by the Consenting Lenders. Such amendment or amendment and restatement and all other documentation entered into in connection with this Term Sheet including the Stockholders Agreement and the Management Incentive Plan (collectively, the "Amendment Documents") shall be in form and substance satisfactory to the Agent, the Consenting Lenders and Borrowers;

(ii) Except as expressly set forth herein or as shall be set forth in the Amendment Documents to reflect the transactions contemplated herein, all other terms and conditions contained in the Credit Agreement and the other Financing Documents shall remain in full force and effect;

(iii) The structure of the transactions contemplated by this Term Sheet, including, without limitation, the creation of "newco" borrowers and guarantors, all tax aspects of the structure of the transactions contemplated herein, and all documentation entered into in connection with this Term Sheet, shall be in form and substance satisfactory to the Transaction Parties and reflected in the Amendment Documents;

(iv) No management or other fees shall be due or payable to Gridiron. The management agreement with Gridiron shall be terminated at the Recapitalization Date and the Amendment Documents shall reflect that any such accrued but unpaid fees shall be waived by Gridiron at such time;

(v)   The Borrowers shall pay all of the fees and expenses (including reasonable fees and expenses of counsel) of the Agent, Gridiron and the Subordinated Lenders incurred in connection with this Term Sheet and the transactions contemplated hereby; provided, that (a) the Borrowers shall not be responsible for the payment of any fees and expenses of Gridiron and the Subordinated Lenders in excess of $800,000 and (b) the fees and expenses of Gridiron and the Subordinated Lenders shall not be paid earlier than 120 days after the Recapitalization Date and shall be paid on a monthly agreed upon basis thereafter;

(vi)   In the event the Borrowers sell one or more of their facilities in connection with their facilities consolidation plan then the net cash proceeds thereof shall be applied to the Term Loan in inverse order of maturity and the Borrowers shall not have any reinvestment rights with respect thereto;

(vii)  Each Subordinated Lender that must qualify as a VCOC shall be provided with customary information rights, inspection rights and the right to consult (but not direct) management; and

(viii) The Credit Agreement shall include a representation and covenant by the Borrowers that the value of the Borrowers' inventory shall not be written down to less than fair market value.  The Agent and Consenting Lenders shall have the right to take such actions from time to time as the Agent deems reasonably necessary to verify and confirm that the aforementioned representation and covenant are true and correct.   To the extent it is believed by the Agent, after consultation with the Borrowers, that any inventory has been written down to less than fair market value, then the Agent may object and consult with an independent appraiser and the auditor of the Company, with the cooperation of the Borrowers, to determine in good faith the fair market value of such inventory.  If it is determined based upon this review that any inventory was written down below fair market value, the excess contribution margin realized upon the sale of such inventory shall be excluded from EBITDA.

CONFIDENTIALITY:            This Term Sheet and the financing arrangements described herein is strictly confidential and shall not be disclosed to any party that is not a Transaction Party, except that, the Transaction Parties may disclose such information to their respective advisors, employees, agents, counsel, and accountant, in each case, who have a need to know such information and have a confidential relationship with such and who have been directed to maintain this Term Sheet and its terms strictly confidential, except where disclosure is required by applicable law. Receipt of a copy of this Term Sheet constitutes the agreement to keep this Term Sheet and its terms strictly confidential and otherwise comply with the provisions of this paragraph.

SCHEDULE A

Capitalization Table

| Shareholders | Tranche A Equity | Tranche B Equity | Tranche C Equity | Tranche D Equity |
|---|---|---|---|---|
| *Lenders* | | | | |
| CIT | 15.59% | 12.67% | 8.66% | 4.33% |
| Cap Source | 3.82% | 3.11% | 2.12% | 1.06% |
| Churchill | 11.11% | 9.03% | 6.17% | 3.09% |
| GE | 10.27% | 8.34% | 5.71% | 2.85% |
| Cratos | 3.78% | 3.07% | 2.10% | 1.05% |
| Denali | 2.52% | 2.05% | 1.40% | 0.70% |
| Pangea | 0.95% | 0.77% | 0.53% | 0.26% |
| Garrison | 3.78% | 3.07% | 2.10% | 1.05% |
| Allied | 5.04% | 4.10% | 2.80% | 1.40% |
| Emporia Preferred | 3.78% | 3.07% | 2.10% | 1.05% |
| MC Funding Ltd | 3.78% | 3.07% | 2.10% | 1.05% |
| OFSI Fund III | 7.56% | 6.15% | 4.20% | 2.10% |
| | 72.00% | 58.50% | 40.00% | 20.00% |
| *Subordinated Lenders* | | | | |
| AEA Mezzanine Funding LLC | 2.82% | 3.55% | 4.59% | 8.19% |
| AEA Mezzanine Funding B LLC | 7.43% | 9.35% | 12.10% | 21.60% |
| AEA Mezzanine (Unleveraged) Fund LP | 3.25% | 4.10% | 5.30% | 9.46% |
| | 13.50% | 17.00% | 22.00% | 39.25% |
| *Existing Equity* | | | | |
| Gridiron Capital Fund | 2.82% | 9.09% | 17.56% | 19.28% |
| Gridiron Strategic Advisors | 0.22% | 0.71% | 1.36% | 1.50% |
| Gridiron Co-Investors | 0.10% | 0.32% | 0.61% | 0.67% |
| AEA Mezzanine Fund LP | 0.24% | 0.78% | 1.51% | 1.66% |
| AEA Mezzanine (Unleveraged) Fund LP | 0.08% | 0.25% | 0.48% | 0.53% |
| CIT Lending Services Corporation | 0.05% | 0.17% | 0.33% | 0.37% |
| CS Equity III LLC | 0.03% | 0.10% | 0.20% | 0.21% |
| LB I Group Inc. | 0.21% | 0.69% | 1.33% | 1.46% |
| Phoenix Life Insurance Company | 0.50% | 1.62% | 3.12% | 3.43% |
| Bruce Barron | 0.16% | 0.52% | 1.00% | 1.10% |
| Robert Heffron | 0.03% | 0.09% | 0.17% | 0.18% |
| Don Helms | 0.02% | 0.06% | 0.12% | 0.13% |
| Michael Barber | 0.01% | 0.03% | 0.07% | 0.07% |
| Jim Morton | 0.01% | 0.02% | 0.04% | 0.04% |
| Robyn James | 0.00% | 0.01% | 0.01% | 0.01% |
| Ralph Dodge | 0.01% | 0.03% | 0.07% | 0.07% |
| Phil Halt | 0.00% | 0.01% | 0.02% | 0.02% |
| | 4.50% | 14.50% | 28.00% | 30.75% |
| *Management Equity* | 10.00% | 10.00% | 10.00% | 10.00% |
| **TOTAL** | **100.00%** | **100.00%** | **100.00%** | **100.00%** |

31882372.DOC

SCHEDULE B

Allocation of Proceeds

1.  Proceeds shall be applied first to the repayment of any loans outstanding under the liquidity backstop. For the avoidance of doubt, the total amount applied to the repayment of loans outstanding under the liquidity backstop shall be excluded from the computation of the total net proceeds to the Lenders contemplated in the definitions of Tranche A, B, C and D Equity below;

2.  The remaining proceeds will then be applied toward the payment in full of the $50 million Term Loan, net of any amortization payments made post-Transaction, and toward the payment in full of any additional loans provided by the Lenders;

3.  Tranche A Equity: Following the repayment in full of, any loans outstanding under the liquidity backstop, the Term Loan and any additional loans provided by the Lenders, the next $13.9 million of proceeds shall be split 72.0% to the Lenders, 10.0% to the senior management of the Borrowers, 13.5% to the Subordinated Lenders and 4.5% to Existing Equity (until the Lenders have received total net proceeds of $60 million);

4.  Tranche B Equity: Following distribution in full of proceeds subject to Tranche A, the next $34.2 million of proceeds shall be split 58.5% to the Lenders, 10.0% to the senior management of the Borrowers, 17.0% to the Subordinated Lenders and 14.5% to Existing Equity (until the Lenders have received total net proceeds of $80 million);

5.  Tranche C Equity: Following distribution in full of proceeds subject to Tranches A and B, the next $25.0 million of proceeds shall be split 40.0% to the Lenders, 10.0% to the senior management of the Borrowers, 22.0% to the Subordinated Lenders and 28.0% to Existing Equity (until the Lenders have received total net proceeds of $90 million); and

6.  Tranche D Equity: Following distribution in full of the proceeds subject to Tranches A, B and C, any additional proceeds shall be split 20.0% to the Lenders, 10% to the senior management of the Borrowers, 39.25% to the Subordinated Lenders and 30.75% to Existing Equity.

SCHEDULE C

"EBITDA" means with respect to Holdings and its consolidated Subsidiaries for any period (a) the sum of (i) Net Income, (ii) Interest Expense, (iii) Federal, state, local and foreign income taxes payable for such period, (iv) depreciation and amortization, asset impairment charges, non-cash employee compensation expenses and other non-cash items properly deductible in determining Net Income, (v) any payments, fees and expenses incurred in respect of the financial restructuring and Chapter 11 proceedings and the Plan, including legal and professional expenses, payments due to rejection of contracts in connection with the Plan, amendment fees, and upfront and continuing fees related to the liquidity backstop, (vi) fees and expenses of the Administrative Agent and Lenders, (vii) director fees and expenses (including recruiting costs), (viii) fees and expenses incurred by the Borrowers relating to Section 5.04 of the Credit Agreement, (ix) the cost of any management retention program put in place for Fiscal Year 2010 in the amount of $300,000 (x) operational restructuring costs associated with the facilities consolidation plan (specifically excluding any allocation of overhead or any other costs not specifically attributable to the facilities consolidation plan); provided, that the nature of such expenses shall be consistent with, and the aggregate amount limited to, the Budget to be attached as an Exhibit to the applicable Amendment Document, and (xi) loss on sale of assets outside the ordinary course of business, including disposition of facilities and equipment, minus (b) the sum of (i) non-cash items properly added in determining Net Income for such period, (ii) the gain on sale of assets outside the ordinary course of business, including disposition of facilities and equipment and (iii) any gain or loss on any equity incentives from the Management Incentive Plan, if any.

"Excess Cash Flow" means, with respect to Holdings and its consolidated Subsidiaries for any period, the amount, if any, by which EBITDA for such period (but determined by adding back thereto, but without duplication, any amount deducted in the calculation of Net Income that was paid, incurred or accrued in violation of any of the provisions of this Agreement unless otherwise agreed by the Administrative Agent in its sole discretion) exceeds (a) the sum of (i) Debt Service Expense for such period in respect of Funded Debt incurred in accordance with Section 6.01, (ii) Capital Expenditures permitted pursuant to Section 6.09 and made during such period (except to the extent financed with proceeds of Indebtedness (other than the liquidity backstop) or the issuance of equity), (iii) all Taxes paid in cash during such period, and (iv) Investments made in cash during such period, to the extent permitted under Section 6.04, plus (b) any decrease in working capital for Holdings and its Subsidiaries during such period (subject to the working capital normalization adjustment to be set out in an Exhibit to the applicable Amendment Document) and any extraordinary cash gains for Holdings and its Subsidiaries during such period; minus (c) any increase in working capital for Holdings and its Subsidiaries during such period (subject to the working capital normalization adjustment to be set out in an Exhibit to the applicable Amendment Document) and any extraordinary cash losses for Holdings and its Subsidiaries during such period. For the avoidance of doubt, the following shall be excluded from the computation of Excess Cash Flow: (a) any income tax refunds received in Fiscal Year 2010, which will remain available to the Borrowers to fund their liquidity requirements in the normal course of operations and (b) the proceeds of facility or other asset sales outside the ordinary course of business, which shall be remitted to the Administrative Agent in full and applied as a prepayment in accordance with Section 2.09(f).

"Fixed Charge Coverage Ratio" means, with respect to Holdings and its consolidated Subsidiaries as of the date of determination thereof, the ratio of (i) EBITDA minus normal course Capital Expenditures made, excluding capital expenditures associated with the facilities consolidation plan (except to the extent financed with Indebtedness other than the liquidity backstop) and Taxes paid in cash (net of refunds actually received in cash (other than refunds received for Fiscal Year 2010)) for the period of four fiscal quarters most recently ended on or prior to such date to (ii) the Debt Service Expense for such period, plus cash contributions made with respect to the Borrowers' underfunded pension plan liability.

31882372.DOC

"Restructuring/Consolidation Capex" means incremental, out-of-pocket Capital Expenditures specifically attributable to the operational restructuring and facilities consolidation plan; provided, that the nature of such expenses shall be consistent with the Budget to be attached as an Exhibit to the applicable Amendment Document and such expenses shall not exceed the covenant level of $1,700,000 as specified herein.

Notwithstanding anything to the contrary contained in the definitions herein, it is acknowledged that certain defined terms and references to the pre-petition Credit Agreement may no longer be applicable or may require adjustment and such adjustments will be made in the Amendment Documents.

**Fansteel Industries - Proposed Covenant Summary**

| ($000s) | Q4-10 | Q1-11 | Q2-11 | Q3-11 | Q4-11 | Q1-12 | Q2-12 | Q3-12 | Q4-12 | Q1-13 | Q2-13 | Q3-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum EBITDA** | | | | | | | | | | | | |
| TTM Per Model | $ 3,074 | $ 3,291 | $ 3,847 | $ 4,879 | $ 6,438 | $ 8,016 | $ 9,306 | $10,314 | $10,997 | $11,555 | $ 12,080 | $ 12,658 |
| Cushion | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Calculated Covenant | 2,613 | 2,797 | 3,270 | 4,147 | 5,472 | 6,813 | 7,910 | 8,767 | 9,347 | 9,822 | 10,268 | 10,759 |
| **Proposed Covenant** | $ 2,600 | $ 2,800 | $ 3,300 | $ 4,100 | $ 5,500 | $ 6,800 | $ 7,900 | $ 8,800 | $ 9,300 | $ 9,800 | $ 10,300 | $ 10,800 |
| **Maximum Normal Capex** | | | | | | | | | | | | |
| Annual Capex Per Model | $ 900 | | | | $ 900 | | | | $ 1,400 | | | $ 1,200 |
| Cushion | 110% | | | | 110% | | | | 110% | | | 110% |
| Covenant | 990 | | | | 990 | | | | 1,540 | | | 1,320 |
| **Proposed Covenant** | $ 1,000 | | | | $ 1,000 | | | | $ 1,550 | | | $ 1,350 |
| **Maximum Restructuring/Consolidation Capex** | | | | | | | | | | | | |
| Annual Capex Per Model | $ 1,513 | | | | | | | | | | | |
| Cushion | 110% | | | | | | | | | | | |
| Covenant | $ 1,664 | | | | | | | | | | | |
| **Proposed Covenant** | $ 1,700 | | | | | | | | | | | |
| **Fixed Charge Covenant** | | | | | | | | | | | | |
| Covenant Base EBITDA | $ 2,613 | $ 2,797 | $ 3,270 | $ 4,147 | $ 5,472 | $ 6,813 | $ 7,910 | $ 8,767 | $ 9,347 | $ 9,822 | $ 10,268 | $ 10,759 |
| Normal Course Capex | (990) | (990) | (990) | (990) | (990) | (1,128) | (1,265) | (1,403) | (1,540) | (1,595) | (1,650) | (1,705) |
| EBITDA for Covenant | 1,623 | 1,807 | 2,280 | 3,157 | 4,482 | 5,686 | 6,645 | 7,365 | 7,807 | 8,227 | 8,618 | 9,054 |
| Debt Amortization | $ - | $ 250 | $ 500 | $ 750 | $ 1,000 | $ 1,100 | $ 1,200 | $ 1,300 | $ 1,400 | $ 1,550 | $ 1,700 | $ 1,850 |
| Pension Contribution | 1,115 | 1,304 | 1,265 | 940 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| Interest [1] | 3,280 | 3,280 | 3,265 | 3,250 | 3,235 | 3,220 | 3,199 | 3,178 | 3,157 | 3,136 | 3,106 | 3,076 |
| Fixed Charge for Covenant | 4,395 | 4,834 | 5,030 | 4,940 | 5,135 | 5,220 | 5,299 | 5,378 | 5,457 | 5,586 | 5,706 | 5,826 |
| Fixed Charge Ratio | 0.37 | 0.37 | 0.45 | 0.64 | 0.87 | 1.09 | 1.25 | 1.37 | 1.43 | 1.47 | 1.51 | 1.55 |
| **Proposed Covenant** | 0.35 | 0.35 | 0.40 | 0.50 | 0.70 | 1.00 | 1.10 | 1.20 | 1.20 | 1.30 | 1.20 | 1.20 |

[1] Interest calculated by the Company assumes a fully drawn revolver throughout.

31882372.DOC

SCHEDULE D

Additional Quarterly and Monthly Reporting Requirements

Quarterly for 2011 and thereafter, Monthly for 2010:

1.  Detailed Management Discussion and Analysis regarding (i) overall business performance and industry trends, (ii) financial results and variances to budget/ forecast for each business unit (including revenue, EBITDA, working capital and capital expenditures) and (iii) updates as to the timing and status of key corporate initiatives including product outsourcing, plant consolidation and new product/ customer development activities.

Monthly:

1.  A summary discussion (by business unit) of the monthly financial statements of the Borrowers;

2.  Summary of bookings, backlogs and shipments for each business unit along with comparisons to prior month and prior year;

3.  Rolling calculation of trailing-twelve month EBITDA;

4.  Sales to top 20 (overall) customers for current month and YTD along with comparative data for prior year; and

5.  Customary borrowing base level reporting on a monthly basis or more frequently as requested by the Agent upon the occurrence of an event of default.

31882372.DOC