## <u>EXHIBIT A-3</u>

**(LLC Agreement Term Sheet)**

*The Preliminary Summary of Terms and Conditions outlined below is not intended to set forth all of the terms and conditions of the transactions contemplated hereby. This Summary of Terms and Conditions is subject to further review by each of the parties, including their counsel, does not obligate any person to proceed with any proposed transaction. It therefore does not constitute a binding commitment nor an offer to enter into a binding commitment. A binding commitment with respect to any proposed transaction would only result from the execution of a definitive agreement, which may be entered into at the parties' sole discretion and may be refused by the parties for any reason in their sole discretion.*

**Preliminary Summary of Terms and Conditions ("Term Sheet")**
**of a Limited Liability Company Agreement in respect of Debt Restructuring/Recapitalization of Ramsey Holdings, Inc.**

**Ramsey Industries, Inc. and its Subsidiaries**

**March 23, 2010**

| | |
|---|---|
| LLC AGREEMENT: | LLC Agreement (the "LLC Agreement") to be entered into by and among the Lenders (as defined below) (or any of their respective designees), the Subordinated Lenders (as defined below) (or any of their respective designees), the Current Equity Holders (as defined below) (or any of their respective designees) and the Management Equity Holders (as defined below), which LLC Agreement shall provide terms in respect of new equity interests to be issued in Newco (as defined below), all as more particularly described in this Term Sheet. |
| NEWCO (THE LLC) | Prior to the Recapitalization Date (as defined below), Newco shall be formed as a Delaware limited liability company ("Newco"). On the Recapitalization Date, Newco will become the owner of all of the outstanding equity interests of Ramsey Holdings, Inc., all in accordance with the provisions of the Plan (as defined below). |
| BORROWERS: | Ramsey Industries, Inc. ("Ramsey Industries"), Ramsey Winch Company ("Ramsey Winch"), Auto Crane Company ("Auto Crane") and Eskridge, Inc. ("Eskridge"). |
| HOLDINGS: | Ramsey Holdings, Inc. (collectively with the Borrowers, the "Ramsey Companies") |
| AGENT: | CIT Lending Services Corporation ("CIT") |
| LENDERS: | The existing Lenders under the existing Credit Agreement, more particularly identified on Schedule A attached hereto under "Class A Interests" (collectively, the "Lenders"). |
| SUBORDINATED LENDERS: | AEA Mezzanine Funding LLC, AEA Mezzanine Funding B LLC and AEA Mezzanine (Unleveraged) Fund LP (collectively, the "Subordinated Lenders") |

CURRENT EQUITY HOLDERS:   The current holders of equity in Ramsey Holdings, Inc. (the "Current Equity Holders").

MANAGEMENT EQUITY
HOLDERS:   Bruce Barron, Robert Heffron, Don Helms, Michael Barber, Jim Morton, Robyn James, Ralph Dodge, Phil Halt and John R. Celoni, Jr., together with any other members of management who may, in the future, receive Class D Interests in Newco pursuant to the terms of the Management Equity Incentive Plan (as defined below) ("Management Equity Holders")

RECAPITALIZATION DATE:   The "Recapitalization Date" shall mean the date of substantial consummation of the Ramsey Companies' plan of reorganization (including all exhibits, schedules and annexes thereto) (the "Plan")

EQUITY IN NEWCO:   On the Recapitalization Date, (i) the Lenders that consent to the Plan (the "Consenting Lenders") and their respective affiliates that are counterparties to an existing Swap Agreement (each, an "Affiliate Counterparty") will be issued Class A-1 Interests of Newco (either directly or to any of their respective designees), (ii) the Lenders that are not Consenting Lenders and their respective Affiliate Counterparties will be issued Class A-2 Interests of Newco (either directly or to any of their respective designees; each such Lender that is not a Consenting Lender, Affiliate Counterparty and designee, an "Initial Class A-2 Interest Holder") (the Class A-1 Interests and the Class A-2 Interests collectively referred to herein as the "Class A Interests"), (iii) the Subordinated Lenders will be issued Class B Interests of Newco (either directly or to any of their respective designees), (iv) the Current Equity Holders will be issued Class C Interests of Newco (either directly or to any of their respective designees) and (v) the Management Equity Holders will be issued Class D Interests of Newco. The allocations of such equity interests in Newco among the Lenders (and their respective Affiliate Counterparties or designees), the Subordinated Lenders (or their respective designees), the Current Equity Holders (or their respective designees) and the Management Equity Holders is as set forth on Schedule A attached hereto. All Class D Interests shall be issuable by Newco in accordance with the terms and conditions of a Management Equity Incentive Plan of Newco (the "Management Equity Incentive Plan"), such Management Equity Incentive Plan to become effective on the Recapitalization Date.

ISSUANCES OF NEW
SECURITIES BY NEWCO:   Newco shall not issue any additional equity securities or debt securities without having obtained the prior written consent of (i) holders of a majority-in-interest of the Class A Interests of Newco, (ii) holders of a majority-in-interest of the Class B Interests of Newco and (iii) holders of a majority-in-interest of the Class C Interests of Newco.

VOTING OF NEWCO EQUITY
INTERESTS: Each of the Class A Interests, Class B Interests and the Class C Interests that are not held by Management Equity Holders shall be voting securities; provided, however, that holders of Class A-2 Interests shall not have any voting rights with respect to the appointment of directors of Newco and the Ramsey Companies. Any holder of Class A Interests or Class B Interests may, however, at its sole option, elect to convert all or any portion of such Class A Interests or Class B Interests into non-voting securities, which non-voting securities, except for the absence of voting rights, shall have the same economic and other rights of Class A Interests or Class B Interests, as the case may be.

CAPITAL CONTRIBUTIONS: The initial equity interests of Newco to be issued to the Lenders (and their respective Affiliate Counterparties or designees), the Subordinated Lenders (or any of their respective designees), the Current Equity Holders (or any of their respective Designees) and the Management Equity Holders shall be issued in connection with the Plan and no such parties shall be obligated to make a capital contribution to Newco in respect of such issuance. None of the holders of equity interests in Newco shall have any obligations to make additional capital contributions to Newco at any time in the future.

MANAGEMENT
INCENTIVE PLAN: The Management Incentive Plan attached as Schedule C hereto.

PAYMENTS IN RESPECT
OF EQUITY IN NEWCO
AND DEBT IN THE RAMSEY
COMPANIES: Upon the occurrence of any of the following (each, a "Liquidity Event"): (a) any sale of Newco or the Ramsey Companies (whether by way of merger, consolidation, sale of all of the outstanding membership interests, sale of all of the outstanding shares of capital stock, or sale of all or substantially all of the assets of Newco or the Ramsey Companies), (b) a liquidation, dissolution or winding up of Newco or the Ramsey Companies, whether voluntary or involuntary, or (c) any distributions made by Newco to the holders of membership interests, proceeds of such event, or the amount of distributions, as the case may be, shall be distributed to the holders of debt in the Ramsey Companies and the holders of equity in Newco in accordance with the provisions set forth in Schedule B attached hereto. Any such payments shall be made pro rata to the holders of each Class of equity interests of Newco based upon their respective percentage ownership interest of such Class as more particularly set forth on Schedule A attached hereto.

CORPORATE
GOVERNANCE OF NEWCO
AND THE RAMSEY
COMPANIES:

Newco shall have a board of directors as described below in this Term Sheet. The individuals chosen to serve on the board of directors of Newco shall also serve as the directors of each Ramsey Company. Any action to be taken by a board of directors must be authorized by a majority of the directors of such board.

COMPOSITION OF THE
BOARDS OF DIRECTORS:

In accordance with the Plan, and at all times following the Recapitalization Date, the board of directors of Newco, Holdings and each of the Borrowers shall be comprised of seven directors of which (i) four directors shall be Independent Directors designated collectively by the holders of a majority-in-interest of the Class A-1 Interests in Newco to be issued in accordance with the Plan (the "Consenting Class A-1 Holders"), (ii) one director (the "Class B Director") shall be designated by the holders of a majority-in-interest of the Class B Interests in Newco to be issued in accordance with the Plan (the "Consenting Class B Holders"), (iii) one director (the "Gridiron Director") shall be designated by Gridiron Capital ("Gridiron") and (iv) one director shall be the CEO of Ramsey Industries. The Consenting Class A-1 Holders shall propose two search firms to identify Independent Directors for the initial boards of directors and Gridiron and the Consenting Class B Holders shall select one of such firms. The selected search firm shall be engaged to identify not less than eight qualified Independent Director candidates from which the Consenting Class A-1 Holders shall choose four as the Independent Director candidates of the holders of Class A-1 Interests. Gridiron and the Consenting Class B Holders shall have the right to eliminate one or two of such four Independent Director candidates, in which event the Consenting Class A-1 Holders shall fill any such open directorship positions from the remaining candidates identified by the search firm.

Replacement of Independent Directors. The process for replacement of an Independent Director shall be as follows: The Consenting Class A-1 Holders shall reengage the search firm used for the selection of the initial Independent Directors (or if such firm is no longer able to provide such function, a replacement nationally recognized search firm selected by the Consenting Class A-1 Holders and reasonably acceptable to Gridiron and the Consenting Class B Holders). Such search firm shall identify not less than three qualified Independent Director candidates for each open Board position from which the Consenting Class A-1 Holders shall choose one as the Independent Director candidate of the holders of Class A-1 Interests. If not previously used to eliminate a candidate in the event of the removal of an Independent Director (excluding, to be clear, any elimination of a candidate pursuant to the first paragraph of this Section, "Composition of the Boards of Directors"), Gridiron and the Consenting Class B Holders collectively shall have a one-time right

(which if not used shall continue until it is used) to eliminate one of such replacement Independent Director candidates and in the event such right is exercised, the Consenting Class A-1 Holders shall fill such position from the remaining candidates identified by the search firm. The Class B Director may be removed by (i) the Consenting Class B Holders for any or no reason or (ii) a majority of the directors of the applicable board of directors for cause. The Gridiron Director may be removed by (i) Gridiron for any or no reason or (ii) a majority of the directors of the applicable board of directors for cause. The Class B Director that ceases to serve as a director, whether as a result of removal, resignation or otherwise, may be replaced only by the Consenting Class B Holders. The Gridiron Director that ceases to serve as a director, whether as a result of removal, resignation or otherwise, may be replaced only by Gridiron.

Removal of Independent Directors. The process for removal of an Independent Director shall be as follows: The three Independent Directors (other than the Independent Director to be removed), shall send a notice to each of the holders of Class A-1 Interests of Newco identifying the Independent Director to be removed. The Consenting Class A-1 Holders shall reengage the search firm used for the selection of the initial Independent Directors (or if such firm is no longer able to provide such function, a replacement nationally recognized search firm selected by the Consenting Class A-1 Holders and reasonably acceptable to Gridiron and the Consenting Class B Holders). Such search firm shall identify not less than three qualified Independent Director candidates from which the Consenting Class A-1 Holders shall choose one as the Independent Director candidate of the holders of Class A-1 Interests of Newco. If not previously used to eliminate a candidate as a replacement Independent Director (excluding, to be clear, any elimination of a candidate pursuant to the first paragraph of this Section, "Composition of the Boards of Directors"), Gridiron and the Consenting Class B Holders collectively shall have a one-time right (which if not used shall continue until it is used) to eliminate one of such Independent Director candidates in the event of which the Consenting Class A-1 Holders shall fill such position from the remaining candidates identified by the search firm.

As used herein, the term "Independent Director" means an individual selected as set forth above on the basis of such individual's independence and disinterestedness with respect to the Lenders and on such individual's experience, qualifications and integrity. A director shall not be considered independent if (i) the director is, or has been within the last five years, a full-time employee of any Lender or any Affiliate of any Lender, or a director's spouse is or has been within the last five years an officer of a Lender or any Affiliate of any Lender, (ii) the director has received, or a director's spouse has received, during any twelve-month period within the last five years, more than $120,000 in direct compensation from any Lender or any Affiliate of any Lender, other than pension or other forms of deferred compensation for prior service (provided such compensation is not

contingent in any way on continued service), (iii) the director, or a director's spouse, is a current partner or employee of a firm that is the external auditor of any Lender or any Affiliate of any Lender, or (iv) (A) the director, or a director's spouse, is a current partner or employee of a management or consulting firm that has received over $500,000 from any Lender or any Affiliate of any Lender in any of the last five years or (B) the director, or a director's spouse, was within the last five years a partner or employee of such a firm and personally worked on engagements for any Lender or any Affiliate of any Lender which generated payment of over $500,000 from any Lender or any Affiliate of any Lender in any of the last five years. Each of the Independent Director candidates shall represent that he or she meets this Independent Director definition.  If an Independent Director candidate that is selected as an Independent Director ceases to meet the qualifications for independence, then such Director will be removed and replaced as provided above.  For purposes of the foregoing, an Affiliate of a Lender shall mean a financial institution that is controlled by, controlling or under common control with a Lender; provided that an Affiliate shall not include a former borrower of a Lender that is controlled by a Lender by virtue of foreclosure or similar action.

As used herein, "cause" shall mean, with respect to the removal of a director, such director's (i) willful and continued failure substantially to perform his or her duties with Newco and/or any of the Ramsey Companies in his or her established capacity as a director, (ii) willful conduct that is materially injurious, monetarily or otherwise, to Newco and/or any of the Ramsey Companies, (iii) conviction for, or plea of guilty or no contest to, a felony or a crime involving moral turpitude or (iv) abuse of illegal drugs or other controlled substances or habitual intoxication.

OFFICERS OF NEWCO AND
THE RAMSEY COMPANIES:

The CEO of Ramsey Industries and any members of management of the Ramsey Companies that the applicable board of directors shall determine should serve as an officer of Newco and/or any of the Ramsey Companies, shall serve as officers of Newco and/or the Ramsey Companies.  The LLC Agreement shall require Newco and the Ramsey Companies to carry a D&O insurance tail policy covering current and former officers and directors for a period of six (6) years following the Recapitalization Date, provided, that the cost of such D&O insurance tail policy shall not exceed $125,000 (on a one-time payment basis for the entire six (6) year term) and shall be included in Borrowers' final cash collateral budget.

RESTRICTIONS ON
TRANSFER:

Holders of Class A Interests, Class B Interests or Class C Interests shall be entitled to transfer all or a portion of their membership interests to (i) Permitted Transferees (as defined below) and (ii) to any other third parties (such third parties, "Other Permitted Transferees").  Holders of Class D Interests shall only be entitled to transfer all or any portion of their respective Class D Interest to the

extent such transfer is permissible under the Management Equity Incentive Plan.  Any transferee of any equity interests in Newco shall be obligated to execute a joinder agreement in connection with such transfer pursuant to which such transferee shall become bound by all of the terms and conditions of the LLC Agreement.

In addition, in the event that any holder of Class A Interests shall transfer any portion of its Class A Interests to a third party that is not an Initial Class A-2 Interest Holder or an affiliate of an Initial Class A-2 Interest Holder, all Class A Interests received by such transferee shall automatically be Class A-1 Interests upon such transfer; and in the event that any holder of Class A Interests shall transfer any portion of its Class A Interests to a third party that is an Initial Class A-2 Interest Holder or an affiliate of an Initial Class A-2 Interest Holder, all Class A Interests received by such transferee shall automatically be Class A-2 Interests upon such transfer.

PERMITTED TRANSFEREES:

A "Permitted Transferee" means, with respect to a holder of membership interests who is a natural person:  (1) upon such holder's death, such holder's personal representative for purposes of the administration of such holder's estate, and to any devisee, legatee or beneficiary of such estate; (2) such holder's spouse or issue or any trust for the benefit thereof; or (3) to an entity, all of the voting equity securities of which are owned by such holder.

A "Permitted Transferee" means, with respect to a holder of membership interests that is an entity:  (1) an entity that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such holder (an "Affiliated Holder"); (2) a special purpose entity that has been formed or created by or on behalf of such holder or an Affiliated Holder or that is associated with such holder or an Affiliated Holder; or (3) a manager or other Affiliated Holder of a holder that is a special purpose entity.  For the purpose of this definition, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to an entity, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

RIGHT OF FIRST REFUSAL WITH RESPECT TO CLASS A INTERESTS:

If one or more holders of Class A Interests ("Selling Holder(s)") desires to transfer to an Other Permitted Transferee in one or a series of related transactions, five percent (5%) or more of the Class A Interests held by all holders of Class A Interests (taking into account any transfers by such Selling Holder(s) within the last twelve (12) months other than to Permitted Transferees of such Selling Holder(s)), the Selling Holder(s) shall first obtain a written bona fide

purchase offer therefor from a potential purchaser (the "Bona Fide Offer") and the following procedures shall apply:

(i)   The Selling Holder(s) shall first deliver to all of the (A) other holders of Class A Interests (such other holders, the "Other Holders"), (B) holders of Class B Interests, and (C) holders of Class C Interests written notice of such Selling Holder(s)' desire to transfer such Class A Interests (an "Offer Notice"). The Offer Notice shall (A) identify the number of Class A Interests proposed to be transferred (the "Offered Interests"), (B) name the identity of the potential purchaser making the Bona Fide Offer, (C) specify the cash price per Class A Interest proposed to be paid in the Bona Fide Offer (the "Offer Price") and the other material terms and conditions of such sale (which shall be the same as those set forth in the Bona Fide Offer) and (D) contain and be deemed to constitute an irrevocable offer by the Selling Holder(s) to sell to each Other Holder, holder of Class B Interests and holder of Class C Interests, the Offered Interests in accordance with the procedures set forth below.

(ii)   If any Other Holder wishes to purchase a portion of the Offered Interests, such Other Holder shall, within ten (10) days following receipt of the Offer Notice (the "Offer Period"), deliver to the Selling Holder(s) a written notice (an "Acceptance Notice"), stating that such Other Holder is willing to purchase a portion of the Offered Interests, and the Acceptance Notice shall constitute an irrevocable commitment by such Other Holder to purchase the number of Offered Interests set forth in the Acceptance Notice. Each Other Holder may elect to purchase all or a portion of such Holder's Pro Rata Share of the Offered Interests. "Pro Rata Share" means, with respect to any Other Holder, the fraction that results from dividing (A) the number of Class A Interests held by such Other Holder, by (B) the number of Class A Interests held by all Other Holders.

(iii)   If any Other Holder fails to deliver an Acceptance Notice prior to the expiration of the Offer Period, such Other Holder shall be deemed to have rejected the Selling Holder(s)' offer set forth in the Offer Notice.

(iv)   Following the Offer Period, if any portion of the Offered Interests has not been purchased in accordance with clause (ii) above, the Other Holders that have elected to purchase a portion of the Offered Interests shall have the right, exercisable within five (5) business days following the expiration of the Offer Period (the "Second Offer Period"), to further subscribe for the remaining Offered Interests which have not been so purchased in accordance with clause (ii) above. The portion each such Other Holder may be entitled to purchase shall be pro rata based upon the respective ownership interests of each such Other Holder that has elected to purchase Offered Interests pursuant to clause (ii) above.

(v) If, following the Second Offer Period, any portion of the Offered Interests has not been purchased (any such remaining interests, the "Remaining Interests"), the holders of Class B Interests will have the right, exercisable within five (5) business days following the expiration of the Second Offer Period (the "Remaining Interests Offer Period"), to purchase up to 75% of the Remaining Interests and the holders of Class C Interests will have the right, exercisable during the Remaining Interests Offer Period, to purchase up to 25% of the Remaining Interests pursuant to procedures similar to those described above. To the extent the holders of Class C Interests shall not have purchased all of the Remaining Interests they are entitled to purchase, the holders of Class B Interests shall have the right, exercisable within five (5) business days following the expiration of the Remaining Interests Offer Period (the "Second Remaining Interests Offer Period"), to purchase all or any portion of such Remaining Interests not so purchased by the holders of Class C Interests. To the extent the holders of Class B Interests shall not have purchased all of the Remaining Interests they are entitled to purchase, the holders of Class C Interests shall have the right, exercisable during the Second Remaining Interests Offer Period, to purchase all or any portion of such Remaining Interests not so purchased by the holders of Class B Interests. Each Class B Holder and Class C Holder shall be permitted to purchase up to its Pro Rata B Share and Pro Rata C Share, respectively, of the maximum number of Remaining Interests that the Class B Holders or Class Holders, as the case may be, are permitted to purchase as described above. "Pro Rata B Share" means, with respect to any holder of Class B Interests, the fraction that results from dividing (A) the number of Class B Interests held by such holder of Class B Interests, by (B) the number of Class B Interests held by all holders of Class B Interests. "Pro Rata C Share" means, with respect to any holder of Class C Interests, the fraction that results from dividing (A) the number of Class C Interests held by such holder of Class C Interests, by (B) the number of Class C Interests held by all holders of Class C Interests.

(vi) With respect to any Other Holder (or any holder of Class B Interests or Class C Interests that elects to purchase Remaining Interests pursuant to clause (v) above) that is not an Initial Class A-2 Interest Holder or an affiliate of an Initial Class A-2 Interest Holder, all Class A Interests purchased by such holder in connection with such holder's exercise of its right of first refusal shall automatically be Class A-1 Interests upon the closing of such purchase. With respect to any Other Holder (or any holder of Class B Interests or Class C Interests that elects to purchase Remaining Interests pursuant to clause (v) above) that is an Initial Class A-2 Interest Holder or an affiliate of an Initial Class A-2 Interest Holder, all Class A Interests purchased by such holder in connection with such holder's exercise of its right of first refusal shall automatically be Class A-2 Interests upon the closing of such purchase.

**RIGHT OF FIRST REFUSAL WITH RESPECT TO CLASS B INTERESTS AND CLASS C INTERESTS:**

With respect to transfers of Class B Interests, the LLC Agreement will also provide for a right of first refusal similar to the right of first refusal described above with respect to transfers of Class A Interests, except that the offer to purchase such Class B Interests shall be made, first, to the holders of Class B Interests, second, to the holders of Class A Interests, and third, to the holders of Class C Interests.

With respect to transfers of Class C Interests, the LLC Agreement will also provide for a right of first refusal similar to the right of first refusal described above with respect to transfers of Class A Interests, except that the offer to purchase such Class shall be made, first, to the holders of Class C Interests, second, to the holders of Class A Interests, and third, to the holders of Class B Interests.

**AMENDMENT OF LLC AGREEMENT:**

The LLC Agreement may be amended with the written consent of holders of a majority-in-interest of each of the Class A Interests, Class B Interests and Class C Interests; provided, however, that notwithstanding the foregoing, any amendment that is solely ministerial or administrative in nature or that solely affects the Class A Interests (without increasing or improving the rights, privileges or preferences of the Class A Interests or any of the holders thereof) may be made with the written consent of the holders of a majority-in-interest of the Class A Interests acting alone (for purposes of example, modifying any of the provisions of the LLC Agreement relating to composition of the Board of Directors or governance of the Company would be deemed not to solely affect the Class A Interests).

**RELEASE AND WAIVER:**

On the Recapitalization Date, the Transaction Parties (as defined below) shall enter into a mutual release or mutual releases for each party and all current and former directors and officers of the debtors, in form and substance reasonably satisfactory to each such party.

**VCOC RIGHTS:**

Each Subordinated Lender that must qualify as a VCOC shall be provided with customary information rights, inspection rights and the right to consult (but not direct) management.

**OTHER:**

(i) The structure of the transactions contemplated by this Term Sheet, all tax aspects of the structure of the transactions contemplated herein, and all documentation entered into in connection with this Term Sheet, shall be in form and substance satisfactory to the Consenting Class A-1 Holders, the Subordinated Lenders, the Borrowers and Gridiron (the "Transaction Parties") and reflected in the New Credit Agreement, the LLC Agreement and any other applicable ancillary documents thereto;

(ii) A new Credit Agreement (the "New Credit Agreement"), will be entered into by and among the Borrowers (as defined below), the

Lenders, each Affiliate Counterparty, and the Agent, which New Credit Agreement will replace the existing Credit Agreement, dated as of April 5, 2007 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among the Borrowers, the Lenders and the Agent; and

(iii) The LLC Agreement shall be governed in accordance with the laws of the State of Delaware, without giving effect to the conflicts of law principles thereof.

(iv) So long as they hold Class B Interests or Class C Interests, the Ramsey Companies will be required to provide to Gridiron and the Subordinated Lenders all financial forecasts and reports delivered to the Agent.

CONFIDENTIALITY:

This Term Sheet and the arrangements described herein is strictly confidential and shall not be disclosed to any party that is not a Transaction Party, except that the Transaction Parties may disclose such information to their respective advisors, employees, agents, counsel, and accountant, in each case, who have a need to know such information and have a confidential relationship with such and who have been directed to maintain this Term Sheet and its terms strictly confidential, except where disclosure is required by applicable law, and this Term Sheet shall be disclosed as part of the bankruptcy Plan filings. Receipt of a copy of this Term Sheet constitutes the agreement to keep this Term Sheet and its terms strictly confidential, except as provided above, and to otherwise comply with the provisions of this paragraph.

SCHEDULE A

Capitalization Table

| Shareholders | Percentage of Equity |
|---|---|
| **Lenders (Class A Interests)** | |
| CIT | 21.655% |
| Cap Source | 5.308% |
| Churchill | 15.432% |
| GE | 14.264% |
| Cratos | 5.253% |
| Denali | 3.502% |
| Pangea | 1.313% |
| Garrison | 5.253% |
| Allied | 7.005% |
| Emporia Preferred | 5.253% |
| MC Funding Ltd | 5.253% |
| OFSI Fund III | 10.507% |
| | 100.00% |
| | |
| **Subordinated Lenders (Class B Interests)** | |
| AEA Mezzanine Funding LLC | 20.870% |
| AEA Mezzanine Funding B LLC | 55.020% |
| AEA Mezzanine (Unleveraged) Fund LP | 24.110% |
| | 100.00% |
| | |
| **Existing Equity (Class C Interests)** | |
| Gridiron Capital Fund | 62.710% |
| Gridiron Strategic Advisors | 4.871% |
| Gridiron Co-Investors | 2.191% |
| AEA Mezzanine Fund LP | 5.408% |
| AEA Mezzanine (Unleveraged) Fund LP | 1.718% |
| CIT Lending Services Corporation | 1.188% |
| CS Equity III LLC | 0.697% |
| LB I Group Inc. | 4.750% |
| Phoenix Life Insurance Company | 11.160% |
| Bruce Barron | 3.563% |
| Robert Heffron | 0.594% |
| Don Helms | 0.428% |
| Michael Barber | 0.238% |
| Jim Morton | 0.143% |
| Robyn James | 0.048% |
| Ralph Dodge | 0.238% |
| Phil Halt | 0.059% |
| | 100.00% |

**Management Equity (Class D Interests)**

**Pursuant to Management Incentive Plan**

SCHEDULE B

Allocation of Proceeds Upon Occurrence of a Liquidity Event

1.  Proceeds shall be applied first to the repayment of any loans outstanding under the Revolving Loan (to be defined in the New Credit Agreement). For the avoidance of doubt, the total amount applied to the repayment of loans outstanding under the Revolving Loan shall be excluded from the computation of the total net proceeds to the Lenders (and their respective Affiliate Counterparties), the Subordinated Lenders, the Current Equity Holders and the Management Equity Holders;

2.  The remaining proceeds will then be applied toward the payment in full of the $50 million Term Loan (to be defined in the New Credit Agreement), net of any amortization payments made post-reorganization, and toward the payment in full of any additional loans provided by the Lenders (and their respective Affiliate Counterparties);

3.  Following the repayment in full of the items described in clauses (1) and (2) above, the next $13.9 million of proceeds shall be allocated 72.0% to the holders of Class A Interests in Newco, 13.5% to the holders of Class B Interests in Newco, 4.5% to the holders of Class C Interests in Newco, and 10% to the holders of Class D Interests in Newco; provided, however, that any payments pursuant to this clause (3) shall cease in the event that, and at such time as, the Lenders (and their respective Affiliate Counterparties) shall have received aggregate net proceeds in respect of clauses (2) and (3) which is equal to $60 million;

4.  Following the payment in full of the items described in clauses (1), (2) and (3) above, the next $34.2 million of proceeds shall be allocated 58.5% to the holders of Class A Interests in Newco, 17.0% to the holders of Class B Interests in Newco, 14.5% to the holders of Class C Interests in Newco, and 10.0% to the holders of Class D Interests in Newco; provided, however, that any payments pursuant to this clause (4) shall cease in the event that, and at such time as, the Lenders (and their respective Affiliate Counterparties) shall have received aggregate net proceeds in respect of clauses (2), (3) and (4) which is equal to $80 million;

5.  Following the payment in full of the items described in clauses (1), (2), (3) and (4) above, the next $25.0 million of proceeds shall be allocated 40.0% to the holders of Class A Interests in Newco, 22.0% to the holders of Class B Interests in Newco, 28.0% to the holders of Class C Interests in Newco, and 10.0% to the holders of Class D Interests in Newco; provided, however, that any payments pursuant to this clause (5) shall cease in the event that, and at such time as, the Lenders (and their respective Affiliate Counterparties) shall have received aggregate net proceeds in respect of clauses (2), (3), (4) and (5) which is equal to $90 million; and

6.  Following the payment in full of the items described in clauses (1), (2), (3), (4) and (5) above, any additional proceeds shall be allocated 20.0% to the holders of Class A Interests in Newco, 39.25% to the holders of Class B Interests in Newco, 30.75% to the holders of Class C Interests in Newco, and 10.0% to the holders of Class D Interests in Newco.

SCHEDULE C

<u>MANAGEMENT INCENTIVE PLAN</u>

See Attached.

*The Preliminary Summary of Terms and Conditions outlined below is not intended to set forth all the terms and conditions of the transactions contemplated hereby.*

**Preliminary Summary of Terms and Conditions of Management Incentive Plan ("MIP Term Sheet") for NewCo LLC ("NewCo" a to be formed Delaware LLC that shall own 100% of the stock of Ramsey Holdings Inc. ("Holdings") and Holdings and its Subsidiaries.**

**March 23, 2010**

| | |
|---|---|
| TERM SHEET: | February 3, 2010 Preliminary Summary of Terms and Conditions of an Amendment Agreement or an Amendment and Restatement of the Credit Agreement and a Recapitalization of Ramsey Holdings, Inc. |
| PLAN: | The Plan of Reorganization of Holdings and its subsidiaries (the "Plan"), confirmed by the United States Bankruptcy Court for the Northern District of Oklahoma in Case No. 09-13998-M. |
| NEWCO: | The new entity formed pursuant to the Plan to own all the issued and outstanding stock of Holdings or such relevant entity. |
| THE COMPANY: | NewCo, together with Holdings and its subsidiaries, Ramsey Industries, Inc., Ramsey Winch Company, Auto Crane Company, and Eskridge, Inc. |
| EFFECTIVE DATE: | The date of substantial consummation of the Plan. |
| 2009 RESTRUCTURING BONUS: | The portion of the restructuring bonus awarded to John R. Celoni, Jr., Donald Helms, and Michael Barber that the Company was committed to but not authorized by the Bankruptcy Court to pay shall be paid in full on the Effective Date. |
| GUARANTEED RETENTION BONUS: | A $300,000 bonus to be paid to persons and in amounts to be identified on the later of: (i) August 4, 2010; and (ii) the Effective Date, provided, such person is an employee of the Company at the time of payment. |
| 2010 PERFORMANCE BONUS: | A discretionary performance bonus for fiscal year 2010 in an amount of $500,000 to be paid to persons and in amounts to be identified. The 2010 Performance Bonus shall be paid upon the approval of Company's 2010 audited financial statement by the Board of Directors. The 2010 Performance Bonus shall be conditioned only upon: (i) such person being an employee of the Company at the time of payment; and (ii) the Company achieving an EBITDA (as such term is defined in the Term Sheet) for fiscal year 2010 of at least $3,000,000 (after giving effect to the payment of such performance bonus). Provided, however, if on December 31, 2010 the person is an employee of the Company and is terminated without Cause or for death or disability prior to the payment date and the bonus would have otherwise been earned, then the person, or such person's heirs as may be applicable, shall be paid such bonus when the other bonus payments are made. |

{866886;2}

FUTURE
REMUNERATION:

All future bonus programs and any other changes to remuneration for the executive management team (i.e. CEO, CFO, COO, EVP of Sales and other similar positions if created in the future) shall be at the discretion of the Board of Directors after receiving the recommendation of, and in consultation with, the Chief Executive Officer of the Company. Other remuneration for employees or contractors of the Company who are not part of the executive management team shall be determined at the discretion of the Chief Executive Officer or his designee in a manner generally consistent with the total budget for any fiscal year.

ECONOMIC
INTEREST UPON
LIQUIDITY EVENT:

At the Effective Date, persons to be identified shall be entitled to receive Class D Interests as described in the Term Sheet of a Limited Liability Company Agreement interest (i.e. the "Option Interests") in the Company (allocation of Class D Interests to be provided).

The Option Interests in aggregate shall total 10% of the equity related economic interests (i.e. all distributions after payment in full of the Term Loan and the Liquidity Backstop) in the Company inclusive of the dilution of the Option Interests. The Option Interests shall be subject to future dilution pro-rata to the existing equity related economic interests in the Company. Subject to final tax analysis in the final documentation which shall be intended to provide capital gains treatment for the Class D Interests over a zero cost basis, the Option Interests shall have a zero cost basis and shall be further defined and structured in the final documentation with the expectation that the recipients shall receive capital gains treatment for proceeds received in the Option Interests.

The Option Interests shall be subject to vesting as follows should the person be an employee of the Company at such respective dates:

- 25% at the 6 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date);
- 25% at the 24 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date);
- 25% at the 33 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date); and
- 25% at a Liquidity Event.

Provided that:

- Should the person be terminated for Cause (as such term is defined in such person's employment agreement) then the recipient shall forfeit any previously vested portion of such person's Option Interests and shall not be eligible for further vesting of their Option Interests or payment of any kind pursuant to this incentive;
- Should the person be terminated due to death or disability, the vested portion of such person's Option Interests shall be retained and the next successive portion of such person's (or such person's heirs as the case may be) Option Interests shall vest;

- Should the person be terminated without Cause, the vested portion of such person's Option Interests shall be retained and such person's remaining Option Interests shall vest pro-rata based upon the number of days worked that year prior to termination in relation to the next successive vesting date (*i.e.* if the person is terminated without Cause at the 36 month anniversary of the Effective Date and a Liquidity Event occurs at the 37 month anniversary of the Effective Date, then the person's Option Interests shall vest 6/7th of the final 30% or 25.143% of the final 30%);
- Should a Liquidity Event occur prior to such vesting dates, but the person is an employee of the Company at the time of the Liquidity Event, the vesting shall accelerate so that such person is fully vested as of the time of the Liquidity Event;
- Unvested amounts for any person shall fall into the "Unallocated" Option interests as further described below.

The Company shall have the one time option (but not the requirement) exercisable until the later of thirty (30) days after any termination and ten (10) days after the determination of the purchase price as described below to purchase all, and not less than all, of the vested portion of any person's Option Interests following such person's termination due to any reason other than for Cause (in which case all vested Option Interests shall be forfeited without compensation) at a purchase price which shall be calculated as the product of: (i) the vested amount of such Option Interests to be purchased as a percent of the overall Interests multiplied by (ii) the Adjusted Equity Value. The Adjusted Equity Value shall be calculated as: (a) the enterprise value of Ramsey Industries, Inc. at the date of such termination as determined by a qualified independent valuer selected by the Board and reasonably acceptable to the holder of such Option Interests; minus (b) $20,000,000; minus (c) the total of all repayments of term debt and distributions to the holders of Interests from the Effective Date until the termination date. The costs and expenses of such valuation shall be borne by the Company.

In the event of an additional allocation of Option the Board of Directors, after due consultation with the Chief Executive Officer, may award any Unallocated Option Interests to current or future employees at their discretion, provided that no Option Interests shall be awarded to persons who are not employed on a full time basis by the Company (*i.e.* Option Interests shall not be awarded to Board of Directors members, consultants, non-employee shareholders or other parties). Should any Option Interests remain Unallocated at the date of a Liquidity Event, then such Unallocated Option Interests shall be allocated to the persons that have received and vested Option Interests (regardless of whether they remain an employee of the Company at such time), pro-rata to their vested Option Interests (*i.e.* so that upon a Liquidity Event the full 10% shall be allocated and vested).

IMPLEMENTATION
AND TERMINATION:    The terms contained herein shall be implemented contractually in final documentation to be legally binding as of the Effective Date. All equity related incentives currently in place at the Company, including the Option Certificates and related plan and Subscription Agreements for employees to

{866886;2}    3

invest additional capital (if any) shall be terminated as of the Effective Date.

# EXHIBIT A-4

**(Exit Term Loan Term Sheet)**

SUMMARY TERMS AND CONDITIONS

[Newco, LLC]
Ramsey Holdings, Inc.
Ramsey Industries, Inc.
Ramsey Winch Company
Auto Crane Company
Eskridge, Inc.

March 23, 2010

$50,000,000 Senior Term Loan

*Terms used in this Term Sheet without definition have the meanings assigned to such terms in the Pre-Petition Credit Agreement (as defined below).*

| | |
|---|---|
| **Borrowers:** | Ramsey Industries, Inc. ("Ramsey"), Ramsey Winch Company ("Ramsey Winch"), Auto Crane Company ("Auto Crane") and Eskridge, Inc. ("Eskridge" and, together with Ramsey, Ramsey Winch and Auto Crane, the "Borrowers"). Ramsey shall be a wholly-owned subsidiary of Ramsey Holdings, Inc. ("Intermediate Holdings"), which shall be a wholly-owned subsidiary of a newly formed Delaware limited liability company ("Holdings"). Ramsey Winch, Auto Crane and Eskridge shall be wholly-owned subsidiaries of Ramsey. |
| **Guarantors:** | Intermediate Holdings and all present and future direct or indirect domestic subsidiaries of the Borrowers or Holdings that are not Borrowers. The Senior Term Loan will be fully and unconditionally guaranteed on a joint and several basis by all Guarantors. |
| **Agent:** | CIT Lending Services Corporation ("CIT"), as administrative agent and collateral agent. |
| **Term Loan Lenders:** | The Pre-Petition Lenders and each affiliate of a Pre-Petition Lender that was a counterparty to a Swap Agreement. |
| **Pre-Petition Lenders:** | The lenders party to that certain Credit Agreement dated as of April 5, 2007 (as amended, supplemented or otherwise modified prior to the date hereof, the "Pre-Petition Credit Agreement") by and among the Borrowers, the lenders party thereto and CIT, as administrative agent and collateral agent. |
| **Senior Term Loan:** | Senior secured term loan in an aggregate outstanding principal amount of $50,000,000 (the "Term Loan"). Each Term Loan |

Summary Terms and Conditions

<table>
<tr><td></td><td>Lender shall have a pro rata portion of the Term Loan based on the aggregate amount of the Loans and other Obligations owing to such Term Loan Lender (including Obligations owing to such Term Loan Lender under or in connection with existing Swap Agreements) on the Closing Date.</td></tr>
</table>

|  |  |
|---|---|
| **Closing Date:** | The date on which all conditions precedent have been satisfied or waived. |
| **Interest Rate:** | Interest on the Term Loan shall be payable in cash on a monthly basis on the last day of each month at a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Rate of 400 basis points. The Adjusted LIBO Rate will have a floor of 2%. The default rate of interest shall be equal to 2% per annum above the rate set forth above in accordance with the terms of the Pre-Petition Credit Agreement. |
| **Maturity Date:** | October 31, 2013. |
| **Availability:** | Amounts repaid under the Term Loan may not be re-borrowed. |
| **Fees:** | A non-refundable Upfront Fee of $250,000, which shall be fully earned and payable on the Closing Date, shall be paid to the Agent by the Borrowers on the Closing Date for distribution to the Term Loan Lenders on a pro rata basis. The Upfront Fee may be paid using the proceeds of Revolving Loans (as defined below) borrowed on the Closing Date to the extent provided for in the 13-Week Cash Flow Forecast (which shall include the Upfront Fee). |
| **Unsigned Lenders:** | Until such time as a Term Loan Lender shall have delivered to the Agent a signature page to the Credit Agreement duly executed by an authorized officer of such Term Loan Lender, (i) the Agent shall not make any payments to such Term Loan Lender, whether of principal, interest, fees or otherwise, and shall hold all such funds on behalf of such Term Loan Lender (provided, that notwithstanding the foregoing, such payments shall be deemed to have been made by the Borrowers for all purposes when paid to the Agent), (ii) such Term Loan Lender may not transfer (by assignment, participation or otherwise), its Term Loan or any of its rights or obligations under the Credit Agreement or other Loan Documents, (iii) such Term Loan Lender shall not receive any of the equity interests issued to Term Loan Lenders by Holdings, which equity interests shall be held by the Agent on behalf of such Term Loan Lender and (iv) the Term Loan of such Term Loan Lender shall not be included when determining Required Lenders. |

## CERTAIN PAYMENT TERMS

**Amortization:**   The outstanding principal balance of the Term Loan shall be repaid in consecutive quarterly installments (due on the last day of each quarter, commencing with the quarterly installment due on March 31, 2011), as follows: (i) $250,000 per quarter during calendar year 2011, (ii) $350,000 per quarter during calendar year 2012 and (iii) $500,000 per quarter during calendar year 2013, with the remaining unpaid principal balance due and payable on the Maturity Date. No Term Loan amortization shall be due during calendar year 2010.

**Optional Prepayment:**   The Borrowers may prepay the Term Loan under the same circumstances as set forth in the Pre-Petition Credit Agreement. A prepayment fee shall not be charged in connection therewith.

**Mandatory Prepayment:**   The Borrowers will be required to make mandatory prepayments (other than scheduled amortization of principal as set forth above) under the same circumstances as set forth in the Pre-Petition Credit Agreement except that in the event the Borrowers sell one or more of their facilities in connection with their facilities consolidation plan then the net cash proceeds thereof shall be applied to the Term Loan in inverse order of maturity and the Borrowers shall not have any reinvestment rights with respect thereto.

**Application of Prepayments:**   Once all outstanding Revolving Loans have been paid in full, prepayments, whether optional or mandatory, shall be applied to the prepayment of the Term Loan in inverse order of maturity until the outstanding principal amount of the Term Loan has been reduced to $0.

**Excess Cash Flow Payments:**   Commencing with the quarter ending September 30, 2010 and continuing on a quarterly basis thereafter: (i) for each quarter ending March 31, June 30 and September 30, the Borrowers shall, on the date on which financial statements are required to be delivered for such quarters, prepay the Term Loan in an amount equal to 25% of Excess Cash Flow (as defined on Schedule A attached hereto) for each such quarter to be applied pro rata, in the inverse order of maturity and (ii) for each quarter ending December 31, the Borrowers shall, on the date on which financial statements are required to be delivered for such quarters, prepay the Term Loan in an amount equal to (a) the sum of (x) 75% of

Excess Cash Flow for such quarter <u>plus</u> (y) 75% of Excess Cash Flow for each of the prior three (3) quarters (the "<u>Prior Quarters</u>"), in each case, including non-recurring items (to be further defined in the Credit Agreement), <u>minus</u> (b) the aggregate amount of Excess Cash Flow Payments previously made by the Borrowers for the Prior Quarters, to be applied in the inverse order of maturity.

**COLLATERAL**          The Term Loan will be secured by a perfected first priority security interest in all of the assets of the Ramsey Companies on a pari passu basis with the Revolving Loans, except that during the continuance of an Event of Default, the proceeds from any sale or other disposition of, realization upon or receipt of proceeds from any of the Collateral shall be applied to the repayment of the loans and other amounts outstanding under the Senior Revolving Credit Facility (as defined below) prior to the repayment of any Term Loans.

**CERTAIN CONDITIONS**

**Conditions
Precedent:**          Closing will be subject to the satisfaction of all conditions precedent deemed necessary or appropriate by Agent and Consenting Lenders, including but not limited to the following:

-          Execution and delivery by the Borrowers, the Guarantors, the Agent and the Consenting Lenders of a definitive credit agreement ("<u>Credit Agreement</u>"), related security agreement(s), guarantees, pledge agreements, mortgages, assignment agreements and all other agreements, instruments, certificates and documents reasonably requested by the Agent and Consenting Lenders. Such Credit Agreement and all other agreements, instruments, certificates and documents entered into in connection with the transactions contemplated by this Term Sheet, including the Holdings LLC Agreement and the Management Incentive Plan (collectively, the <u>Loan Documents</u>" shall be in form and substance satisfactory to the Agent, the Consenting Lenders and the Borrowers;

-          Substantial consummation of the Ramsey Companies' plan of reorganization (including all exhibits, schedules and annexes thereto) (the "<u>Plan</u>"); the Plan, the treatment of claims contained therein, the related confirmation order, and all agreements and other documents entered into in connection with the Plan, shall be in form and substance

reasonably satisfactory to the Transaction Parties (defined below);

- Notwithstanding anything to the contrary contained herein, the structure of the transactions contemplated by this Term Sheet, including, without limitation, all tax aspects of the structure of the transactions contemplated herein, shall be in form and substance satisfactory to the Transaction Parties;

- The Agent and Consenting Lenders shall have received and be satisfied with (i) unaudited financial statements for each quarterly and monthly period ending after December 31, 2009 for Intermediate Holdings and its subsidiaries on a consolidated and consolidating basis, and (ii) the audited balance sheet of Intermediate Holdings and its subsidiaries as at the Closing Date;

- The Agent and Consenting Lenders shall have received a 13-week cash flow forecast, in form and substance satisfactory to the Agent, including information pertaining to accounts receivables, inventory and accounts payable.

- The Borrowers shall have no debt that will survive the closing of the Credit Agreement other than (i) the debt under the Credit Agreement, (ii) other scheduled debt, which may include certain capital leases and other customary obligations, existing on the Closing Date and approved by the Agent and (iii) deferred payment obligations under the Plan;

- The Agent and Consenting Lenders shall have received and be satisfied with the Borrowers' insurance policies, including endorsements in favor of the Agent with respect thereto;

- The Agent shall have received evidence of a valid and perfected first priority security interest in the Collateral in favor of the Agent;

- The Agent shall have received UCC and other applicable lien search reports satisfactory to the Agent;

- Any governmental and third party approvals necessary in connection with the transactions contemplated by this Term Sheet shall have been obtained and be in full force and

effect, and all waiting periods shall have expired without any action being taken or threatened by any authority that would restrain or otherwise impose adverse conditions on the transactions contemplated by this Term Sheet;

- The Agent shall be satisfied that there has been no event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of Intermediate Holdings, the Borrowers and/or their subsidiaries, since December 18, 2009 (excluding any event or condition resulting from the Ramsey Companies' bankruptcy filing on such date);

- The Agent shall have received such legal opinions, secretary's certificates, closing certificates, solvency certificates, good standing certificates, certified organizational documents, resolutions and other documents and instruments as are customary for transactions of this type or as it may reasonably request;

- Receipt of all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and OFAC;

- With respect to each parcel of real estate owned by the Borrowers or a Guarantor on which the Consenting Lenders will have a first priority lien, Agent's receipt of, and satisfaction with, (i) title insurance issued by a title insurance company reasonably satisfactory to Agent and (ii) if required by the Agent, a survey prepared by independent licensed land surveyor reasonably satisfactory to Agent, the costs of all of which shall be paid by the Borrowers;

- The entire amount of the Loans and other Obligations outstanding under the Pre-Petition Credit Agreement (including Obligations owing to a Term Loan Lender under or in connection with existing Swap Agreements) in excess of $50,000,000 shall have been converted into the equity interests of Holdings, which after giving effect to such conversion and the other transactions contemplated by this Term Sheet, including the conversion of the entire amount

of the Subordinated Indebtedness into the equity interests of Holdings, shall equal 100% of the Class A equity interests of Holdings. Each Term Loan Lender shall receive a pro rata portion of such equity interests of Holdings based on the aggregate amount of the Loans and other Obligations owing to such Term Loan Lender (including Obligations under or in connection with existing Swap Agreements) on the Closing Date. The equity interests of Holdings issued to the Term Loan Lenders may be comprised of voting and non-voting equity interests;

- The entire amount of the Subordinated Indebtedness shall have been converted into a specified amount of the equity interests of Holdings as set forth below, upon terms and conditions and pursuant to documentation, in each case, satisfactory to the Agent, the Lenders constituting at least a majority in number of all Lenders and holding at least two-thirds of the outstanding amount of the Loans and other Obligations outstanding under the Pre-Petition Credit Agreement (including Obligations owing to a Lender under or in connection with existing Swap Agreements) who have consented to the terms hereof (the "Consenting Lenders"), the Borrowers, Gridiron Capital ("Gridiron") and the holders of the Subordinated Indebtedness (the "Subordinated Lenders" and, together with the Agent, the Consenting Lenders, the Borrowers and Gridiron, the "Transaction Parties");

- After giving effect to the transactions contemplated by this Term Sheet, the Lenders shall own 100% of the Class A equity interests of Holdings, the current equity holders of Intermediate Holdings (including Gridiron) ("Existing Equity") shall own 100% of the Class C equity interests of Holdings and the Subordinated Lenders shall own 100% of the Class B equity interests of Holdings, in each case as set forth in the Capitalization Table attached to the LLC Term Sheet as Schedule A;

- The management agreement with Gridiron shall have been terminated at the Closing Date and the Loan Documents shall reflect that any such accrued but unpaid fees shall be waived by Gridiron at such time. No management or other fees shall be due or payable to Gridiron;

- The Management Incentive Plan shall reflect the terms and conditions (including payment conditions and amounts)

contained in the Preliminary Summary of Terms and Conditions of Management Incentive Plan for NewCo LLC and Holdings and its Subsidiaries attached hereto as Exhibit A with such modifications as may be agreed to by the Borrowers, the Agent and Consenting Lenders;

- The Borrowers shall have paid all of the fees and expenses (including reasonable fees and expenses of counsel) of the Agent, Gridiron and the Subordinated Lenders incurred in connection with this Term Sheet and the transactions contemplated hereby; <u>provided,</u> that (a) the Borrowers shall not be responsible for the payment of any fees and expenses of Gridiron and the Subordinated Lenders in excess of $720,000 and (b) the fees and expenses of Gridiron and the Subordinated Lenders shall not be paid earlier than 120 days after the Closing Date and shall be paid on a monthly agreed upon basis thereafter. These fees shall be paid pro-rata between Gridiron and AEA ($486,274 and $233,726, respectively) in accordance with previously provided estimates pro-rated to the $720,000 maximum and in accordance with the Plan; and

- The Borrowers shall have paid the accrued expenses, not to exceed $50,000 in the aggregate, of the members of the boards of directors being replaced on the Closing Date.

## CERTAIN DOCUMENTATION MATTERS

**Representations and Warranties:**    The Credit Agreement will contain representations and warranties based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders, including a representation that the value of the Borrowers' inventory has not been written down to less than fair market value and a representation that Holdings and Intermediate Holdings have not and will not engage in any business activities and have not had and will not have any assets or other holdings, other than the equity ownership interests of Ramsey (in the case of Intermediate Holdings) or Intermediate Holdings (in the case of Holdings).

**Reporting:**    In addition to the reporting requirements set forth in the Pre-Petition Credit Agreement, the Borrowers shall deliver to the Agent for distribution to the Lenders on a weekly basis, a rolling 13-week cash flow forecast, in form and substance satisfactory to the Agent, including (i) information pertaining to accounts

receivable, inventory and accounts payable and (ii) a comparison of the actual results for such calendar week with the corresponding forecast.   The Borrowers shall also provide the quarterly and monthly reporting as set forth on Schedule B attached hereto and other such other reporting as may be reasonably requested by the Agent or Consenting Lenders.

**Inspections:**   The Credit Agreement will contain inspection, examination and audit provisions substantially similar to those set forth in the Pre-Petition Credit Agreement, except that the Agent and Required Lenders may exercise their rights to visit, inspect, examine, audit, etc. once per quarter at the Borrowers' expense (or as often as the Agent or Required Lenders may request upon the occurrence and during the continuance of an Event of Default).

**Covenants:**   The Credit Agreement will contain affirmative and negative covenants based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders, including covenants by the Borrowers that (i) the value of the Borrowers' inventory shall not be written down to less than fair market value, (ii) the Agent and Required Lenders shall have the right to take such actions from time to time as the Agent deems reasonably necessary to verify and confirm compliance with the aforementioned covenant, (iii) to the extent it is believed by the Agent, after consultation with the Borrowers, that any inventory has been written down to less than fair market value, then the Agent may object and consult with an independent appraiser and the auditor of the Borrowers, with the cooperation of the Borrowers, to determine in good faith the fair market value of such inventory and (iv) if it is determined based upon the aforementioned review that any inventory was written down below fair market value, the excess contribution margin realized upon the sale of such inventory shall be excluded from EBITDA.

**Financial Covenants:**   The Credit Agreement will contain only the following financial covenants:

a)  <u>Maximum CAPEX</u>:   Amounts and the definition of Restructuring/Consolidation Capex are set forth on Schedule A attached hereto.   The definition of normal course Capex shall be consistent with the definition of Capital Expenditures in the Pre-Petition Credit Agreement.

With respect to Maximum Normal Capex as shown on Schedule A, if the amount of Capital Expenditures made in

any Fiscal Year is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in the first two fiscal quarters of the following Fiscal Year.

With respect to Restructuring/Consolidation Capex as shown on Schedule A, if the amount of Capital Expenditures made in Fiscal Year 2010 is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in Fiscal Year 2011.

b) <u>Minimum EBITDA</u>:  Amounts and the definition of EBITDA are set forth on Schedule A attached hereto. Compliance will be tested on the last day of each calendar quarter commencing December 31, 2010 on a trailing twelve month basis.

c) <u>Minimum FCC</u>: Ratios and the definition of Fixed Charge Coverage Ratio are as set forth on Schedule A attached hereto.

**Accounting:**

If the Borrowers adopt fresh start accounting, the Borrowers and the Consenting Lenders will negotiate in good faith to adjust the covenant levels set forth on Schedule A attached hereto, if any adjustment is needed, such that they conform to the projections and cushions utilized in determining the covenant levels set forth on Schedule A attached hereto.

**Events of Default:**

The Credit Agreement will contain Events of Default based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders.

**Costs, Fees and Expenses:**

The Credit Agreement will contain provisions regarding the Borrowers' payment of the Agent's and Lenders' costs, fees and expenses substantially similar to those set forth in the Pre-Petition Credit Agreement.

**Indemnification:**

The Credit Agreement will contain indemnification provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders.

**Participation and**

{866879;2}

10

| | |
|---|---|
| **Assignment:** | The Credit Agreement will contain participation and assignment provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders. |
| **Required Lenders:** | Lenders holding at least (i) 51% of the Term Loan exposure and (ii) 51% of the Revolving Loan exposure or Revolving Loan commitments; <u>provided</u>, that so long as there are only 2 Revolving Lenders (as defined below), the consent of both Revolving Lenders shall be necessary to satisfy clause (ii) above. |
| **Amendments and Waivers:** | Subject to approval of Required Lenders, except that all affected Lenders must consent to increases in commitment amounts, reductions in principal, interest and fees, extensions of maturities and release of substantially all of the guarantors and collateral. |
| **Yield Protection:** | The Credit Agreement shall contain yield protection provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders. |
| **Management Incentive Plan:** | The Credit Agreement will permit, and the Required Lenders will not object if the Borrowers pay the amounts set forth in the Management Incentive Plan in accordance with the terms thereof. |
| **Governing Law and Jurisdiction:** | New York. |
| **Waiver of Jury Trial:** | The Credit Agreement will contain waiver of jury trial provisions substantially similar to that contained in the Pre-Petition Credit Agreement. |
| **Agent's Counsel:** | Kaye Scholer LLP. |
| **Borrowers' Counsel:** | GableGotwals. |
| Certain Defined Terms: | "<u>Lenders</u>" means, collectively, the Term Loan Lenders and the Revolving Lenders. |
| | "<u>LLC Term Sheet</u>" means the Preliminary Summary of Terms and Conditions of a Limited Liability Company Agreement in respect of Debt Restructuring/Recapitalization of Ramsey Holdings, Inc. dated on or about the date hereof and prepared by Kaye Scholer LLP. |

{866879;2}

11

"Senior Revolving Credit Facility" means the $3,000,000 senior secured revolving credit facility contained in the Credit Agreement pursuant to which revolving loans ("Revolving Loans") are made available to the Borrowers by the lenders with revolving loan commitments (the "Revolving Lenders") in accordance with the terms thereof.