SCHEDULE A

"EBITDA" means with respect to Intermediate Holdings and its consolidated Subsidiaries for any period (a) the sum of (i) Net Income, (ii) Interest Expense, (iii) Federal, state, local and foreign income taxes payable for such period, (iv) depreciation and amortization, asset impairment charges, non-cash employee compensation expenses and other non-cash items properly deductible in determining Net Income, (v) any payments, fees and expenses incurred in respect of the financial restructuring and Chapter 11 proceedings and the Plan, including legal and professional expenses, payments due to rejection of contracts in connection with the Plan, amendment fees, and upfront and continuing fees related to the Senior Revolving Credit Facility, (vi) fees and expenses of the Administrative Agent and Lenders, (vii) director fees and expenses (including recruiting costs), (viii) fees and expenses incurred by the Borrowers relating to Section 5.04 of the Credit Agreement, (ix) the cost of any management retention program put in place for Fiscal Year 2010 in the amount of $300,000 (x) operational restructuring costs associated with the facilities consolidation plan (specifically excluding any allocation of overhead or any other costs not specifically attributable to the facilities consolidation plan); provided, that the nature of such expenses shall be consistent with, and the aggregate amount limited to, the Budget to be attached as an Exhibit to the Credit Agreement, and (xi) loss on sale of assets outside the ordinary course of business, including disposition of facilities and equipment, minus (b) the sum of (i) non-cash items properly added in determining Net Income for such period, (ii) the gain on sale of assets outside the ordinary course of business, including disposition of facilities and equipment and (iii) any gain or loss on any equity incentives from the Management Incentive Plan, if any.

"Excess Cash Flow" means, with respect to Intermediate Holdings and its consolidated Subsidiaries for any period, the amount, if any, by which EBITDA for such period (but determined by adding back thereto, but without duplication, any amount deducted in the calculation of Net Income that was paid, incurred or accrued in violation of any of the provisions of this Agreement unless otherwise agreed by the Administrative Agent in its sole discretion) exceeds (a) the sum of (i) Debt Service Expense for such period in respect of Funded Debt incurred in accordance with Section 6.01, (ii) Capital Expenditures permitted pursuant to Section 6.09 and made during such period (except to the extent financed with proceeds of Indebtedness (other than the Senior Revolving Credit Facility) or the issuance of equity), (iii) all Taxes paid in cash during such period, and (iv) Investments made in cash during such period, to the extent permitted under Section 6.04, plus (b) any decrease in working capital for Intermediate Holdings and its consolidated Subsidiaries during such period (subject to the working capital normalization adjustment to be set out in an Exhibit to the Credit Agreement) and any extraordinary cash gains for Intermediate Holdings and its consolidated Subsidiaries during such period; minus (c) any increase in working capital for Intermediate Holdings and its consolidated Subsidiaries during such period (subject to the working capital normalization adjustment to be set out in an Exhibit to the Credit Agreement) and any extraordinary cash losses for Intermediate Holdings and its consolidated Subsidiaries during such period. For the avoidance of doubt, the following shall be excluded from the computation of Excess Cash Flow: (a) any income tax refunds received in Fiscal Year 2010, which will remain available to the Borrowers to fund their liquidity requirements in the normal course of operations and (b) the proceeds of facility or other asset sales outside the ordinary course of business, which shall be remitted to the Administrative Agent in full and applied as a prepayment in accordance with Section 2.09(f).

"Fixed Charge Coverage Ratio" means, with respect to Intermediate Holdings and its consolidated Subsidiaries as of the date of determination thereof, the ratio of (i) EBITDA minus normal course Capital Expenditures made, excluding capital expenditures associated with the facilities consolidation plan (except to the extent financed with Indebtedness other than the Senior Revolving Credit Facility) and Taxes paid in cash (net of refunds actually received in cash (other than refunds received for Fiscal Year 2010)) for the period of four fiscal quarters most recently ended on or prior to such date to (ii) the Debt Service Expense for such period, plus cash contributions made with respect to the Borrowers' underfunded pension plan liability.

"Restructuring/Consolidation Capex" means incremental, out-of-pocket Capital Expenditures specifically attributable to the operational restructuring and facilities consolidation plan; provided, that the nature of such expenses shall be consistent with the Budget to be attached as an Exhibit to the Credit Agreement and such expenses shall not exceed the covenant level of $1,700,000 as specified herein.

Notwithstanding anything to the contrary contained in the definitions herein, it is acknowledged that certain defined terms and references to the Pre-Petition Credit Agreement may no longer be applicable or may require adjustment and such adjustments will be made in the Loan Documents.

| Ramsey Industries - Proposed Covenant Summary | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | Q4-10 | Q1-11 | Q2-11 | Q3-11 | Q4-11 | Q1-12 | Q2-12 | Q3-12 | Q4-12 | Q1-13 | Q2-13 | Q3-13 |
| **Minimum EBITDA** | | | | | | | | | | | | |
| TTM Per Model | $ 3,074 | $ 3,291 | $ 3,847 | $ 4,879 | $ 6,438 | $ 8,016 | $ 9,306 | $10,314 | $10,997 | $11,555 | $ 12,080 | $ 12,658 |
| Cushion | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% |
| Calculated Covenant | 2,613 | 2,797 | 3,270 | 4,147 | 5,472 | 6,813 | 7,910 | 8,767 | 9,347 | 9,822 | 10,268 | 10,759 |
| *Proposed Covenant* | *$ 2,600* | *$ 2,800* | *$ 3,300* | *$ 4,100* | *$ 5,500* | *$ 6,800* | *$ 7,900* | *$ 8,800* | *$ 9,300* | *$ 9,800* | *$ 10,300* | *$ 10,800* |
| **Maximum Normal Capex** | | | | | | | | | | | | |
| Annual Capex Per Model | $ 900 | | | | $ 900 | | | | $ 1,400 | | | $ 1,200 |
| Cushion | 110% | | | | 110% | | | | 110% | | | 110% |
| Covenant | 990 | | | | 990 | | | | 1,540 | | | 1,320 |
| *Proposed Covenant* | *$ 1,000* | | | | *$ 1,000* | | | | *$ 1,550* | | | *$ 1,350* |
| **Maximum Restructuring/Consolidation Capex** | | | | | | | | | | | | |
| Annual Capex Per Model | $ 1,513 | | | | | | | | | | | |
| Cushion | 110% | | | | | | | | | | | |
| Covenant | $ 1,664 | | | | | | | | | | | |
| *Proposed Covenant* | *$ 1,700* | | | | | | | | | | | |
| **Fixed Charge Covenant** | | | | | | | | | | | | |
| Covenant Base EBITDA | $ 2,613 | $ 2,797 | $ 3,270 | $ 4,147 | $ 5,472 | $ 6,813 | $ 7,910 | $ 8,767 | $ 9,347 | $ 9,822 | $ 10,268 | $ 10,759 |
| Normal Course Capex | (990) | (990) | (990) | (990) | (990) | (1,128) | (1,265) | (1,403) | (1,540) | (1,595) | (1,650) | (1,705) |
| EBITDA for Covenant | 1,623 | 1,807 | 2,280 | 3,157 | 4,482 | 5,686 | 6,645 | 7,365 | 7,807 | 8,227 | 8,618 | 9,054 |
| Debt Amortization | $ - | $ 250 | $ 500 | $ 750 | $ 1,000 | $ 1,100 | $ 1,200 | $ 1,300 | $ 1,400 | $ 1,550 | $ 1,700 | $ 1,850 |
| Pension Contribution | 1,115 | 1,304 | 1,265 | 940 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 |
| Interest [1] | 3,280 | 3,280 | 3,265 | 3,250 | 3,235 | 3,220 | 3,199 | 3,178 | 3,157 | 3,136 | 3,106 | 3,076 |
| Fixed Charge for Covenant | 4,395 | 4,834 | 5,030 | 4,940 | 5,135 | 5,220 | 5,299 | 5,378 | 5,457 | 5,586 | 5,706 | 5,826 |
| **Fixed Charge Ratio** | 0.37 | 0.37 | 0.45 | 0.64 | 0.87 | 1.09 | 1.25 | 1.37 | 1.43 | 1.47 | 1.51 | 1.55 |
| *Proposed Covenant* | *0.35* | *0.35* | *0.40* | *0.50* | *0.70* | *1.00* | *1.10* | *1.20* | *1.20* | *1.20* | *1.20* | *1.20* |

[1] Interest calculated by the Company assumes a fully drawn revolver throughout.

## SCHEDULE B

### Additional Quarterly and Monthly Reporting Requirements

**Quarterly for 2011 and thereafter, Monthly for 2010:**

1. Detailed Management Discussion and Analysis regarding (i) overall business performance and industry trends, (ii) financial results and variances to budget/ forecast for each business unit (including revenue, EBITDA, working capital and capital expenditures) and (iii) updates as to the timing and status of key corporate initiatives including product outsourcing, plant consolidation and new product/ customer development activities.

**Monthly:**

1. A summary discussion (by business unit) of the monthly financial statements of the Borrowers;

2. Summary of bookings, backlogs and shipments for each business unit along with comparisons to prior month and prior year;

3. Rolling calculation of trailing-twelve month EBITDA;

4. Sales to top 20 (overall) customers for current month and YTD along with comparative data for prior year; and

5. Customary borrowing base level reporting on a monthly basis or more frequently as requested by the Agent upon the occurrence of an event of default.

EXHIBIT A

[Management Incentive Plan Term Sheet]

*The Preliminary Summary of Terms and Conditions outlined below is not intended to set forth all the terms and conditions of the transactions contemplated hereby.*

**Preliminary Summary of Terms and Conditions of Management Incentive Plan ("MIP Term Sheet") for NewCo LLC ("NewCo" a to be formed Delaware LLC that shall own 100% of the stock of Ramsey Holdings Inc. ("Holdings") and Holdings and its Subsidiaries.**

**March 23, 2010**

| | |
|---|---|
| TERM SHEET: | February 3, 2010 Preliminary Summary of Terms and Conditions of an Amendment Agreement or an Amendment and Restatement of the Credit Agreement and a Recapitalization of Ramsey Holdings, Inc. |
| PLAN: | The Plan of Reorganization of Holdings and its subsidiaries (the "Plan"), confirmed by the United States Bankruptcy Court for the Northern District of Oklahoma in Case No. 09-13998-M. |
| NEWCO: | The new entity formed pursuant to the Plan to own all the issued and outstanding stock of Holdings or such relevant entity. |
| THE COMPANY: | NewCo, together with Holdings and its subsidiaries, Ramsey Industries, Inc., Ramsey Winch Company, Auto Crane Company, and Eskridge, Inc. |
| EFFECTIVE DATE: | The date of substantial consummation of the Plan. |
| 2009 RESTRUCTURING BONUS: | The portion of the restructuring bonus awarded to John R. Celoni, Jr., Donald Helms, and Michael Barber that the Company was committed to but not authorized by the Bankruptcy Court to pay shall be paid in full on the Effective Date. |
| GUARANTEED RETENTION BONUS: | A $300,000 bonus to be paid to persons and in amounts to be identified on the later of: (i) August 4, 2010; and (ii) the Effective Date, provided, such person is an employee of the Company at the time of payment. |
| 2010 PERFORMANCE BONUS: | A discretionary performance bonus for fiscal year 2010 in an amount of $500,000 to be paid to persons and in amounts to be identified. The 2010 Performance Bonus shall be paid upon the approval of Company's 2010 audited financial statement by the Board of Directors. The 2010 Performance Bonus shall be conditioned only upon: (i) such person being an employee of the Company at the time of payment; and (ii) the Company achieving an EBITDA (as such term is defined in the Term Sheet) for fiscal year 2010 of at least $3,000,000 (after giving effect to the payment of such performance bonus). Provided, however, if on December 31, 2010 the person is an employee of the Company and is terminated without Cause or for death or disability prior to the payment date and the bonus would have otherwise been earned, then the person, or such person's heirs as may be applicable, shall be paid such bonus when the other bonus payments are made. |

| | |
|---|---|
| **FUTURE REMUNERATION:** | All future bonus programs and any other changes to remuneration for the executive management team (i.e. CEO, CFO, COO, EVP of Sales and other similar positions if created in the future) shall be at the discretion of the Board of Directors after receiving the recommendation of, and in consultation with, the Chief Executive Officer of the Company.   Other remuneration for employees or contractors of the Company who are not part of the executive management team shall be determined at the discretion of the Chief Executive Officer or his designee in a manner generally consistent with the total budget for any fiscal year. |
| **ECONOMIC INTEREST UPON LIQUIDITY EVENT:** | At the Effective Date, persons to be identified shall be entitled to receive Class D Interests as described in the Term Sheet of a Limited Liability Company Agreement interest (i.e. the "Option Interests") in the Company (allocation of Class D Interests to be provided). |

The Option Interests in aggregate shall total 10% of the equity related economic interests (i.e. all distributions after payment in full of the Term Loan and the Liquidity Backstop) in the Company inclusive of the dilution of the Option Interests. The Option Interests shall be subject to future dilution pro-rata to the existing equity related economic interests in the Company. Subject to final tax analysis in the final documentation which shall be intended to provide capital gains treatment for the Class D Interests over a zero cost basis, the Option Interests shall have a zero cost basis and shall be further defined and structured in the final documentation with the expectation that the recipients shall receive capital gains treatment for proceeds received in the Option Interests.

The Option Interests shall be subject to vesting as follows should the person be an employee of the Company at such respective dates:

- 25% at the 6 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date);
- 25% at the 24 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date);
- 25% at the 33 month anniversary of the Effective Date (or their Start Date in the event of a new employee after the Effective Date); and
- 25% at a Liquidity Event.

Provided that:

- Should the person be terminated for Cause (as such term is defined in such person's employment agreement) then the recipient shall forfeit any previously vested portion of such person's Option Interests and shall not be eligible for further vesting of their Option Interests or payment of any kind pursuant to this incentive;
- Should the person be terminated due to death or disability, the vested portion of such person's Option Interests shall be retained and the next successive portion of such person's (or such person's heirs as the case may be) Option Interests shall vest;

- Should the person be terminated without Cause, the vested portion of such person's Option Interests shall be retained and such person's remaining Option Interests shall vest pro-rata based upon the number of days worked that year prior to termination in relation to the next successive vesting date (*i.e.* if the person is terminated without Cause at the 36 month anniversary of the Effective Date and a Liquidity Event occurs at the 37 month anniversary of the Effective Date, then the person's Option Interests shall vest 6/7th of the final 30% or 25.143% of the final 30%);
- Should a Liquidity Event occur prior to such vesting dates, but the person is an employee of the Company at the time of the Liquidity Event, the vesting shall accelerate so that such person is fully vested as of the time of the Liquidity Event;
- Unvested amounts for any person shall fall into the "Unallocated" Option interests as further described below.

The Company shall have the one time option (but not the requirement) exercisable until the later of thirty (30) days after any termination and ten (10) days after the determination of the purchase price as described below to purchase all, and not less than all, of the vested portion of any person's Option Interests following such person's termination due to any reason other than for Cause (in which case all vested Option Interests shall be forfeited without compensation) at a purchase price which shall be calculated as the product of: (i) the vested amount of such Option Interests to be purchased as a percent of the overall Interests multiplied by (ii) the Adjusted Equity Value. The Adjusted Equity Value shall be calculated as: (a) the enterprise value of Ramsey Industries, Inc. at the date of such termination as determined by a qualified independent valuer selected by the Board and reasonably acceptable to the holder of such Option Interests; minus (b) $20,000,000; minus (c) the total of all repayments of term debt and distributions to the holders of Interests from the Effective Date until the termination date. The costs and expenses of such valuation shall be borne by the Company.

In the event of an additional allocation of Option the Board of Directors, after due consultation with the Chief Executive Officer, may award any Unallocated Option Interests to current or future employees at their discretion, provided that no Option Interests shall be awarded to persons who are not employed on a full time basis by the Company (*i.e.* Option Interests shall not be awarded to Board of Directors members, consultants, non-employee shareholders or other parties). Should any Option Interests remain Unallocated at the date of a Liquidity Event, then such Unallocated Option Interests shall be allocated to the persons that have received and vested Option Interests (regardless of whether they remain an employee of the Company at such time), pro-rata to their vested Option Interests (*i.e.* so that upon a Liquidity Event the full 10% shall be allocated and vested).

IMPLEMENTATION AND TERMINATION:

The terms contained herein shall be implemented contractually in final documentation to be legally binding as of the Effective Date. All equity related incentives currently in place at the Company, including the Option Certificates and related plan and Subscription Agreements for employees to

invest additional capital (if any) shall be terminated as of the Effective Date.

# EXHIBIT A-5

**(Exit Revolving Facility Commitment Letter
With Exit Revolving Facility Term Sheet)**

CIT Lending Services Corporation
505 Fifth Avenue
New York, New York 10017

Churchill Financial Cayman Ltd.
c/o Churchill Financial LLC
400 Park Avenue, Suite 1510
New York, NY 10022

March 23, 2010

Senior Revolving Credit Facility
Commitment Letter

**CONFIDENTIAL**

Ramsey Holdings, Inc.
Ramsey Industries, Inc.
Ramsey Winch Company
Auto Crane Company
Eskridge, Inc.

4707 North Mingo Road
Tulsa, OK  74117

Ladies and Gentlemen:

Ramsey Industries, Inc. ("Ramsey"), Ramsey Winch Company ("Ramsey Winch"), Auto Crane Company ("Auto Crane") and Eskridge, Inc. ("Eskridge" and, together with Ramsey, Ramsey Winch and Auto Crane, the "Borrowers") are parties to that certain Credit Agreement dated as of April 5, 2007 (as amended, supplemented or otherwise modified, the "Pre-Petition Credit Agreement") by and among the Borrowers, the lenders party thereto (the "Pre-Petition Lenders") and CIT Lending Services Corporation ("CIT" or "Agent").  Pursuant to the terms of the Parent Guarantee and the Security Agreement (as such terms are defined in the Pre-Petition Credit Agreement) Ramsey Holdings, Inc. ("Pre-Petition Holdings" and, together with the Borrowers, the "Ramsey Companies" sometimes referred to herein collectively as "you") has guaranteed the obligations of the Borrowers under the Pre-Petition Credit Agreement and related documents and has granted a security interests in all of its assets to secure the satisfaction and performance of the obligations of the Borrowers under the Pre-Petition Credit Agreement and related documents.

The Ramsey Companies are debtors-in-possession in a Chapter 11 bankruptcy case commenced in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court").

In accordance with the terms of the Plan (as defined in the Term Sheet referred to below), the Ramsey Companies have requested CIT and Churchill Financial Cayman Ltd. ("Churchill" and, together with CIT, the "Commitment Parties") commit to provide a senior secured revolving credit facility in the aggregate amount not to exceed $3,000,000 at any time outstanding (the "Senior Revolving Credit Facility").

31940953.DOC

1.      **Commitments.**

Based upon and subject to the terms and conditions set forth in this commitment letter (the "Commitment Letter"), the Summary Terms and Conditions attached hereto as Appendix A (the "Term Sheet") and the fee letter of even date herewith (the "Fee Letter", and together with the Commitment Letter and the Term Sheet, the "Commitment"), CIT is pleased to advise you of its commitment to provide up to $2,000,000 of the Senior Revolving Credit Facility and to act as the administrative agent and collateral agent in respect thereof, and Churchill is pleased to advise you of its commitment to replace its Revolving Loan Commitment (as defined in the Pre-Petition Credit Agreement) provided for in the Pre-Petition Credit Agreement with a commitment to provide up to $1,000,000 of the Senior Revolving Credit Facility, in each case, on the terms and conditions set forth in the Loan Documentation (as defined below).  CIT will act as the sole administrative agent and sole collateral agent for the Senior Revolving Credit Facility.  You agree that no other agents or arrangers will be appointed, and no other titles or compensation (other than as set forth in the Fee Letter) will be awarded or paid, in connection with the Senior Revolving Credit Facility unless approved by the Commitment Parties.  The commitment of each Commitment Party is several and neither Commitment Party shall be obligated to fund its commitment if the other Commitment Party does not fund its commitment.

The proceeds of loans made under the Senior Revolving Credit Facility may only be used for the purposes described in the Use of Proceeds section of the Term Sheet.

In consideration of the commitments and agreements of the Commitment Parties hereunder, you agree to pay the nonrefundable fees described in the Term Sheet and the Fee Letter.

2.      **Conditions.**

The Commitment does not set forth all of the terms and conditions of the proposed financing; rather, it only summarizes the major points of understanding which will be the basis of the final financing agreements and related documentation (which are collectively referred to herein as the "Loan Documentation") which will be drafted by, and will be in form and substance satisfactory to, the Commitment Parties and their counsel.  All terms used in this Commitment Letter and not otherwise defined herein shall have the meanings ascribed to them in the Term Sheet.

The Commitment is issued by the Commitment Parties based upon the financial and other information regarding the Ramsey Companies previously provided to the Commitment Parties. Accordingly, the Commitment and the structure and terms of the Senior Revolving Credit Facility set forth in the Term Sheet are subject to the fulfillment to the satisfaction of the Commitment Parties of the following conditions (in addition to those set forth in the Term Sheet):  (i) an order of confirmation of the Plan has been entered, (ii) there shall not have occurred after December 18, 2009 any event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Ramsey Companies, taken as a whole; (iii) the Commitment Parties shall not become aware of any information or other matter (including new or updated financial information or projections) concerning the Ramsey Companies that differs from, or is inconsistent with, the information previously provided to the Commitment Parties by or on behalf of the Ramsey Companies in any

material respect, as determined by the Commitment Parties and (iv) there shall not be any pending or threatened litigation or other proceedings (private or governmental) with respect to any of the transactions contemplated hereby.

3.   **Information.**

You hereby represent and covenant that (i) all information, other than financial information and projections ("Projections"), which has been or is hereafter made available to the Commitment Parties by or on behalf of the Ramsey Companies or their representatives in connection with the transactions contemplated hereby ("Information") is or, when furnished, will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (ii) the Projections that have been or will be made available to Commitment Parties have been and will be prepared in good faith based upon assumptions that are reasonable at the time made and at the time made available to the Commitment Parties.  You hereby agree to supplement the Information and the Projections from time to time and to promptly advise the Commitment Parties of all developments materially affecting the Ramsey Companies, any of their respective affiliates or the transactions contemplated hereby until the closing date of the Senior Revolving Credit Facility so that the representation and warranty in the preceding sentence is correct on the closing date of the Senior Revolving Credit Facility.  In structuring and entering into the Senior Revolving Credit Facility, the Commitment Parties will be using and relying on the Information and the Projections without independent verification thereof.

4.   **Indemnity and Expenses.**

The Ramsey Companies jointly and severally agree (a) to indemnify and hold harmless each Revolving Lender and their respective affiliates and controlling persons and the respective officers, directors, employees, agents, attorneys, members and successors and assigns of each of the foregoing (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter (including the Term Sheet), the Fee Letter, the Senior Revolving Credit Facility or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto, and to reimburse each such Indemnified Person upon demand for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnified Person, and (b) to reimburse each Indemnified Person from time to time, upon presentation of a summary statement, for all reasonable out-of-pocket expenses (including but not limited to expenses of the Commitment Parties' due diligence investigation, travel expenses, reasonable fees, disbursements and other charges of counsel to the Commitment Parties), in each case incurred in connection with the Senior Revolving Credit Facility and the preparation of this Commitment Letter, the Fee Letter, the Loan Documentation and any security arrangements in connection therewith and the administration, amendment, modification or waiver thereof (or any proposed

amendment, modification or waiver thereof), whether or not the closing date occurs for the Senior Revolving Credit Facility or any Loan Documentation is executed and delivered or any extensions of credit are made under the Senior Revolving Credit Facility. Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for (i) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnified Person or (ii) any indirect, special, punitive or consequential damages in connection with its activities related to the Senior Revolving Credit Facility.

5.     **Other Services.**

You acknowledge that the Commitment Parties and their affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other persons in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. You also acknowledge that neither the Commitment Parties nor any of their affiliates have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

You hereby agree that, on or after the closing of the Senior Revolving Credit Facility, Agent or any of its affiliates may place "tombstone" advertisements (which may include any of the Ramsey Companies' trade names or corporate logos and a brief description of the Senior Revolving Credit Facility and the transactions contemplated by this Commitment Letter) in publications or other media of their choice (including without limitation "e-tombstones" published or otherwise circulated in electronic form and related hyperlinks to the Ramsey Companies' corporate website) at Agent's own expense. In addition, Agent may disclose the information about the Senior Revolving Credit Facility and the transactions contemplated by this Commitment Letter to market data collectors and similar service providers to the financing community.

6.     **Confidentiality.**

This Commitment Letter is delivered to you on the understanding that none of this Commitment Letter, the Term Sheet or the Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) to your respective officers, employees, attorneys, accountants and advisors on a confidential and need-to-know basis, and (b) as required by applicable law or compulsory legal process, including without limitation any filings with the Bankruptcy Court (in which case you agree to inform the Commitment Parties promptly thereof); provided, however, that such disclosure shall be made only on the condition that such matters may not, except as required by law, be further disclosed. Except as permitted above, none of this Commitment Letter, the Term Sheet or the Fee Letter nor any of their terms or substance shall be disclosed by the Ramsey Companies directly or indirectly to any other potential source of financing without the prior written consent of the Agent. No person, other than the parties hereto, is entitled to rely upon this Commitment Letter or any of its contents or have any beneficial or legal right, remedy, or claim hereunder. No person shall, except as required by law,

use the name of, or refer to, Agent, or any of its affiliates, in any correspondence, discussions, press release, advertisement or disclosure made in connection with the Senior Revolving Credit Facility without the prior written consent of Agent.

7.    **Survival.**

The compensation, reimbursement, expense, indemnification, confidentiality, governing law, forum and waiver of jury trial provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or CIT's or Churchill's commitment hereunder.

8.    **Assignments; Amendments; Governing Law, Etc.**

The Commitment shall not be assignable by you without the prior written consent of the Commitment Parties. The Commitment is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or to create any rights in favor of, any person other than the parties hereto (and Indemnified Persons) and you agree that it does not create a fiduciary relationship among the parties hereto. CIT and Churchill may assign their respective commitments hereunder to any of their affiliates or any Pre-Petition Lender (or their respective successors or assigns). Any such assignment to an affiliate will not relieve CIT or Churchill, as applicable, from any of its obligations hereunder unless and until such affiliate shall have funded the portion of the commitment so assigned. Any assignment to a Pre-Petition Lender (or their respective successors or assigns) shall release CIT or Churchill, as applicable, from the portion of its commitment hereunder so assigned. Any and all obligations of, and services to be provided by, CIT or Churchill hereunder (including, without limitation, CIT's or Churchill's commitment) may be performed and any and all rights of CIT or Churchill hereunder may be exercised by or through any of their affiliates or branches. THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT OR THE PERFORMANCE OF SERVICES HEREUNDER.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the transactions contemplated hereby in any New York State or in any

such Federal court and (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

This Commitment Letter, together with the Term Sheet and the Fee Letter, embodies the entire understanding among the parties hereto relating to the matters discussed herein and therein and supersedes all prior discussions, negotiations, proposals, agreements and understandings, whether oral or written, relating to the subject matter hereof and thereof. No course of prior conduct or dealings between the parties hereto, no usage of trade, and no parole or extrinsic evidence of any nature, shall be used or be relevant to supplement, explain or modify any term used herein. Any modification or waiver of the Commitment or the terms hereof must be in writing, must be stated to be such and must be signed by an authorized representative of each party hereto.

9.      **Patriot Act.**

Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Ramsey Companies and each Guarantor (as defined in the Term Sheet), which information includes names and addresses and other information that will allow such Lender to identify the Ramsey Companies and each Guarantor in accordance with the Patriot Act.

10.      **Acceptance of Commitment; Termination.**

If you wish to accept the Commitment, please return executed counterparts of this Commitment Letter, the Fee Letter and an order of the Bankruptcy Court authorizing the Ramsey Companies to execute and deliver this Commitment, to CIT on or before 5:00 p.m., New York City time, on March 23, 2010; otherwise, the offer set forth herein shall automatically terminate on such date and time and be of no further force or effect. In the event that (i) at 5:00 P.M. Eastern Time on May 6, 2010 if a disclosure statement consistent with the Plan and this Term Sheet shall not have been approved by the Bankruptcy Court on or before such date, (ii) at 5:00 P.M. Eastern Time on June 30, 2010 if the Bankruptcy Court has not entered an order confirming the Plan on or before such date (the "Plan Confirmation Date") or (iii) at 5:00 P.M. Eastern Time on the 30th day after the Plan Confirmation Date, unless on or before such date substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan shall have occurred, then this Commitment Letter and CIT's and Churchill's commitment and undertakings hereunder shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension. Before such date, the Commitment Parties may terminate this Commitment Letter if any event occurs or information becomes available that, in their judgment, results or is likely to result in the failure to satisfy any condition precedent set forth or referred to herein or in the Term Sheet or the other exhibits hereto.

This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission shall be effective as a delivery of a manually executed counterpart of this Commitment Letter.

Very truly yours,

CIT LENDING SERVICES CORPORATION

By: _____
    Name: Carmen Cesareno
    Title: Vice President

CHURCHILL FINANCIAL CAYMAN LTD.

By: _____
    Name:
    Title:

31940953.DOC

This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission shall be effective as a delivery of a manually executed counterpart of this Commitment Letter.

Very truly yours,

CIT LENDING SERVICES CORPORATION

By:_____
    Name:
    Title:

CHURCHILL FINANCIAL CAYMAN LTD.
By: Churchill Financial LLC, as its Collateral Manager

By:_____
    Name: DAVID NORTHRUP
    Title: VICE PRESIDENT

31940953.DOC

**The Foregoing Is Hereby Accepted And
Agreed To In All Respects By The Undersigned:**

RAMSEY HOLDINGS, INC.

By: _____
    Name: John R. Celoni, Jr.
    Title: President & CEO

RAMSEY INDUSTRIES, INC.

By: _____
    Name: John R. Celoni, Jr.
    Title: President & CEO

RAMSEY WINCH COMPANY

By: _____
    Name: John R. Celoni, Jr.
    Title: President & CEO

AUTO CRANE COMPANY

By: _____
    Name: John R. Celoni, Jr.
    Title: President & CEO

ESKRIDGE, INC.

By: _____
    Name: John R. Celoni, Jr.
    Title: President & CEO

FOR SETTLEMENT PURPOSES
SUBJECT TO FRE 408

APPENDIX A

SUMMARY TERMS AND CONDITIONS

[Newco, LLC]
Ramsey Holdings, Inc.
Ramsey Industries, Inc.
Ramsey Winch Company
Auto Crane Company
Eskridge, Inc.

March 23, 2010

$3,000,000 Senior Revolving Credit Facility

*The Summary Terms and Conditions outlined below is the "Term Sheet" referred to in the Commitment Letter, dated March 23, 2010, from CIT and Churchill Financial Cayman Ltd. to Ramsey Holdings, Inc., Ramsey Industries, Inc., Ramsey Winch Company, Auto Crane Company and Eskridge, Inc. (the "Commitment Letter"). Terms used in this Term Sheet without definition have the meanings assigned to such terms in the Commitment Letter or in the Pre-Petition Credit Agreement, as applicable.*

| | |
|---|---|
| **Borrowers:** | Ramsey Industries, Inc. ("Ramsey"), Ramsey Winch Company ("Ramsey Winch"), Auto Crane Company ("Auto Crane") and Eskridge, Inc. ("Eskridge" and, together with Ramsey, Ramsey Winch and Auto Crane, the "Borrowers"). Ramsey shall be a wholly-owned subsidiary of Ramsey Holdings, Inc. ("Intermediate Holdings"), which shall be a wholly-owned subsidiary of a newly formed Delaware limited liability company ("Holdings"). Ramsey Winch, Auto Crane and Eskridge shall be wholly-owned subsidiaries of Ramsey. |
| **Guarantors:** | Intermediate Holdings and all present and future direct or indirect domestic subsidiaries of the Borrowers or Holdings that are not Borrowers. The Senior Revolving Credit Facility will be fully and unconditionally guaranteed on a joint and several basis by all Guarantors. |
| **Agent:** | CIT Lending Services Corporation ("CIT"), as administrative agent and collateral agent. |

31940953.DOC

Summary Terms and Conditions

| | |
|---|---|
| **Revolving Lenders:** | CIT and Churchill Financial Cayman Ltd.   Each Revolving Lender's commitment shall be several not joint. |
| **Pre-Petition Lenders:** | The lenders party to that certain Credit Agreement dated as of April 5, 2007 (as amended, supplemented or otherwise modified prior to the date hereof, the "Pre-Petition Credit Agreement") by and among the Borrowers, the lenders party thereto and CIT, as administrative agent and collateral agent. |
| **Senior Revolving Credit Facility:** | Senior secured revolving credit facility pursuant to which advances ("Revolving Loans") may be made to the Borrowers in an aggregate amount not to exceed $3,000,000 at any time outstanding. |
| **Closing Date:** | The date on which all conditions precedent have been satisfied or waived. |
| **Interest Rate:** | Interest on amounts outstanding under the Senior Revolving Credit Facility shall be payable in cash on a monthly basis on the last day or each month at a rate per annum equal to the Adjusted LIBO Rate plus the Applicable Rate of 500 basis points.  The Adjusted LIBO Rate will have a floor of 2%.  The default rate of interest shall be equal to 2% per annum above the rate set forth above in accordance with the terms of the Pre-Petition Credit Agreement. |
| **Maturity Date:** | October 31, 2013. |
| **Availability:** | Amounts under the Senior Revolving Credit Facility may be borrowed, repaid and reborrowed from the Closing Date until five business days before the Maturity Date.  The amount of the advance made under the Senior Revolving Credit Facility on the Closing Date shall not exceed the amount set forth in the 13-Week Cash Flow Forecast.  If an Event of Default is continuing under the Credit Agreement and the Revolving Lenders agree in their sole discretion to continue lending to the Borrowers at the Borrowers' request (or permit the use of cash collateral, at the Borrowers' request) then the Revolving Lenders will not impose as a condition to any such lending (or use of cash collateral) that the Borrowers forego payment of interest due and owing on the Term Loan (as defined below). |
| **Borrowing Base:** | All advances under the Senior Revolving Credit Facility will be subject to a Borrowing Base formula substantially similar to the Borrowing Base formula set forth in the Pre-Petition Credit Agreement.  Standards of eligibility may be fixed and revised from |

31940953.DOC

2

time to time solely by the Agent in the Agent's judgment exercised in good faith in accordance with credit policies customary for a secured lender.

**Fees:**

An unused line fee at a rate per annum equal to 0.25% shall be payable on the daily unutilized portion of the Senior Revolving Credit Facility.  Such fee will be payable monthly in arrears on the last day of each month and on the date of termination of the Senior Revolving Credit Facility commitment.

An Upfront Fee of $100,000, which shall be fully earned on the Closing Date, shall be paid to the Agent for distribution to the Revolving Lenders on a pro rata basis as follows: (i) $50,000 shall be paid on the Closing Date (which may be paid using the proceeds of Revolving Loans borrowed on the Closing Date to the extent provided for in the 13-Week Cash Flow Forecast, which shall include $50,000 of the Upfront Fee) and (ii) $50,000 shall be paid on the 6 month anniversary of the Closing Date.

The other fees are set forth in the Fee Letter.

**Use of Proceeds:**

The proceeds of advances made under the Senior Revolving Credit Facility may only be used (subject to the terms and conditions of the Credit Agreement): (i) to fund ongoing working capital requirements; and (ii) for general corporate purposes. Notwithstanding the foregoing, the proceeds of the advance made under the Senior Revolving Credit Facility on the Closing Date may only be used for those expenditures and in the amounts, in each case, set forth in the 13-Week Cash Flow Forecast.

**Cash Management:**

Borrowers shall implement cash management procedures satisfactory to the Agent, including lock box procedures and blocked account agreements that will provide for full dominion and automatic daily sweeps into a bank account designated and controlled by the Agent (the "Agent's Account").  Collections shall be applied to reduce the outstanding balance of Revolving Loans to $0.  Once the outstanding balance of Revolving Loans has been reduced to $0, any excess shall be remitted to one of the Borrowers' bank accounts (which shall be subject to a control agreement in favor of the Agent) one business day following the Agent's receipt of good funds in the Agent's Account.

## CERTAIN PAYMENT TERMS

## Optional

Summary Terms and Conditions

**Prepayment:**

The Borrowers may repay the Revolving Loans under the same circumstances as set forth in the Pre-Petition Credit Agreement. A repayment fee shall not be charged in connection therewith.

**Mandatory
Prepayment:**

The Borrowers will be required to make mandatory prepayments under the same circumstances as set forth in the Pre-Petition Credit Agreement except that in the event the Borrowers sell one or more of their facilities in connection with their facilities consolidation plan then the net cash proceeds thereof shall be applied to the Term Loan in inverse order of maturity and the Borrowers shall not have any reinvestment rights with respect thereto.

**Application of
Prepayments:**

Once all outstanding Revolving Loans have been paid in full, prepayments, whether optional or mandatory, shall be applied to the prepayment of the Term Loan until the outstanding principal amount of the Term Loan has been reduced to $0.

**COLLATERAL**

The Senior Revolving Credit Facility will be secured by a perfected first priority security interest in all of the assets of the Ramsey Companies on a pari passu basis with the Term Loan, except that during the continuance of an Event of Default, the proceeds from any sale or other disposition of, realization upon or receipt of proceeds from any of the Collateral shall be applied to the repayment of the loans and other amounts outstanding under the Senior Revolving Credit Facility prior to the repayment of any Term Loans.

## CERTAIN CONDITIONS

**Conditions
Precedent:**

Closing will be subject to the satisfaction of all conditions precedent deemed necessary or appropriate by Agent and Consenting Lenders, including but not limited to the following:

-       Execution and delivery by the Borrowers, the Guarantors, the Agent and the Consenting Lenders of a definitive credit agreement ("Credit Agreement"), related security agreement(s), guarantees, pledge agreements, mortgages, assignment agreements and all other agreements, instruments, certificates and documents reasonably requested by the Agent and Consenting Lenders. Such Credit Agreement and all other agreements, instruments, certificates and documents entered into in connection with the transactions contemplated by this Term Sheet, including

Summary Terms and Conditions

the Holdings LLC Agreement and the Management Incentive Plan (collectively, the "Loan Documents" shall be in form and substance satisfactory to the Agent, the Consenting Lenders and the Borrowers;

- Substantial consummation of the Ramsey Companies' plan of reorganization (including all exhibits, schedules and annexes thereto) (the "Plan"); the Plan, the treatment of claims contained therein, the related confirmation order, and all agreements and other documents entered into in connection with the Plan, shall be in form and substance reasonably satisfactory to the Transaction Parties (defined below);

- Notwithstanding anything to the contrary contained herein, the structure of the transactions contemplated by this Term Sheet, including, without limitation, all tax aspects of the structure of the transactions contemplated herein, shall be in form and substance satisfactory to the Transaction Parties;

- The Agent and Consenting Lenders shall have received and be satisfied with (i) unaudited financial statements for each quarterly and monthly period ending after December 31, 2009 for Intermediate Holdings and its subsidiaries on a consolidated and consolidating basis, and (ii) the audited balance sheet of Intermediate Holdings and its subsidiaries as at the Closing Date;

- The Agent and Consenting Lenders shall have received a 13-week cash flow forecast ("13-Week Cash Flow Forecast"), in form and substance satisfactory to the Agent, including information pertaining to accounts receivables, inventory and accounts payable.

- The Borrowers shall have no debt that will survive the closing of the Credit Agreement other than (i) the debt under the Credit Agreement, (ii) other scheduled debt, which may include certain capital leases and other customary obligations, existing on the Closing Date and approved by the Agent and (iii) deferred payment obligations under the Plan;

- The Agent or its affiliates shall have completed a field examination of the Borrowers' assets, liabilities, cash management system, book and records, and the results of

such field examination shall be reasonably satisfactory to the Agent in all respects;

- The Agent and Consenting Lenders shall have received and be satisfied with the Borrowers' insurance policies, including endorsements in favor of the Agent with respect thereto;

- The Agent shall have received evidence of a valid and perfected first priority security interest in the Collateral in favor of the Agent;

- The Agent shall have received UCC and other applicable lien search reports satisfactory to the Agent;

- Any governmental and third party approvals necessary in connection with the transactions contemplated by this Term Sheet shall have been obtained and be in full force and effect, and all waiting periods shall have expired without any action being taken or threatened by any authority that would restrain or otherwise impose adverse conditions on the transactions contemplated by this Term Sheet;

- The Agent shall be satisfied that there has been no event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of Intermediate Holdings, the Borrowers and/or their subsidiaries, since December 18, 2009 (excluding any event or condition resulting from the Ramsey Companies' bankruptcy filing on such date);

- The Agent shall have received such legal opinions, secretary's certificates, closing certificates, solvency certificates, good standing certificates, certified organizational documents, resolutions and other documents and instruments as are customary for transactions of this type or as it may reasonably request;

- Receipt of all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act and OFAC;

&ndash; With respect to each parcel of real estate owned by the Borrowers or a Guarantor on which the Consenting Lenders will have a first priority lien, Agent's receipt of, and satisfaction with, (i) title insurance issued by a title insurance company reasonably satisfactory to Agent and (ii) if required by the Agent, a survey prepared by independent licensed land surveyor reasonably satisfactory to Agent, the costs of all of which shall be paid by the Borrowers;

&ndash; The entire amount of the Loans and other Obligations outstanding under the Pre-Petition Credit Agreement (including Obligations owing to a Term Loan Lender (as defined below) under or in connection with existing Swap Agreements) in excess of $50,000,000 shall have been converted into the equity interests of Holdings, which after giving effect to such conversion and the other transactions contemplated by this Term Sheet, including the conversion of the entire amount of the Subordinated Indebtedness into the equity interests of Holdings, shall equal 100% of the Class A equity interests of Holdings.  Each Term Loan Lender shall receive a pro rata portion of such equity interests of Holdings based on the aggregate amount of the Loans and other Obligations owing to such Term Loan Lender (including Obligations under or in connection with existing Swap Agreements) on the Closing Date.  The equity interests of Holdings issued to the Term Loan Lenders may be comprised of voting and non-voting equity interests;

&ndash; The entire amount of the Subordinated Indebtedness shall have been converted into a specified amount of the equity interests of Holdings as set forth below, upon terms and conditions and pursuant to documentation, in each case, satisfactory to the Agent, the Lenders (as defined below) constituting at least a majority in number of all Lenders and holding at least two-thirds of the outstanding amount of the Loans and other Obligations outstanding under the Pre-Petition Credit Agreement (including Obligations owing to a Lender under or in connection with existing Swap Agreements) who have consented to the terms hereof (the "Consenting Lenders"), the Borrowers, Gridiron Capital ("Gridiron") and the holders of the Subordinated Indebtedness (the "Subordinated Lenders" and, together with the Agent, the Consenting Lenders, the Borrowers and Gridiron, the "Transaction Parties");

      –    After giving effect to the transactions contemplated by this Term Sheet, the Lenders shall own 100% of the Class A equity interests of Holdings, the current equity holders of Intermediate Holdings (including Gridiron) ("Existing Equity") shall own 100% of the Class C equity interests of Holdings and the Subordinated Lenders shall own 100% of the Class B equity interests of Holdings, in each case as set forth in the Capitalization Table attached to the LLC Term Sheet as Schedule A;

      –    The management agreement with Gridiron shall have been terminated at the Closing Date and the Loan Documents shall reflect that any such accrued but unpaid fees shall be waived by Gridiron at such time. No management or other fees shall be due or payable to Gridiron;

      –    The Management Incentive Plan shall reflect the terms and conditions (including payment conditions and amounts) contained in the Preliminary Summary of Terms and Conditions of Management Incentive Plan for NewCo LLC and Holdings and its Subsidiaries attached hereto as Exhibit A with such modifications as may be agreed to by the Borrowers, the Agent and Consenting Lenders;

      –    The Borrowers shall have paid all of the fees and expenses (including reasonable fees and expenses of counsel) of the Agent, Gridiron and the Subordinated Lenders incurred in connection with this Term Sheet and the transactions contemplated hereby; provided, that (a) the Borrowers shall not be responsible for the payment of any fees and expenses of Gridiron and the Subordinated Lenders in excess of $720,000 and (b) the fees and expenses of Gridiron and the Subordinated Lenders shall not be paid earlier than 120 days after the Closing Date and shall be paid on a monthly agreed upon basis thereafter. These fees shall be paid pro-rata between Gridiron and AEA ($486,274 and $233,726, respectively) in accordance with previously provided estimates pro-rated to the $720,000 maximum and in accordance with the Plan; and

      –    The Borrowers shall have paid the accrued expenses, not to exceed $50,000 in the aggregate, of the members of the boards of directors being replaced on the Closing Date.

**Conditions to**

**Extensions of Credit:**   The making of each extension of credit shall be subject to conditions based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders.

## CERTAIN DOCUMENTATION MATTERS

**Representations and Warranties:**   The Credit Agreement will contain representations and warranties based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders, including a representation that the value of the Borrowers' inventory has not been written down to less than fair market value and a representation that Holdings and Intermediate Holdings have not and will not engage in any business activities and have not had and will not have any assets or other holdings, other than the equity ownership interests of Ramsey (in the case of Intermediate Holdings) or Intermediate Holdings (in the case of Holdings).

**Reporting:**   In addition to the reporting requirements set forth in the Pre-Petition Credit Agreement, the Borrowers shall deliver to the Agent for distribution to the Lenders on a weekly basis, a rolling 13-week cash flow forecast, in form and substance satisfactory to the Agent, including (i) information pertaining to accounts receivables, inventory and accounts payable and (ii) a comparison of the actual results for such calendar week with the corresponding forecast. The Borrowers shall also provide the quarterly and monthly reporting as set forth on Schedule B attached hereto and other such other reporting as may be reasonably requested by the Agent or Consenting Lenders.

**Inspections:**   The Credit Agreement will contain inspection, examination and audit provisions substantially similar to those set forth in the Pre-Petition Credit Agreement, except that the Agent and Required Lenders may exercise their rights to visit, inspect, examine, audit, etc. once per quarter at the Borrowers' expense (or as often as the Agent or Required Lenders may request upon the occurrence and during the continuance of an Event of Default).

**Covenants:**   The Credit Agreement will contain affirmative and negative covenants based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders, including covenants by the Borrowers that (i) the value of the Borrowers' inventory shall not be written down to less than fair

31940953.DOC

9

market value, (ii) the Agent and Required Lenders shall have the right to take such actions from time to time as the Agent deems reasonably necessary to verify and confirm compliance with the aforementioned covenant, (iii) to the extent it is believed by the Agent, after consultation with the Borrowers, that any inventory has been written down to less than fair market value, then the Agent may object and consult with an independent appraiser and the auditor of the Borrowers, with the cooperation of the Borrowers, to determine in good faith the fair market value of such inventory and (iv) if it is determined based upon the aforementioned review that any inventory was written down below fair market value, the excess contribution margin realized upon the sale of such inventory shall be excluded from EBITDA.

**Financial Covenants:**

The Credit Agreement will contain only the following financial covenants:

a) <u>Maximum CAPEX</u>:  Amounts and the definition of Restructuring/Consolidation Capex are set forth on Schedule A attached hereto.  The definition of normal course Capex shall be consistent with the definition of Capital Expenditures in the Pre-Petition Credit Agreement.

With respect to Maximum Normal Capex as shown on Schedule A, if the amount of Capital Expenditures made in any Fiscal Year is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in the first two fiscal quarters of the following Fiscal Year.

With respect to Restructuring/Consolidation Capex as shown on Schedule A, if the amount of Capital Expenditures made in Fiscal Year 2010 is less than the amount permitted to be made in such Fiscal Year, the unused amount may be carried forward for use in Fiscal Year 2011.

b) <u>Minimum EBITDA:</u>  Amounts and the definition of EBITDA are set forth on Schedule A attached hereto.  Compliance will be tested on the last day of each calendar quarter commencing December 31, 2010 on a trailing twelve month basis.

c) <u>Minimum FCC</u>:  Ratios and the definition of Fixed Charge Coverage Ratio are as set forth on Schedule A attached hereto.

**Accounting:**

If the Borrowers adopt fresh start accounting, the Borrowers and the Consenting Lenders will negotiate in good faith to adjust the covenant levels set forth on Schedule A attached hereto, if any

adjustment is needed, such that they conform to the projections and cushions utilized in determining the covenant levels set forth on Schedule A attached hereto.

**Events of Default:** The Credit Agreement will contain Events of Default based upon those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be agreed upon by the Borrowers, the Agent and the Consenting Lenders.

**Costs, Fees and Expenses:** The Credit Agreement will contain provisions regarding the Borrowers' payment of the Agent's and Lenders' costs, fees and expenses substantially similar to those set forth in the Pre-Petition Credit Agreement.

**Indemnification:** The Credit Agreement will contain indemnification provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders.

**Participation and Assignment:** The Credit Agreement will contain participation and assignment provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders.

**Required Lenders:** Lenders holding at least (i) 51% of the Term Loan exposure and (ii) 51% of the Revolving Loan exposure or Revolving Loan commitments; provided, that so long as there are only 2 Revolving Lenders, the consent of both Revolving Lenders shall be necessary to satisfy clause (ii) above.

**Amendments and Waivers:** Subject to approval of Required Lenders, except that all affected Lenders must consent to increases in commitment amounts, reductions in principal, interest and fees, extensions of maturities and release of substantially all of the guarantors and collateral.

**Yield Protection:** The Credit Agreement shall contain yield protection provisions substantially similar to those set forth in the Pre-Petition Credit Agreement with such modifications or additions as may be requested by the Agent or Consenting Lenders.

**Management Incentive**

31940953.DOC

11

| | |
|---|---|
| **Plan:** | The Credit Agreement will permit, and the Required Lenders will not object if the Borrowers pay the amounts set forth in the Management Incentive Plan in accordance with the terms thereof. |
| **Governing Law and Jurisdiction:** | New York. |
| **Waiver of Jury Trial:** | The Credit Agreement will contain waiver of jury trial provisions substantially similar to that contained in the Pre-Petition Credit Agreement. |
| **Agent's Counsel:** | Kaye Scholer LLP. |
| **Borrowers' Counsel:** | GableGotwals. |
| **Certain Defined Terms:** | "Lenders" means, collectively, the Term Loan Lenders and the Revolving Lenders. |
| | "LLC Term Sheet" means the Preliminary Summary of Terms and Conditions of a Limited Liability Company Agreement in respect of Debt Restructuring/Recapitalization of Ramsey Holdings, Inc. dated on or about the date hereof and prepared by Kaye Scholer LLP. |
| | "Term Loan" means the $50,000,000 term loan under the Credit Agreement. |
| | "Term Loan Lenders" means, collectively, the Pre-Petition Lenders and each affiliate of a Pre-Petition Lender that was a counterparty to a Swap Agreement. |